## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SZ DJI TECHNOLOGY CO., LTD.,
Lobby of T2, DJI Sky City, No. 53 Xianyuan Road, Xili
Community, Xili Street, Nanshan District, Shenzhen, PRC,

Plaintiff,

- v -

U.S. DEPARTMENT OF DEFENSE,
1400 Defense Pentagon, Washington, D.C. 20301,

LLOYD J. AUSTIN III, in his official capacity as
SECRETARY OF THE UNITED STATES
DEPARTMENT OF DEFENSE,
1000 Defense Pentagon,
Washington, D.C. 20301,

LAURA D. TAYLOR-KALE, in her official capacity as
ASSISTANT SECRETARY OF DEFENSE FOR
INDUSTRIAL BASE POLICY,
3010 Defense Pentagon,
Washington, D.C. 20301,

Defendants.

Index No.

**COMPLAINT**

Plaintiff SZ DJI Technology Co., Ltd. ("DJI"), by and through its undersigned counsel, hereby files this Complaint against Defendants, the U.S. Department of Defense ("DoD"), Lloyd J. Austin III, in his official capacity as Secretary of Defense, U.S. Department of Defense, and Laura D. Taylor-Kale, in her official capacity as Assistant Secretary of Defense for Industrial Base Policy, alleging as follows:

## INTRODUCTION

1.      DJI is the largest privately owned seller of consumer and commercial drones, which are used by police departments, fire departments, other first responders, large and small companies, and hobbyists throughout the United States and the world.  This

lawsuit challenges DoD's decision to designate DJI as a "Chinese Military Company" ("CMC") despite the fact that DJI is neither owned nor controlled by the Chinese military, and, as DoD acknowledges, sells only "consumer and commercial"—not military—drones.

2.      DJI, through outside counsel, sought to engage with DoD over more than a 16-month period to understand the rationale for DJI's designation, obtain the administrative record, and provide DoD with facts demonstrating that DJI is not a CMC under the statutory criteria.  On July 27, 2023, DJI filed a comprehensive delisting petition establishing that DoD was required to remove DJI from the CMC List pursuant to its statutory duty to "make . . . deletions" from the List "on an ongoing basis based on the latest information available."

3.      Despite those efforts, DoD refused to meaningfully engage, declining to provide its rationale for DJI's designation and ignoring DJI's requests for a meeting.  Then, without notice, on January 31, 2024, DoD redesignated DJI.  On September 6, 2024, DJI, having determined that it had no other reasonable option available, informed DoD that it planned to seek judicial relief.  Only then did DoD produce a "courtesy copy" of an internal report (the "Report") that it described as containing the full rationale for DJI's designation.

4.      The Report, dated November 2023, contains a scattershot set of claims that are wholly inadequate to support DJI's designation.  Among numerous deficiencies, the Report applies the wrong legal standard, confuses individuals with common Chinese names, and relies on stale alleged facts and attenuated connections that fall far short of demonstrating that DJI is a CMC.  The Report reveals that DJI was designated through a "deeply flawed" designation process.  *Xiaomi Corp.* v. *Dep't of Def.*, Civ. No. 21-280, 2021 WL 950144 (D.D.C. Mar. 12, 2021).

5.     As a result of DJI's designation, which branded the company a national security threat, DJI has suffered ongoing financial and reputational harm, including lost business, and DJI employees have been stigmatized and harassed.

6.     DoD's designation of DJI and its failure to remove DJI from the CMC List violates the law and DJI's due-process rights.  This Court should set aside, enjoin, and declare unconstitutional those actions under the Administrative Procedure Act and the U.S. Constitution.

## JURISDICTION AND VENUE

7.     This Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1331 (federal-question jurisdiction) and § 2201 (the Declaratory Judgment Act).

8.     This Court has the authority to grant declaratory and injunctive relief under 28 U.S.C. §§ 2201 *et seq.* (the Declaratory Judgment Act), 5 U.S.C. §§ 701 *et seq.* (the Administrative Procedure Act) ("APA"), and the equitable power.

9.     Venue is proper under 28 U.S.C. 1391(b) and (e) as this is a civil action in which Defendants are federal agencies and officers acting in their official capacities, and a substantial part of the events giving rise to these claims occurred in the District of Columbia, and Defendants reside in this district.

## PARTIES

10.     Plaintiff SZ DJI Technology Co., Ltd. is a privately owned and operated company headquartered in Shenzhen, China, with offices throughout Asia, Europe, and the United States.  The company's products are used by consumers worldwide.  It has several U.S. subsidiaries that have more than 150 employees and service Unmanned Aerial Vehicles ("UAVs" or drones) sold in North America.

11.     Defendant Department of Defense ("DoD") is a department of the Executive Branch of the United States Government and an executive agency within the meaning of 5 U.S.C. § 551(1).  DoD is responsible for publishing and maintaining the CMC List according to the designation criteria in Section 1260H of the FY2021 National Defense Authorization Act.  *See* Pub. L. No. 116-283.

12.     Defendant Lloyd J. Austin III is the Secretary of Defense.  In that capacity, he oversees the functions of DoD, including the maintenance of the CMC List.  He is sued in his official capacity.

13.     Defendant Laura D. Taylor-Kale is the Assistant Secretary of Defense for Industrial Base Policy.  In that capacity, she manages the processes for the designation of entities on the CMC List and the removal of entities from the CMC List.  She is sued in her official capacity.

## FACTS

### A.    DJI's History and Business

14.     DJI is the largest consumer and commercial drone company, supplying the majority of drones in those markets worldwide.

15.     Generally speaking, drones are un-piloted aircraft, but great variation exists within that broad definition.[1]  On one end of the spectrum are consumer drones, which are similar to "remote controlled aerial cameras" powered by rechargeable batteries.[2] On the other end are military drones, which usually "resemble fixed-wing aircraft" with an

---

[1]     *What is a Drone?*, FLYING (May 20, 2024), https://tinyurl.com/2dk9nhtj.

[2]     Craig Phillips, *A Drone by Any Other Name: The Different Kinds of Drones*, PBS (Apr. 27, 2017), https://tinyurl.com/3yr367jw.

"enormous wingspan," and "tend to be powered by gasoline or diesel engines[.]"[3]  As DoD acknowledges, DJI does not produce military drones.  Report at 4.

16.     DJI started in 2006 in its founder Frank Wang's university dorm room. Frank was an engineering student whose model drones impressed his professor Li Zexiang, who in turn provided Frank early stage funding for DJI.

17.     Henry Lu, Frank's family friend, managed the company's finances, and Swift Xie, Frank's high school friend, managed the company's marketing.  Today, Henry, Swift, and Professor Li remain the largest shareholders of DJI along with Frank.

18.     In 2012, DJI unveiled "Phantom," the first ready-to-fly consumer drone that "wouldn't break apart after its first crash."[4]  This was a watershed moment in consumer UAVs, and, in 2015, the Smithsonian's National Air & Space Museum acquired a replica of the drone for display.[5]  The consumer market embraced DJI products, so DJI kept developing and producing more.[6]

19.     Today, DJI produces the vast majority of UAVs for consumers and commercial enterprises.  Its products are widely available: they may be purchased online through retailers such as Amazon or at brick-and-mortar stores like Best Buy, Target, and Sam's Club.

---

[3]      *How are Military Drones Different from Commercial Drones?*, ZENADRONE, https://tinyurl.com/bd2d78ae (last visited Oct. 17, 2024); *see also What is a Drone*, *supra* note 1 (noting that some consumer ("personal") drones can be purchased for just $30 while Northrop-Grumman produces a military drone priced around $500 million).

[4]      Ryan Mac, Heng Shao & Franki Bi, *Bow To Your Billionaire Drone Overlord: Frank Wang's Quest To Put DJI Robots Into The Sky*, FORBES (May 24, 2015), https://tinyurl.com/49mtk7zc.

[5]      Arthur Holland Michel, *Drones in the National Air & Space Museum*, CTR. FOR THE STUDY OF THE DRONE AT BARD COLL. (Apr. 2, 2015), https://tinyurl.com/3wetxrst.

[6]      *Timeline of DJI Drones*, DRDRONE, https://tinyurl.com/2s483dx6 (last visited Oct. 17, 2024).

20.     DJI is the market leader in drone safety, which contributes to its products' global popularity.  DJI was the first major civilian UAV manufacturer to implement geofencing, a mechanism that prevents UAVs from entering into or taking off from restricted zones.  DJI determines restricted zones, including airports, power plants, and prisons, based on aviation and public safety, and works with local authorities to implement additional geofencing requests.  Since 2017, DJI has also offered governments and airports "AeroScope," a platform that can detect DJI UAVs in real time.  DJI is also the first UAV company to integrate ADS-B receivers on UAVs, allowing DJI users to detect crewed aircraft and avoid potential collisions.

21.     DJI understands the importance of data security and gives its users control over the data they generate.  DJI UAVs do not need to connect to the internet to operate. Following initial activation, DJI UAVs can be used entirely offline in "airplane mode." DJI also offers a "local data mode" that prevents any data from being transmitted to or from DJI's flight apps and servers, while allowing users to access the internet for particular purposes like map services.  Third-party consulting firms such as Booz Allen Hamilton, FTI Consulting, and Kivu Consulting have analyzed various DJI products and validated their security.[7]  So too have the U.S. Department of the Interior, the U.S. National Oceanic and Atmospheric Administration, the U.S. Department of Homeland Security, and DoD.[8]

---

[7]     *New Independent Audit Confirms Robust Privacy Controls Available To DJI Drone Operators*, VIEWPOINTS (Sept. 25, 2024), https://tinyurl.com/2sa8rycs; *New Independent Audit Finds No Evidence of Data Transmission to DJI, China, or Any Unexpected Party*, VIEWPOINTS (Dec. 9, 2021), https://tinyurl.com/yck2krwk (detailing the scope of these security evaluations and their findings).

[8]     More information about the scope of these security evaluations and their findings can be found at *New Independent Audit Finds No Evidence of Data Transmission to DJI, China, or Any Unexpected Party, supra* note 7; *see also* Chris Mills Robrigo & Maggie Miller, *Pentagon report clears use of drones made by top Chinese manufacturer*, The Hill (June 1, 2021, 4:26pm) https://tinyurl.com/p484ytbb ("An analysis of the two Da Jiang Innovations [DJI] drones built for government use found 'no malicious code or intent' and are 'recommended for use by government

**B.**     **Use of DJI's Products in the United States**

22.     In the United States, DJI UAVs have been used for years by government agencies, large corporations, small businesses, and hobbyists.

23.     ***Public Safety***. Police departments, fire departments, and other first responders in the United States frequently use DJI UAVs.  According to one study, 924 of the 1,030 public-safety agencies surveyed used DJI UAVs.[9]  DJI UAVs improve these agencies' public safety capabilities by, for example, enhancing response times, reducing operational costs, and improving decision-making by providing greater situational insight. "No other company's offerings come close to DJI's cheap, powerful drones, experts say—potentially leaving government agencies, police and first responders in the lurch if DJI is shut out."[10]

24.     DJI UAVs provide critical support to law enforcement, improving officer safety by enabling officers to more readily locate and apprehend criminals.[11]  For example, local law enforcement in Saginaw, Michigan used thermal imaging on a DJI UAV to arrest a burglary suspect.[12]  And in this context, no reasonable alternative exists to replace DJI drones.[13]

---

entities and forces working with US services.'").  The report was later disavowed without explanation in a subsequent press release.  *See* Department Statement on DJI Systems, U.S. Dep't of Defense (July 23, 2021), https://tinyurl.com/5yv4xerk.

[9]     *See* DAN GETTINGER, PUBLIC SAFETY DRONES, CTR. FOR THE STUDY OF THE DRONE AT BARD COLLEGE (March 2020) (3d ed. 2020).

[10]     Kaveh Waddell, *Searching for the next great American drone company*, AXIOS (Nov. 23, 2019), https://tinyurl.com/3j25m37v.

[11]     Kevin Severin, *Oklahoma City Police Sees Success with Drone Program*, FOX25 (Sept. 3, 2021, 5:53pm), https://tinyurl.com/mvzazshc.

[12]     Terry Camp, *Saginaw County Sheriff's Drone Pays Off with Arrest of Two Suspects*, ABC 12 NEWS (Nov. 22, 2021), https://tinyurl.com/mnjtc8u7.

[13]     *See* Marrian Zhou & Yigan Yu, *DJI to the rescue? U.S. police want China drones despite Washington clampdown*, NIKKEI ASIA (June 14, 2024), https://tinyurl.com/ynnsfrux ("U.S. drones

25.     Similarly, many first responders providing relief during natural disasters also employ DJI UAVs.  For example, relief teams in Tucson, Arizona; Bedford, Virginia; Niagara, Kentucky; Morristown, Tennessee; and Cranford, New Jersey, as well as others, have deployed DJI UAVs following tornadoes and flooding to view debris, assist homeowners, and determine the proper equipment needed to provide aid.[14]

26.     As the U.S. Government Accountability Office (GAO) described in a report last month, the Department of the Interior's decision to not use Chinese-made drones (which primarily affects DJI drones) has left its component bureaus with an insufficient number of drones to mount an acceptable response in critical emergency situations.[15] Competitor UAV companies simply do not provide products with the same functionality at the same (or any) price point, meaning many public and private entities use either DJI drones or no drones at all.[16]

---

cost three to four times more than Chinese models without offering even the same level of technology.").

[14]     Tucson Fire Department, X (Feb. 9, 2022), https://tinyurl.com/yuvefthf (Tucson, AZ fire department used DJI drone to find a cyclist that had crashed into cactus);  WDBJ7 Staff, *Rescuer Describes Discovery of Lost Hikers in Bedford*, WDBJ7 (Dec. 26, 2021, 2:54am), https://tinyurl.com/yrfbjady (describing use of a drone and thermal camera to locate two lost hikers); Marisa Patwa, *Drone Used to Locate 90-Year-Old Missing Niagara Man Who'd Been Trapped Under UTV for Three Days*, 44News (Aug. 20, 2021), https://tinyurl.com/phj6twa5 (reporting on the rescue of a 90-year-old man trapped under his wrecked car thanks to drone footage); Scott Barkley, *Tennessee association first to use drone in disaster relief*, Baptist Standard (Jan. 10, 2022), https://tinyurl.com/mrpafyp5 ("Morristown, TN's Nolachucky Baptist Association Disaster Relief used DJI drone to find missing teenager"); Miriam McNabb, *In NJ, Cranford Police Use Drones for Hurrican Ida Response and More*, DRONE LIFE (Dec. 10, 2021), https://tinyurl.com/2zamuusa.

[15]     GOVERNMENT ACCOUNTABILITY OFFICE, FEDERAL LANDS: EFFECTS OF INTERIOR'S POLICIES ON FOREIGN-MADE DRONES ("GAO Report"), 24-106924, 1-2 (Sept. 25, 2024); *see also* Adam Juniper, *American anti-DJI laws risks help spread of wildfires – says US government report*, YAHOO! NEWS (Oct. 3, 2024), https://tinyurl.com/4dvf7hzj (noting that Interior's policy predominantly affects DJI drones).  The GAO Report also found that the Department of the Interior has also had to curtail its collection of environmental data, limit cultural resource and historic preservation monitoring programs, halt certain wildlife surveys altogether, and even end public education initiatives and collaborations with research institutions.  *See* GAO Report, *supra*, at 11-14.

[16]     *See* GAO Report, *supra* note 15, at 6 (observing that Interior's average per drone cost increased from about $2,600 in fiscal years 2017 through 2020, to over $15,000 in fiscal year 2023), 7 ("It has been difficult to find compliant drones with sufficient technological capabilities to fully meet

27.     **Worker Safety**.  Large and small businesses alike use DJI UAVs to accomplish dangerous or difficult tasks.  For example, a global energy company used DJI UAVs to detect methane over an area too large to reach with handheld devices; a railway used DJI UAVs to inspect bridge and rail infrastructure; and a pharmaceutical company used DJI UAVs to distribute essential medicine to remote healthcare facilities.[17]

28.     **Agriculture and Environmental Protection**.  DJI UAVs have frequently replaced manned aircrafts for crop-spraying across the country.  They have also been used for agricultural research.[18]  And DJI UAVs have become indispensable tools for the study of environmental phenomena that would otherwise have risked the safety of wildlife or researchers to observe, such as climate change, water level erosion, volcanic eruptions, and geological hazards.[19]

29.     **Small Businesses and Hobbyists**.  Small businesses and hobbyists use DJI products to accomplish difficult tasks that add significant value to their products and services.  For instance, DJI drones are the most popular among professionals and hobbyists

---

mission needs."); *see also, e.g.*, Jim Fisher, *The Best Drones for 2024*, PC MAG (Aug. 19, 2024), https://tinyurl.com/3fpwyuss (awarding DJI drones "Best Drone Overall," "Best Budget Drone," "Best Obstacle Avoidance System," "Best Drone for Pro Video and Cinema," and "Most Affordable Drone for Vertical Video").

[17]   METHANE REPORT, CHEVRON (2022), 9, https://tinyurl.com/2ury6xe8; *DroneDeploy and BNSF on Autonomous Reality Capture: The Difference Between Automated and Autonomous*, DRONE LIFE (Oct. 12, 2022), https://tinyurl.com/ysbvshjn (describing how aerial data helps documenting rail network); *Teaming up with Pfizer on New Cargo Drone Project*, WE ROBOTICS (Jan. 12, 2021), https://tinyurl.com/bddhsyfn.

[18]   *Alabama Extension First in U.S. to Research New Drone Model*, ALA. NEWS CTR. (Nov. 19, 2022), https://tinyurl.com/4ymc5nfa; Christina Herrick, *Washington State University Partners With UAV Manufacturer on Research*, GROWING PRODUCE (June 28, 2016), https://tinyurl.com/bdz7d27h.

[19]   *See* GAO Report, *supra* note 15, at 4 (providing examples of "[l]andscapes and natural resources" flights for which the Department of the Interior has used drones); *Use of UASs ("Drones") in 2018 at Kilauea and Beyond*, U.S. GEOLOGICAL SURVEY (June 19, 2020), https://tinyurl.com/zw4u5j2r (DJI UAVs used for data collection in the wake of the eruption of the Kilauea volcano in Hawaii when the active volcano made it impossible for manned aircraft to obtain information necessary for the emergency response).

in the creative industries for aerial photography and cinematography.[20]  And many other businesses use DJI drones as well, including land surveyors, real estate agents, and construction managers.

**C.      DJI's Commitment to Non-Combat Uses of Its UAVs and Sanctions Compliance**

30.      As a matter of corporate policy, DJI neither designs its products nor permits their use for combat purposes.  DJI prohibits doing business with entities that intend to use DJI products for combat.  DJI's distributors and third-party resellers must confirm compliance with this policy.  In line with this policy, in April 2022, DJI announced the suspension of drone sales and other business in Russia and Ukraine to prevent its products from being jerry-rigged and used in the ongoing war.[21]

31.      DJI's compliance policy also prohibits sales of its products (including by its distributors and resellers) to parties or jurisdictions that are sanctioned by the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC") and other governments.  DJI has a multi-faceted compliance program that employs automated screening and other controls to implement its sanctions policy.

**D.      DJI's Independence and Private Ownership**

32.      DJI's ownership and corporate governance structure underscore DJI's independence.  DJI is privately owned and controlled, and it is not an agent or

---

[20]      James Austin, *The Best Drones for Photos and Video*, N.Y. TIMES (Sept. 6, 2024), https://tinyurl.com/he2wfme9 (naming several DJI drones "the best drones" for photo and video use, including the best overall, the best upgrade pick, and the best budget pick); *see also* Andrew Lanxon, Joshua Goldman, *Best Drones for 2024*, CNET (updated Sept. 22, 2024), https://tinyurl.com/ytv946ys (identifying DJI drones as its top 2024 picks for capturing high-quality photos or videos).

[21]      Michelle Toh, *Chinese drone maker DJI halts business in Russia and Ukraine*, CNN (Apr. 27, 2022), https://tinyurl.com/25e2zzpv.

instrumentality of any government.  Frank Wang and the company's early-stage investors (Henry Lu, Swift Xie, and Li Zexiang) together hold 99% of the company's voting rights and approximately 87.4% of its shares.  Since at least 2020, their shares and voting rights have only increased.

33.     The next largest group of investors comprises entities in the private sector and collectively holds 0.4% of the voting rights and 7.2% of the shares.

34.     Last, the smallest shareholding group, with a combined 0.6% of the voting rights and 5.4% of the shares, comprises five state-owned enterprises in China (two state-owned banks, one state-owned insurance company, and two municipal investment funds).

35.     None of the directors of DJI or its parent company, iFlight Technology Company Limited, are a government official, a representative of a government or state-owned entity, or a member or officer of the Chinese Communist Party ("CCP").

### E.     **Statutory Framework and Background**

#### 1.     **Section 1260H's Predecessor**

36.     DoD designated DJI as a CMC purportedly pursuant to the National Defense Authorization Act for Fiscal Year 2021, Pub. L. No. 116-283, § 1260H, 134 Stat. 3388, 3965 (2021) ("Section 1260H").

37.     Section 1260H's provisions stem from a now unused statute, Section 1237 of the 1999 National Defense Authorization Act.[22]

---

[22]     Pub. L. No. 105-261, § 1237, 112 Stat. 1920, 2160 (1998), as amended by Pub. L. No. 106-398, § 1233, 114 Stat. 1654 (2000), and Pub. L. No. 108-375, § 1237, 118 Stat. 1811, 2089 (2004) ("Section 1237"); *see also* Jordan Brunner, *Communist Chinese Military Companies and Section 1237: A Primer*, LAWFARE (Mar. 22, 2021), https://tinyurl.com/2s4aaajs (describing the background and history of Section 1237).

38.     Section 1237 required the Secretary of Defense to compile a list of "Communist Chinese Military Companies" ("CCMCs"), which it defined as companies "owned or controlled by, or affiliated with, the People's Liberation Army or a ministry of the government of the People's Republic of China" or "owned or controlled by an entity affiliated with the defense industrial base of the People's Republic of China."  Section 1237.

39.     As this Court previously observed, Section 1237 required DoD to designate companies directly controlled by the Chinese military and government, as well as "quasi-independent firms that engage in Chinese military modernization," such as "State-Owned Enterprises with extensive ties to China's defense technology industry, operating under the effective control of the Chinese state military apparatus."  *Luokung Tech. Corp.* v. *Dep't of Def.*, 538 F. Supp. 3d 174, 187 (D.D.C. 2021).

40.     For nearly 20 years, however, DoD did not use or otherwise populate the list.  Then, following pressure from Congress, it issued four CCMC lists in just seven months from 2020 to 2021.  *See id.* at 195 n.15; Brunner, *supra*.

### 2.     This Court Twice Enjoined DoD

41.     In 2021, this Court enjoined the DoD—twice—from adding two private companies to the CCMC List.  *See Xiaomi*, 2021 WL 950144, at *13; *Luokung*, 538 F. Supp. 3d at 191.

42.     This Court determined that DoD's designation of the companies was "deeply flawed" and "failed to adhere to several different APA requirements."  *Xiaomi*, 2021 WL 950144 at *8; *see also Luokung*, 538 F. Supp. 3d at 191.  DoD's analysis was "conclusory" and did little more than "parrot the language of [the] statute."  *Xiaomi*, 2021 WL 950144 at *5 (citations omitted).  Its alleged evidence failed to differentiate the

companies from "American technology companies such as Apple." *Luokung*, 538 F. Supp. 3d at 189-90. In both cases, DoD's factual errors and lack of due diligence led the agency to faulty conclusions. *See id.* at 190 n.11.

43.     In both cases, this Court took umbrage with DoD's interpretation of the term "affiliated with," reasoning that it set too low a bar. It held that the "overwhelming weight of authority supports" a higher threshold for "affiliated with," i.e., "a company effectively controlled by another or associated with others under common ownership or control." *Xiaomi*, 2021 WL 950144 at *7 (citation omitted). Under DoD's proposed lower standard, the list of Chinese Military Companies "would potentially encompass all Chinese government contractors, even those that, as here, produce products with no direct military applications." *Luokung*, 538 F. Supp. 3d at 187. Congress did not intend DoD to designate any Chinese company with a loose connection to the Chinese government, but only those "engaged in Chinese military modernization." *Id.* at 186-87 (citing H.R. Rep. 108-491 (2004)) (discussing Section 1237's legislative history).

44.     This Court also acknowledged that DoD's failure to afford the parties notice and a reasonable opportunity to be heard raised "serious" constitutional concerns. *See Xiaomi*, 2021 WL 950144, at *8 n.8; *Luokung*, 538 F. Supp. 3d at 191 n.13.

45.     In 2021, DoD declined to appeal, and removed both Xiaomi and Luokung from the Section 1237 List.

### 3.     Section 1260H

46.     In January 2021, Congress passed the National Defense Authorization Act for Fiscal Year 2021, which included Section 1260H. Pub. L. No. 116-283, § 1237, 134 Stat. 3388, 3965 (2021).

47.     Under Section 1260H, a CMC is any company "engaged in providing commercial services, manufacturing, producing, or exporting," that satisfies at least one of two requirements.  Sec. 1260H(d).  A CMC is either: (1) "directly or indirectly owned, controlled, or beneficially owned by, or in an official or unofficial capacity acting as an agent of or on behalf of, the People's Liberation Army or any other organization subordinate to the Central Military Commission of the Chinese Communist Party"; or (2) a "military-civil fusion contributor to the Chinese defense industrial base."  *Id.*

48.     While Congress did not define "military-civil fusion contributor," it provided eight categories of such companies.  Those are:

    a.  "Entities knowingly receiving assistance from the Government of China or the Chinese Communist Party through science and technology efforts initiated under the Chinese military industrial planning apparatus;
    b.  Entities affiliated with the Chinese Ministry of Industry and Information Technology, including research partnerships and projects;
    c.  Entities receiving assistance, operational direction, or policy guidance from the State Administration for Science, Technology, and Industry for National Defense;
    d.  Any entities or subsidiaries defined as a 'defense enterprise' by the State Council of the People's Republic of China.
    e.  Entities residing in or affiliated with a military-civil fusion enterprise zone or receiving assistance from the Government of China through such enterprise zone;
    f.  Entities awarded with receipt of military production licenses by the Government of China;
    g.  Entities that advertise on national, provincial, and non-governmental military equipment procurement platforms in the People's Republic of China; or
    h.  Any other entities the Secretary determines is appropriate."  *Id.*

49.     Like Section 1237, Section 1260H directs the Secretary of Defense to "identify each entity the Secretary determines, based on the most recent information available, is operating directly or indirectly in the United States or any of its territories and possessions, that is a Chinese Military Company."  Further, the Secretary "shall make additions or deletions" to the CMC List "on an ongoing basis based on the latest

information available." Sec. 1260H(b)(3). After the Secretary has identified entities qualifying as CMCs, he or she must submit an annual report to Congress listing those entities and publish the unclassified portion of the List in the Federal Register. *Id.*; Sec. 1260(b)(1).

50. As commentators have noted, Section 1260H provides a "more precise" definition of Chinese Military Company than Section 1237.[23] Its definition removes "affiliat[ion]" with any "Chinese government ministry" as a basis for designation, allowing "for the more effective targeting of military-affiliated organizations" rather than organizations affiliated with "the Chinese state [more] broadly."[24]

51. Section 1260H also allows DoD to designate "military-civil fusion contributor[s] to the Chinese defense industrial base." Sec. 1260H(d). China's concept of "military-civil fusion" was implemented by the Chinese government in the 1980s to reform its defense sector, historically controlled by "state-owned enterprises that remain walled off from the country's dynamic commercial economy."[25] China sought to replicate American "civil-military integration" and its "proven track record" of innovation.[26] As DoD observed in a 2023 report, military-civil fusion aims to "increase the proportion [of private companies] . . . that contribute to military projects and procurements."[27] Accordingly, "military-civil fusion contributors" refers to "parallels in America's own

---

[23]    Jordan Brunner & Emily Weinstein, *Chinese Military-Civil Fusion and Section 1260H: Congress Incorporates Defense Contributors*, LAWFARE (May 4, 2021), https://tinyurl.com/mw7fm7sr.

[24]    *Id.*

[25]    Elsa B. Kania & Lorand Laskai, *Myths and Realities of China's Military-Civil Fusion Strategy*, CNAS (Jan. 28, 2021),  https://tinyurl.com/4h84p8r8.

[26]    *Id.*

[27]    Office of the Secretary of Defense, ANNUAL REPORT TO CONGRESS: MILITARY AND SECURITY DEVELOPMENTS INVOLVING THE PEOPLE'S REPUBLIC OF CHINA (2023), at 33.

defense innovation ecosystem," such as U.S. defense contractors that work hand-in-hand with the military to develop new technologies or manufacture defense products.[28]

52.     Since 2021, Congress passed several restrictions on entities designated as CMCs.  Under the FY2024 National Defense Authorization Act, Congress banned DoD from contracting with any CMC.  Pub. L. 118-31, 137 Stat. 136, § 805(a)(1).  And under the FY2024 Further Consolidated Appropriations Act, Congress prohibited the Department of Homeland Security from doing the same.  Pub. L. No. 118-47, § 536.

53.     Recently, two companies have challenged their designations by DoD under Section 1260H, alleging similar deficiencies as this Court identified in *Xiaomi* and *Luokung*.  *See Hesai Technology Co., Ltd* v. *U.S. Dep't of Def.*, No. 24-1381 (D.D.C. May 13, 2024); *Advanced Micro-Fabrication Equipment Inc. China* v. *U.S. Dep't of Def.*, Civ. A. No. 24-2357 (D.D.C. Aug. 14, 2024).  While these cases remain pending, DoD has changed course in *Hesai*, first deleting, and then redesignating, Hesai as a CMC on the basis of a new record.  *See Hesai*, Defs.' Resp. to Mot. for an Order to Show Cause, ECF No. 35, 1-2.

F.     <u>DoD Adds DJI to the CMC List without Notice or Explanation</u>

54.     On October 5, 2022, DoD, citing Section 1260H, released a list of entities designated as CMCs operating in the United States.[29]  The list included DJI but provided no rationale for why DJI—or any other company—was designated.

---

[28]     Kania & Laskai, *supra* note 25.

[29]     *See Entities Identified as Chinese Military Companies Operating In the United States In Accordance With Section 1260H of the William M. ("Mac") Thornberry National Defense Authorization Act for Fiscal Year 2021*, DEP'T OF DEF. (Oct. 5, 2022), https://tinyurl.com/3vnvx94d.

55.     By designating DJI, the government branded DJI as a national security threat, which was widely reported in the media[30] and has caused significant and ongoing harm to the company.  Some customers canceled contracts to purchase DJI products, while many more expressed concern about further business dealings with the company.  The designation stigmatized the company and its employees, including the over 150 employees residing in the United States.

56.     And the designation was wrong on its face.  DJI is not "directly, indirectly, or beneficially owned, controlled or acting on behalf of the People's Liberation Army or any other organization subordinate to the Central Military Commission," because neither the People's Liberation Army ("PLA") nor the Central Military Commission own any stake in DJI, and DJI certainly does not operate under their control.  And DJI is not a "military-civil fusion contributor to the Chinese defense industrial base" because DJI does not manufacture or develop military products and does not fall under any of the listed categories.[31]

57.     What is more, DoD designated DJI without warning, notice, or an opportunity to be heard.  Nor did DoD provide DJI with any explanation of its decision.

---

[30]     *See, e.g.,* Brandi Vincent*, Pentagon's list of Chinese military-linked companies operating in the U.S. grows*, DEF. WATCH (Oct. 6, 2022), https://tinyurl.com/mr36etuu; Kanishka Singh, *U.S. widens investment ban to China's BGI Genomics, drone maker DJI*, REUTERS (Oct. 7, 2022), https://tinyurl.com/mry8y2hs; *US puts Chinese drone giant DJI on military ties blacklist*, AL JAZEERA (Oct. 7, 2022), https://tinyurl.com/2y46yves.

[31]     *Cf.* Kania & Laskai, *supra* note 25 (noting that military-civil fusion is an aspirational policy that seeks to replicate, in China, "parallels in America's own defense innovation ecosystem"); ANNUAL REPORT TO CONGRESS: MILITARY AND SECURITY DEVELOPMENTS INVOLVING THE PEOPLE'S REPUBLIC OF CHINA (2023), *supra* note 27 (observing that the military-civil fusion strategy relies on private companies for technology development and procurement).

58.     In May 2023, DJI, through outside counsel, contacted DoD to state that it was wrongly added to the CMC List and to ask for DoD's rationale in adding DJI so that it could respond with specificity.  DJI made multiple requests for a discussion, but DoD declined to entertain even a phone call.

59.     Instead, DoD indicated by email that DJI should "articulate the rationale for why the statutory criteria do not apply to DJI" and provide any additional information supporting DJI's removal from the CMC List.

60.     On July 27, 2023, DJI submitted a petition to DoD seeking the removal of DJI from the CMC List.  Req. to Remove SZ DJI Tech. Co., Ltd. from the CMC List, attached hereto as Exhibit A; *see also* Sec. 1260H(b) (the Secretary of Defense "shall make additions or deletions" to the CMC List "on an ongoing basis based on the most recent information available").  DJI's delisting petition demonstrated why the Section 1260H designation criteria do not apply, enumerated the harmful impact that DJI's designation has had on the company and on U.S. stakeholders, and requested the designation's administrative record.

61.     On September 28, 2023, DJI requested a meeting to discuss the petition and also again requested a copy of the administrative record.  DoD did not respond to the request for a meeting and stated that DJI would need to submit a Freedom of Information Act ("FOIA") request to obtain the administrative record.

62.     DJI promptly filed a FOIA request on October 18, 2023.  DoD set December 15, 2023 as the date by which it expected to respond to DJI's FOIA request, but DoD missed that deadline.  It next projected that it would produce the record by July 19, 2024. DoD again missed that date, and revised its target date to November 25, 2024.

63.     DoD's unwillingness to engage with DJI about the reasons for its designation contrasts sharply with the approach taken by other departments of the U.S. government.  The Treasury Department's OFAC, for example, will generally provide a sanctioned party with the administrative record without requiring that the party proceed through a lengthy FOIA process.  OFAC has repeatedly emphasized that the "power and integrity" of sanctions derive not only from the ability to designate individuals and entities, but also from OFAC's willingness to remove persons from its sanctions lists where circumstances warrant.[32]  In contrast, DoD has no adequate process to allow a designated party to understand the reasons for its designation and to address the party's request for delisting.

### G.      DoD Redesignates DJI to the CMC List, Again without Any Notice or Explanation

64.     On January 31, 2024, DoD redesignated DJI as a CMC, notwithstanding DJI's comprehensive petition detailing the reasons that the statutory criteria do not apply.[33]

65.     Again, DoD provided DJI no explanation for the redesignation, nor did it provide any warning, notice, or opportunity to be heard.

66.     DJI filed a second FOIA request on March 27, 2024, seeking, among other things, the administrative record pertaining to DJI's redesignation.  DoD has yet to produce any documents responsive to DJI's FOIA request.

---

[32]     *Filing a Petition for Removal from an OFAC List*, OFAC, https://tinyurl.com/wvrm5nsv (last visited Oct. 17, 2024).  Treasury further states: "The ultimate goal of sanctions is not to punish, but to bring about a positive change in behavior. Each year, OFAC removes hundreds of individuals and entities from the SDN List. . . . Maintaining the integrity of U.S. sanctions is a high priority for OFAC and is the driving principle behind its rigorous review process that evaluates every request for removal individually on its merits and applies consistent standards to all of them."  *Id.*

[33]     *See DOD Releases List of People's Republic of China (PRC) Military Companies in Accordance With Section 1260H of the National Defense Authorization Act for Fiscal Year 2021*, DEP'T OF DEF. (Jan. 31, 2024), https://tinyurl.com/2t4phyc8.

67.     On September 6, 2024, DJI, through outside counsel, sent a letter to DoD stating that, while DJI sought to engage with DoD in good faith for more than 16 months, DoD's failure to meaningfully engage with DJI, and its refusal to provide any rationale for DJI's designation, left DJI with no reasonable choice but to pursue relief in federal court absent DoD's voluntary removal of DJI.

68.     Four days later on September 10, 2024, the Assistant Secretary of Defense for Industrial Base Policy finally provided a "courtesy copy" of a 26-page report, dated November 29, 2023 (the "Report"), detailing the rationale for DoD's decision to redesignate DJI on January 31, 2024.  There is no valid explanation for DoD's failure to provide the Report months earlier.  But the reason for DoD's reluctance is apparent: the Report is replete with errors and wholly fails to adduce evidence that DJI satisfies the statutory criteria for inclusion on the CMC List.

69.     Also, for the first time in more than 16 months, DoD agreed to DJI's request to discuss the designation.[34]  Although DJI informed DoD that the Report had multiple deficiencies, DoD declined to remove DJI from the CMC List.  This lawsuit followed.

### H.     DoD's Report Does Not Support Designating DJI as a CMC

70.     DoD's Report suffers from a number of deficiencies.  It applies the wrong legal standard, makes a number of factual errors, and engages in strained, attenuated reasoning.  The Report also improperly relies on outdated claims—from as far back as six years before the Report—that do not speak to the relevant issue of whether DJI *currently*

---

[34]     The Assistant Secretary stated in her September 10, 2024 email that while her "staff remains ready to schedule a mutually convenient meeting," "[DJI's or undersigned counsel's] staff has not attempted to schedule a meeting despite the Department's continual offers in our prior communications to meet . . . ."  As shown above, this statement was incorrect and DoD had ignored multiple requests by DJI to meet to discuss this matter.

meets the statutory criteria. *See* Sec. 1260H(a), (b)(3) (CMC designation must be "based on the most recent information available" and DoD is required to make "deletions to the most recent list . . . on an ongoing basis based on the latest information available"). Remarkably, the Report also fails to mention—let alone address—DJI's delisting petition filed on July 27, 2023, which provided information about DJI's business and ownership structure and established why none of the statutory criteria apply to it.[35]

71.     Each of the purported bases for DJI's designation described in the Report is invalid.

### 1.     DJI Is Not Owned by the People's Liberation Army or the Central Military Commission

72.     DoD first asserts that DJI is a CMC under Section 1260H because it is "indirectly owned by the Chinese Communist Party (CCP)." Report at 6. Here, the Report simply applies the wrong legal standard. Section 1260H permits the designation of a company if it is "directly or indirectly owned, controlled or beneficially owned by . . . *the People's Liberation Army* or any other organization subordinate to the *Central Military Commission* of the Chinese Communist Party." Sec. 1260H(D)(1)(B)(i) (emphases added). The PLA is China's military, and the Central Military Commission is a branch of the CCP that administers the PLA.[36] The PLA and the Central Military Commission are not interchangeable with the CCP itself.

---

[35]     During a conference call with DJI's outside counsel on September 23, 2024, DoD represented that the Report (including the sources cited in its endnotes) constitutes the full basis supporting DJI's January 2024 designation.

[36]     *People's Liberation Army*, BRITTANICA, https://tinyurl.com/3vh8sun6 (last updated Oct. 16, 2024); *Central Military Commission (CMC)*, MIN. OF NAT. DEF., https://tinyurl.com/38nnwcwv**Error! Hyperlink reference not valid.** (last visited Oct. 17, 2024); *The Present State, Structure and Operation of Party Organizations*, INST. OF PARTY BUILDING OF THE ORG. DEP. OF THE CENT. COMM. OF THE COMMUNIST PARTY OF CHINA, https://tinyurl.com/mu6v62bn (last visited Oct. 17, 2024).

73.     The Report does not find that DJI is "directly or indirectly owned, controlled, or beneficially owned" by the PLA or any other organization subordinate to the Central Military Commission, which is required for a company to be designated as a CMC under Section (d)(1)(B)(i)(I).

74.     Nor could DoD have made such a finding.  As noted above, DJI is privately held.  CEO Frank Wang, Henry Lu, Swift Xie, and Li Zexiang together hold 87.4% of the company's shares and 99% of voting rights.  None of them is a member of, or has any affiliation with, the PLA or the Central Military Commission.  Further, none of the remaining investors—which are predominantly in the private sector—is owned or controlled by the PLA or the Central Military Commission.  Therefore, DJI is not owned or controlled by the PLA or the Central Military Commission, and does not qualify as a CMC under Section 1260H(D)(1)(B)(i)(I).

75.     Although the Report's allegation that DJI is "indirectly owned by the CCP" is irrelevant to Section 1260H(D)(1)(B)(i)'s standard, that allegation is false and unsupported by the purported facts cited in the Report.  The only evidence presented by the Report relates to certain minority investments in DJI made by two state-owned investment funds: Shanghai Free Trade Zone Equity Fund (the "Shanghai Fund") and the Chengtong Fund Management Co., Ltd (the "Chengtong Fund").  Report at 6.

76.     The Chengtong Fund had ceased to be an investor in DJI as of June 2023, and therefore nothing involving this fund can support DJI's redesignation on January 31, 2024.

77.     The Shanghai Fund owns less than 1% of DJI's shares and less than 0.1% of DJI's voting rights.  Even if the Shanghai Fund were partially owned by the CCP—

which the Report does not establish—the Shanghai Fund's minority investment in DJI is insufficient to establish "ownership" under Section 1260H.  While DoD fails to articulate any standard for "ownership" under the statute, *see ACA Int'l* v. *FCC*, 885 F.3d 687, 700 (D.C. Cir. 2018) (noting that agency action is "arbitrary and capricious if it fails to articulate a comprehensible standard" (citation omitted)), in the analogous sanctions context, the Department of the Treasury's OFAC has consistently applied the "50 Percent Rule."  Under this rule, an entity that is 50% or more owned by a sanctioned entity is considered sanctioned as well.[37]  Because the Shanghai Fund's ownership interest is *more than 50 times* below that threshold, the Report does not establish DJI's indirect ownership by any entity—not the CCP, and certainly not the PLA or the Central Military Commission.[38]

78.      Thus, DoD fails to demonstrate that DJI is owned or controlled by the PLA or any organization subordinate to the Central Military Commission, as required under Section 1260H(D)(1)(B)(i).

### 2.      DJI Is Not a Military-Civil Fusion Contributor to the Defense Industrial Base

79.      Next, the Report claims that DJI is a CMC because it is "a military-civil fusion contributor to the defense industrial base."  Report at 7-16.  Section 1260H(d)(2)

---

[37]      *See Entities Owned by Blocked Persons (50% Rule)*, OFAC, https://tinyurl.com/hw45rewy   (last visited Oct. 17, 2024).  As applied to Iran, for example, blocked persons are deemed to "have an interest in all property and interests in property of an entity in which such persons directly or indirectly own, whether individually or in the aggregate, a 50 percent or greater interest."  31 C.F.R. § 560.425(a) (2022).

[38]      The Shanghai Fund's portfolio companies include, for example, Pagoda (fruit retail and supply chain company), United Imaging (manufacturer of medical imaging and radiotherapy equipment), and SF Express (a delivery service).  *See Shanghai FTZ Fund*, https://tinyurl.com/2v3m2tnt (last visited Oct. 17, 2024).  By DoD's erroneous logic, all of these companies would qualify as a CMC because they are indirectly owned by the CCP.

defines "military-civil fusion contributor" in terms of eight categories. The Report makes no allegations about four of the eight. But with respect to the remaining four categories, the Report commits a number of factual and legal errors, including, as above, failing to "articulate a comprehensible standard for assessing the applicability of [the] statutory categor[ies]." *ACA Int'l*, 885 F.3d at 700 (citation and quotation omitted). The Report falls far short of proving that DJI qualifies under any category.

> **(a)    Category 1: "Entities knowingly receiving assistance from the Government of China or the Chinese Communist Party through science and technology efforts initiated under the Chinese military industrial planning apparatus."**

80.    The first category of a "military-civil fusion contributor" is an entity that is "knowingly receiving assistance from the Government of China or the Chinese Communist Party through science and technology efforts initiated under the Chinese military industrial planning apparatus." The Report erroneously claims that DJI satisfies this category because it allegedly has an "established relationship with military-affiliated research institutions in the PRC," namely, the Academy of Military Science, the National Defense University, and the National University of Defense Technology. Report at 7. The conduct alleged in the Report does not give rise to an "established relationship" with any of these universities, much less one that could be described as DJI "knowingly receiving assistance from the Government of China or the CCP through science and technology efforts initiated under the Chinese military industrial planning apparatus." Sec. 1260H(d)(2)(A).

> **(i)    Alleged relationship with the National Defense University**

81.    The Report does not make any allegations or cite any evidence regarding a purported relationship between DJI and the National Defense University.

           (ii)       **Alleged relationship with the Military Science Academy**

82.     The Report alleges that the Military Science Academy "used DJI *drones*, such as the DJI Livox solid-state LiDAR, to develop and patent a three-dimensional temperature measuring device with multi-sensor fusion (patent CN114061763A)."  Report at 7 (emphasis added).  As an initial matter, this reflects an error.  The patent states that it used a Livox "radar," not a drone;[39]  moreover, Livox is not a DJI-branded product, but is sold by a DJI affiliate.

83.     DJI has no control over whether a research university purchases and uses an off-the-shelf[40] DJI product—let alone a product sold by its affiliate—in the development of a patent application (CN114061763A).  Such use in no way demonstrates a relationship, much less an "established relationship," between DJI and the Military Science Academy.  The patent application at issue also refers to the use of an "Nvid[i]a Jetson Nano edge computing board" and a "SONY IMX477 low-light camera module."[41]  If using an off-the-shelf product in a patent application can serve as the basis for designation, then Nvidia (an American company) and Sony (a Japanese company) would also qualify as CMCs.[42]  Moreover, DJI products have been frequently used by researchers, including those from the U.S. Air Force.[43]  DoD's logic would lead to the conclusion that DJI is also an "American military company."

---

[39]    Invention Patent Application: CN114061763A (published Feb. 18, 2022), https://tinyurl.com/3crwzj7p.

[40]    *See, e.g.*, *Livox Mid-70 LiDAR*, AMAZON, https://tinyurl.com/4n9j64uz (last visited Oct. 17, 2024).

[41]    *Supra* note 39.

[42]    Section 1260H does not require that a company be registered or domiciled in China to constitute a "Chinese Military Company."

[43]    U.S. No. 11,569,871B2 (granted Jan. 31, 2023), https://tinyurl.com/5n6eaycj ("The invention was also demonstrated with two DJI drones to see how they handled interference with each other.").

84.     In any event, DoD's allegation that a research university used an off-the-shelf product sold by an affiliate to develop a patent in no way establishes that *DJI* is "*knowingly receiving assistance*" from the Chinese government or CCP, as required by the statute.   Sec. 1260H(d)(2)(A) (emphasis added).   In fact, that does not establish DJI's knowing receipt of assistance of any kind.

85.     In addition, patent application CN114061763A was published in February 2022, and therefore has little bearing on whether DJI "knowingly receiv[ed] assistance" from the Chinese government or CCP at the time of the January 2024 redesignation.

86.     The Report also alleges that "Zhang Tao" (张涛), who is cited as an inventor for patent application CN114061763A, is also cited as an inventor for DJI patent applications WO2021146875A1 [44] and WO2021253247A1. [45]   The Report does not elaborate, but suggests that this also demonstrates an "established relationship" between DJI and the Military Science Academy.   However, DoD's facts are simply incorrect: the "Zhang Tao" cited in patent application CN114061763A is not the "Zhang Tao" cited in the DJI patent applications.

87.     The Zhang Tao cited in the DJI patent applications was a software testing engineer at DJI from January 2018 to June 2021.   Zhang Tao Decl. ¶ 1, attached hereto as Exhibit B.   Mr. Zhang has no connection with the Military Science Academy and was not involved in patent application CN114061763A.   *Id.* ¶ 7.

88.     This coincidence is unsurprising given that "Zhang Tao" is a common Chinese name, as DoD should have appreciated.   A search on Google Patents for "Zhang

---

[44]     WO2021146875A1 (filed Jan. 20, 2020), https://tinyurl.com/y9hdan32.

[45]     WO2021253247A1 (filed June 16, 2020), https://tinyurl.com/3tkcw9v5.

Tao" as an inventor yields over 100,000 results.[46]   Having employees with common

Chinese names is not a basis for listing under Section 1260H.[47]

**(iii)      Alleged relationship with the National University of Defense Technology**

89.      The Report also alleges that the National University of Defense Technology

used DJI drones to develop and patent certain inventions, including CN112344798B[48] and

CN115330876B.[49]  Report at 7.   As discussed above, the mere use of off-the-shelf DJI

products in patent development does not give rise to an "established relationship" between

DJI and the university, or to knowing receipt of assistance from the Chinese government

or the CCP.

90.      Here, again, the Report conflates two different people.   The Report

incorrectly claims that the "Zheng Wei" (郑伟)[50] cited as an inventor for patent

CN112344798B is also an inventor for a DJI patent application WO2022126415A1.[51]

Report at 8.   While the "Zheng Wei" cited in patent CN112344798B appears to be a

professor at the National University of Defense Technology,[52] the "Zheng Wei" cited in

DJI patent application WO2022126415A1 is a software engineer at Xi'an DJI Technology

Co., Ltd. ("Xi'an DJI").   Zheng Wei Decl. ¶¶ 1, 3, attached hereto as Exhibit C.   Xi'an

---

[46]      Inventor: "Zhang Tao" ("张涛"), Google Patents, https://tinyurl.com/ua973mwy (last visited Oct. 17, 2024).

[47]      *Cf.* Angela Yang, *From crime victims to politicians, misidentifying Asians is part of America's racist history*, NBC NEWS (Mar. 1, 2022), https://tinyurl.com/4tw6z7dc.

[48]      CN112344798B (granted Dec. 30, 2022), https://tinyurl.com/y3ftkwzp.

[49]      CN115330876B (granted Apr. 7, 2023), https://tinyurl.com/mrytk3n9.

[50]      Pursuant to Chinese naming convention which places a person's family name first, we have written 郑伟 as Zheng Wei instead of Wei Zheng.

[51]      WO2022126415A1 (published June 23, 2022), https://tinyurl.com/5yhr8nct.

[52]      *Wei Zheng*, IEEE XPLORE, https://tinyurl.com/bdde5576 (last visited Oct. 17, 2024).

27

DJI's Zheng Wei has no connection to the National University of Defense Technology and was not involved in the patent application CN112344798B. *Id.* ¶ 4. Again, this coincidence is unsurprising—a search on Google Patents for "Zheng Wei" as an inventor yields over 27,750 results.[53]

91.     Thus, the Report fails to demonstrate any "established relationship" between DJI and the aforementioned universities, or that DJI is "knowingly receiving assistance" from the Chinese government or the CCP "through science and technology efforts initiated under the Chinese military industrial planning apparatus."

> **(b)     Category 2: "Entities affiliated with the Chinese Ministry of Industry and Information Technology (MIIT), including research partnerships and projects."**

92.     The second category of a "military-civil fusion contributor" is an entity that is "affiliated with the [MIIT], including research partnerships and projects." The MIIT is a Chinese government agency that regulates a range of products, including, for example, home appliances, computers, consumer electronics, food, textile, and medicine.[54]

---

[53]     Inventor: "Zheng Wei" ("郑伟"), Google Patents, https://tinyurl.com/yc2x496k (last visited Oct. 17, 2024). There also appears to be a "Zheng Wei" with the following patents or patent applications of Microsoft CN111753052A, CN304683437S, CN304672120S, CN304380401S, CN303755510S, CN303755497S, CN303670180S, CN303403677S, CN303368153S, CN303403653S, CN302937245S, CN302815128S, CN302289896S, CN302350747S.

[54]     Gongxinbu: Yi Gaozhiliang Gongji Yinling Daidong Jiadian Xiaofei (工信部：以高质量供给引领带动家电消费) [Ministry of Industry and Information Technology: Driving Home Appliance Consumption with High-quality Supply], Zhengquan Shibao Guanfang Wangzhan (证券时报官方网站) [Securities Times Official Website] (Sept. 15, 2022), https://tinyurl.com/ypswvu2s; Gongxinbu Jiada Lidu Guifan Diannao PC Duan Yingyong Ruanjian Tanchuang Xinxi Xingwei (工信部加大力度规范电脑PC端应用软件弹窗信息行为) [The Ministry of Industry and Information Technology has stepped up efforts to regulate pop-up information behaviors of PC application software], Zhongguo Ribao (中国日报) [China Daily] (Oct. 29, 2021), https://tinyurl.com/4t9spxru; Shipin Gongye Qiye Chengxin Tixi Jianshe (食品工业企业诚信体系建设) [Construction of integrity system for food industry enterprises], Gongye He Xinxihua Bu Zhengwu Fuwu Pingtai (工业和信息化部政务服务平台) [Ministry of Industry and Information Technology Government Service Platform], https://tinyurl.com/3j6wze47 (last visited Oct. 17, 2024); Gongxinbu Yinfa Fangzhi Gongye Fazhan Guihua (工信部印发纺织工业发展规划) [The Ministry of Industry and Information Technology issued the textile industry development plan], Zhongguo Gongshang

93.     The Report makes allegations related to (1) DJI's participation in the drafting of an industry standard, "Safety Requirements for Civilian Unmanned Aircraft Systems," promulgated by the MIIT; (2) DJI's receipt of an invitation to speak at a conference/expo organized by the MIIT; (3) DJI's receipt of a design award issued by the MIIT; and (4) a DJI "Functional Safety Department Lead" serving simultaneously as a professor at a university laboratory overseen by the Ministry of Science and Technology ("MOST") and as a subproject lead for an MIIT automotive-safety project.  Report at 8-9.

94.     But none of these allegations establish the required affiliation between DJI and the MIIT under Section 1260H(d)(2)(B).  To prove affiliation under this Court's precedent, DoD must show that DJI is "effectively controlled" by the MIIT, or at least "associated with" the MIIT "under common ownership or control."  *Xiaomi*, 2021 WL 950144 at *7; *Luokung*, 538 F. Supp. 3d at 184-88 (same).  Moreover, none of these allegations satisfy DoD's preferred but incorrect definition of affiliation, which would require DJI to have a "common purpose" and "shared characteristics" with, or be "closely associated" with, the MIIT "in a dependent or subordinate position."[55]  Most of these allegations also relate to events that transpired years ago, and thus cannot serve as bases for DJI's January 2024 redesignation.

---

Yinhang (中国工商银行) [ICBC] (Sept. 29, 2016), https://tinyurl.com/5a5rxxnn; Gongxinbu: Peiyu Shijie Yiliu Yiyao Gongye Qiye Tuijin Yiyao Chuangxin Chanpin Chanyehua (工信部：培育世界一流医药工业企业  推进医药创新产品产业化) [Ministry of Industry and Information Technology: Cultivate world-class pharmaceutical industry enterprises and promote the industrialization of innovative pharmaceutical products], Yangshiwang (央视网) [CCTV.com] (Sept. 3, 2023), https://tinyurl.com/ydpawrcn.

[55]     This is the standard DoD is advocating in the *Hesai* litigation, *cf. Xiaomi*, 2021 WL 950144 at *6, but the Report makes no mention of this standard.

(i)     **DJI's participation in safety-standards drafting**

95.     As an initial matter, the "Safety Requirements for Civilian Unmanned Aircraft Systems" is plainly a safety standard for civilian, not military, drones.  Report at 8.  Because participating in drafting a civilian safety standard is not probative of being a "civil-*military* fusion contributor to the *Chinese defense industrial base*," DJI's involvement with this safety standard cannot satisfy the statutory criteria.  (Emphases added.)

96.     DoD's apparent position—that participation in any industry-standards drafting establishes the requisite affiliation between a private company and the MIIT—is plainly incorrect.  In the United States, as in China, private entities often work with government agencies to develop safety standards.  For example, Microsoft works with the NIST and the National Cybersecurity Center of Excellence ("NCCoE") to promulgate standards on privacy and cybersecurity.[56]  Under DoD's erroneous approach, Microsoft would be "affiliated with" the NIST and NCCoE, and a military-civil fusion contributor to the American defense industrial base.

97.     Moreover, if non-military standards drafting made an entity affiliated with the MITT and therefore a CMC, a number of major U.S. and international companies would qualify for the CMC List.  For example:

- o **Nokia** has participated in the drafting of **514** MIIT standards for the communications sector;
- o **Ericsson** has participated in the drafting of **290** MIIT standards for the communications sector;
- o **Siemens** has participated in the drafting of **188** MIIT standards for sectors including machinery, communications, and petrochemical;

---

[56]     *See, e.g.*, *How Microsoft and NIST are collaborating to advance the Zero Trust Implementation*, MICROSOFT (Aug. 6, 2024), https://tinyurl.com/yrsya5ys.

- o **Samsung** has participated in the drafting of **148** MIIT standards for sectors including communications and electronics;
- o **Emerson** has participated in the drafting of **108** MIIT standards for sectors including communications and machinery;
- o **Qualcomm** has participated in the drafting of **70** MIIT standards for the communication sector;
- o **Ford** has participated in the drafting of **37** MIIT standards for sectors including automotive, light industry, and nonferrous metals;
- o **Volkswagen** has participated in the drafting of **37** MIIT standards for sectors including machinery and automotive;
- o **Intel** has participated in the drafting of **17** MIIT standards for the communications and electronics sectors; and
- o **Procter & Gamble** has participated in the drafting of **14** MIIT standards for the light industry sector.[57]

98.    Accordingly, DJI's participation in drafting one civilian standard does not establish the necessary affiliation between DJI and the MIIT for purposes of qualifying DJI as a CMC.

### (ii)    Invitation to a 2018 conference/expo

99.    The Report asserts that, because DJI received an invitation to a 2018 global conference/expo organized by the MIIT, DJI must be affiliated with the MIIT.  Report at 9.  This claim fails at multiple levels.  First, the Report neglects to mention that DJI never attended the event.

---

[57]    Additional examples include: **Motorola**: **61** MIIT standards for sectors including communications and electronics; **Samsung Electronics**: **30** MIIT standards for sectors including electronics, light industry, and machinery; **Epson**: **15** MIIT standards for sectors including electronics and machinery; **3M**: **14** MIIT standards for sectors including communications and light industry; **Honeywell**: **10** MIIT standards for sectors including textiles, communications, chemicals, light industry, petrochemicals, and machinery; **Unilever**: **10** MIIT standards for sectors including light industry and packaging; **General Electric**: **9** MIIT standards for sectors including machinery and electronics; **Philip**: **9** MIIT standards for sectors including light industry and electronics; **Dupont**: **8** MIIT standard for sectors including electronics, building materials, machinery, light industry, and chemical; **Colgate**: **8** MIIT standard for the light industry sector; **HP**: **7** MIIT standards for the electronics sector; **Rockwell Automation**: **5** MIIT standard for the machinery sector; **Goodyear Tire & Rubber**: **4** MIIT standards for the chemical sector; **Eastman Chemical**: **3** MIIT standard for sectors including automobile and chemical; **Apple**: **3** MIIT standards for the electronics sector; **AMD**: **3** MIIT standards for the electronics sector; **General Motors**: **2** MIIT standards for sectors including automobile and electronics; **Dell**: **2** MIIT standards for the electronics sector; **Chevron**: **1** MIIT standard for the machinery sector; **Microsoft**: **1** MIIT standard for the communications sector.  *See* Hangye Biaozhun Chaxun（行业标准查询）[Search for Industry Standards], https://tinyurl.com/yc635edc (last visited Oct. 17, 2024).

100.     In addition, more than 20 entities were involved in organizing the expo, including foreign government agencies and research institutions such as the German Academy of Engineering, the International Society of Optical Engineering, the Dutch Technology Entrepreneurs Association, the Italian Ministry of Science and Technology Innovation, the British Institute of Engineering and Technology, and the Australian Department of Industrial Innovation and Science.[58]  It is implausible that DJI is affiliated with all of those institutions simply because it received an invitation to participate in the event.

101.     In addition, the expo took place in 2018 and is therefore not probative of any relationship between DJI and the MIIT at the time of the January 2024 redesignation.

### (iii)     Receipt of a 2020 award

102.     The Report also relies on DJI's receipt of an award to demonstrate an alleged affiliation with the MIIT.  Report at 9.  In 2020, DJI was one of 10 winners of the China Excellent Industrial Design Award ("CEID") issued by the MIIT.  *Id.*  The Report asserts that DJI is affiliated with the MIIT because these awards "were previously given to civilian, dual-use, and military technologies."  *Id.*  As an initial matter, the mere receipt of an award is insufficient to establish an affiliation between DJI and the MIIT.  *See Xiaomi*, 2021 WL 950144 at *8 (finding the Xiaomi CEO's receipt of an award issued by the MIIT insufficient to support Xiaomi's designation).

103.     Moreover, the Report's characterization of the CEID award is incorrect and misleading.  The CEID award has historically been issued to companies across a wide range

---

[58]     2018 Quanqiu Zhineng Gongye Dahui Ji Quanqiu Chuangxin Jishu Chengguo Zhuanyi Dahui Ji Bolan (2018 全球智能工业大会暨 全球创新技术成果转移大会暨博览) [2018 Global Intelligent Industry Conference and Global Innovation Technology Transfer Achievements Conference and Expo], Wurenji Wang (无人机网) [Youav.com] (May 23, 2018), https://tinyurl.com/2ract3sr.

of industries for products with no apparent military applications.  For example, the award has been issued to POCKIT (baby strollers),[59] Casarte (washing machines),[60] Xiao Mi (water filters),[61] Great Wall (SUVs),[62] Taishan (body-measurement machines),[63] United Imaging (PET-CT scanners),[64] and Bosideng (puffy jackets).[65]  Also, the award criteria cited by the Report do not relate to military applications; the key criteria are "being a forerunner, innovativeness, practicality, aesthetic effect, ergonomics, quality, consideration given to environmental protection and economy."  Report at 10.  Critically, the Report itself notes the lack of any criteria involving "direct research collaboration with MIIT."  *Id.*

104.    In addition, DJI was given the award in 2020 and it is thus irrelevant to the question of whether DJI was affiliated with the MIIT at the time of the January 2024 redesignation.

(iv)    **University professor serving as consultant to DJI**

105.    Lastly, the Report claims that DJI is affiliated with the MIIT because a professor at a university laboratory also works for DJI, and the professor had, in the past, also led a research project for the MIIT.  Report at 10.

---

[59]    2016 Nian Jinjiang Zuopin (2016 年金奖作品) [2016 Winners of the CEID Award], Baidu (百度) [Baidu], https://tinyurl.com/96nj3mam (last updated Apr. 12, 2022).

[60]    *Id.*

[61]    *Id.*

[62]    2018 Nian Jinjiang Zuopin (2018 年金奖作品) [2018 Winners of the CEID Award] Baidu (百度) [Baidu], https://tinyurl.com/2wcmsaa3 (last updated Apr. 12, 2022).

[63]    *Id.*

[64]    *Supra* note 59.

[65]    *10 winners announced for China Excellent Industrial Design Award*, WONDERLAND YANTAI (Nov. 26, 2020), https://tinyurl.com/mv356hpc.

106.    Specifically, the Report asserts that Associate Professor Zhang Yuxin at Jilin University ("JLU"), who works in JLU's State Key Laboratory of Automotive Simulation (the "Laboratory"), is also a "Functional Safety Department Lead" for DJI, and holds several patents that were assigned to both DJI and JLU.[66]  *Id.*  The Report further alleges that from October 2020 to October 2022, while he was working for DJI, Professor Zhang also served as a Subproject Leader for an automotive safety project funded by the MIIT.  *Id.*

107.    None of these allegations establish the necessary affiliation between DJI and the MIIT.  As an initial matter, Professor Zhang has advised a number of private companies on safety issues related to automated driving systems.  For several years, he has served as an outside automotive safety consultant—not for DJI, but for a DJI affiliate called SZ Zhuoyu Technology Co., Ltd. ("Zhuoyu").  Zhang Yuxin Decl. ¶ 1, attached hereto as Exhibit D.  Academics frequently hold positions in both the private and public sectors.  It would be nonsensical to suggest that Bloomberg, for example, has an affiliation with DoD because Harvard Professor Cass Sunstein worked for Bloomberg concurrently with advising DoD.[67]

---

[66]    The Report claims that JLU is overseen by the Ministry of Science and Technology ("MOST"), but provides no evidence for that assertion.  Report at 10.  The Report's cited source only states that the Laboratory passed the national key laboratory evaluation organized by the MOST in 2003 and 2008; it does not state that the Laboratory was overseen by the Ministry.  *See* Shiyanshi Jianjie (实验室简介) [Laboratory Introduction], Jilin Daxue Qiche Fangzhen Yu Kongzhi Guojia Zhongdian Shiyanshi (吉林大学汽车仿真与控制国家重点实验室) [JLU State Key Laboratory of Automotive Simulation and Control], https://tinyurl.com/55ava6ve (last visited Oct. 17, 2024).  In any case, MOST is a separate agency from the MIIT.

[67]    *Cass R. Sunstein: Curriculum Vitae*, HARVARD UNIV., https://tinyurl.com/3akjx9um (last visited Oct. 17, 2024) (noting that Sunstein served on the Defense Innovation Board of the U.S. Department of Defense from 2016 to 2017); Executive Branch Personnel Public Financial Disclosure Report (OGE Form 278e), Cass Sunstein, https://tinyurl.com/3b65mbje (last visited Oct. 17, 2024)  (noting that Sunstein worked for Bloomberg from 2013 to 2021).

108.    Moreover, the MIIT research project at issue—titled "Construction and Safety Assessment of SOTIF Scenarios of Automated Driving Systems of Passenger Cars"—assessed the safety of automated driving systems for passenger cars; it was not related to any military or defense applications.  Zhang Yuxin Decl. ¶ 5.  And most importantly, neither Zhuoyu nor DJI played any part in this project.  *Id.* ¶ 6.  In fact, Professor Zhang is prohibited from disclosing the details of this project to any third party, including Zhuoyu and DJI.  *Id.*

109.    In addition, the MIIT project concluded in October 2022, and is therefore irrelevant to DJI's relationship with the MIIT as of the January 2024 redesignation.

(c)    **Category 3: "Entities receiving assistance, operational direction or policy guidance from the State Administration for Science, Technology and Industry for National Defense."**

110.    The third category of a "military-civil fusion contributor" is an entity that is "receiving assistance, operational direction or policy guidance from the State Administration for Science, Technology and Industry for National Defense ["SASTIND"]," a government agency responsible for industrial planning and regulatory aspects of the defense-industry base.[68]  Thus, this category captures companies that receive support from SASTIND as part of its efforts to foster military-civil fusion and improve the defense-industry base.

111.    The Report, however, does not claim that SASTIND supports DJI as part of SASTIND's military-civil fusion efforts.  Rather, the Report alleges that DJI falls within this category for two reasons: (1) DJI is subject to export restrictions on *civilian* drones—

---

[68]    JAMES MULVENON & REBECCA SAMM TYROLER-COOPER, CHINA'S DEFENSE INDUSTRY ON THE PATH OF REFORM, Report Prepared for the U.S.-China Economic and Security Review Comm'n (Oct. 2009), https://tinyurl.com/dnbey5ym.

jointly issued by the Chinese Ministry of Commerce, General Administration of Customs, SASTIND, and the Equipment Development Department of the Central Military Commission—to prevent the use of those drones in the Russia-Ukraine conflict; and (2) 61 patents are jointly held by DJI and four top universities in China, which are alleged by the Report to have connections to SASTIND by virtue of their participation in defense research.  Report at 11-12.  The cited evidence does not establish the requisite relationship between DJI and SASTIND.

### (i)    Export restrictions

112.    The Report claims that DJI "received assistance, operational direction or policy guidance" from SASTIND simply because SASTIND, together with three other regulatory agencies, issued export restrictions on long-range civilian drones to prevent their unintended military use in the Russia-Ukraine conflict.  Report at 11.  However, as the Report itself notes, the restrictions are not targeted at DJI; they apply to all drones exported from China that meet certain criteria for weight and flight distance or duration.  *Id.* Moreover, under the restrictions, a company seeking to export covered drones must apply to the Ministry of Commerce, not SASTIND, for permission.  *Id.*

113.    Being subject to generally applicable export restrictions is not "receiving assistance, operational direction or policy guidance" from a government agency, much less serving as a "military-civil fusion contributor."  Otherwise, by the Report's logic, every U.S. farmer would be "receiving assistance, operational direction or policy guidance" from the U.S. Department of Agriculture, and every publicly traded company would be "receiving assistance, operational direction or policy guidance" from the U.S. Securities and Exchange Commission.  Moreover, it would be strange to justify DJI's designation as a CMC on the fact that it adhered to a restriction *against* the military use of drones.  DoD

has placed DJI in a Catch-22: complying with the restrictions would allegedly support its designation as a CMC, but not complying with the restrictions would lead to the potential misuse of its drones in the Russia-Ukraine conflict.

### (ii)     Joint patents with universities

114.    The Report further claims that DJI "received assistance, operational direction or policy guidance" from SASTIND because DJI owns 61 patents with four top universities in China—JLU, Tsinghua University, Peking University ("PKU"), and Zhejiang University (ZJH)—and these universities have conducted defense-related research.  Report at 12-15.[69]  This attenuated reasoning does not satisfy the statutory standard, and the Report itself admits that it has failed to establish "a direct relationship between DJI and SASTIND."[70]  Report at 12.

115.    Even if these universities had a relationship with SASTIND by virtue of defense-related research collaborations, this does not speak to the relationship between DJI and SASTIND at all.  The Report does not allege that any of the 61 patent applications at issue were part of any research collaboration with SASTIND or that these patent applications are even related to military or defense applications.  In fact, a review of the publicly available patent records show that none of the 61 patent applications have any apparent military or defense applications.[71]

---

[69]    These universities are the equivalent of Harvard, Stanford, Yale, and MIT in the United States.

[70]    Footnote 62 of the Report notes that all universities in China are administered by the Ministry of Education.  This does not mean that all universities are linked to SASTIND, a completely different ministry.  In fact, the footnote further acknowledges that although some universities appear to be directly administered by the MIIT, none of them appeared in DJI's patents.

[71]    Moreover, none of the 61 patent applications at issue contain words such as "军" (military, army) "国防" (defense) "武" (arm, force, battle), or "战斗" (combat).

116.    Moreover, those patent applications were filed between 2018 and 2022, years before the January 2024 redesignation.  Therefore, the Report fails to present any evidence establishing a relationship between DJI and SASTIND as of January 2024, nor does it prove that DJI is receiving "assistance, operational direction or policy guidance" from SASTIND.

117.    In addition, the four Chinese universities at issue have joint patents and/or collaboration agreements with U.S. government agencies, U.S. universities, and/or various international companies.[72]  According to the Report's flawed logic, the U.S. Department of Health and Human Services, the National Institute of Health Office of Technology Transfer, the University of Maryland, Panasonic, Stanford University, Eaton Corporation, the University of Texas, Fuji Electric, Sony, Intel, and Mercedes-Benz would all

---

[72]    For example, JLU holds three patent applications with the U.S. Department of Health and Human Services, the National Institute of Health  Office of Technology Transfer, and the University of Maryland.  *See* WO2008091375A2 (published July 31, 2008), https://tinyurl.com/nhjtsb4y; WO2008091375A9 (published Sept. 18, 2008), https://tinyurl.com/59hxnx5h; WO2008091375A3 (published July 31, 2008), https://tinyurl.com/52uhpvzz.  JLU also has a patent application with General Motors.  *See* WO2007008363A3 (published Mar. 15, 2007), https://tinyurl.com/4av2c7jp.  Peking University ("PKU") holds a number of patents and/or patent applications with the Panasonic Corporation and hosts the "Stanford Center at Peking University."  *See* JPH01277963A (published Nov. 8, 1989), https://tinyurl.com/yx92ekth; JPH01277962A (published Nov. 8, 1989), https://tinyurl.com/u9f58xtb; JPS62182868A (published Aug. 11, 1987), https://tinyurl.com/yckb7ab5; JPH01255067A (published Oct. 11, 1989), https://tinyurl.com/4rzwd7x8; JPS62182965A (published Aug. 11, 1987), https://tinyurl.com/2f645c4j; Stanford Center at Peking University Home Page, https://tinyurl.com/bde29k9h (last visited Oct. 16, 2024).  Zhejiang University holds patent applications with the Eaton Corporation, *see* WO2017106136A1 (published June 22, 2017), https://tinyurl.com/5h2xersd, the University of Texas, *see* WO2017132816A1 (published Aug. 10, 2017), https://tinyurl.com/2vrjw4me, and Fuji Electric, *see* WO2008101367A1 (published Aug. 28, 2008), https://tinyurl.com/44u5673m.  Tsinghua University has 18 patents and/or patent applications with Sony, *see, e.g.*, CN104052553A (published Sept. 17, 2014), https://tinyurl.com/mr4y7bxb; CN108738067A (published Nov. 2, 2018), https://tinyurl.com/ybuxm6bc; CN103716886A (published Apr. 9, 2014), https://tinyurl.com/5c46xvy5, a patent application with Intel, *see* CN118434071A (published Aug. 2, 2024), https://tinyurl.com/bdzezyxj, as well as an ongoing research collaboration with Mercedes-Benz related to intelligent transportation, intelligent vehicles, and sustainable development.  Qiye Hezuo (企业合作) [Enterprise Cooperation], Qinghua Daxue (清华大学) [Tsinghua University], https://tinyurl.com/ymx9wnma (last visited Oct. 16, 2024).

presumably be "receiving assistance, operational direction or policy guidance" from SASTIND and would qualify as CMCs.

118.    Accordingly, the Report has failed to establish that DJI is "receiving assistance, operational direction or policy guidance from" SASTIND.

> **(d)     Category 4: "Any entities or subsidiaries defined as a 'defense enterprise" by the State Council of the People's Republic of China."**

119.    The fourth category of a "military-civil fusion contributor" is an entity that is "defined as a 'defense enterprise' by the State Council of the People's Republic of China." The Report makes no allegations about DJI under this category.

> **(e)     Category 5: "Entities residing in or affiliated with a military-civil fusion enterprise zone or receiving assistance from the Government of China through such enterprise zone."**

120.    The fifth category of a "military-civil fusion contributor" is an entity that is "residing in or affiliated with a military-civil fusion enterprise zone or receiving assistance from the Government of China through such enterprise zone."  The Report claims that DJI satisfies this category because it was planning to build an Innovation Center and Global Technical Support Center in the Xi'an High-Tech Industrial Development Zone (西安高新技术产业开发区) (the "Xi'an High Tech Zone"), which it claims is a military-civil fusion enterprise zone.  Report at 15.  The Report further claims that the Xi'an High Tech Zone is also known as Xi'an Economic and Technological Development Zone (西安经济技术开发区). *Id.*

121.    As an initial matter, the Xi'an High Tech Zone is not the Xi'an Economic and Technological Development Zone.  A quick Google search in either English or Chinese reveals that these two zones are completely different entities despite starting with the word

"Xi'an," which is a city in China.[73]  DJI has no connection to, or presence in, the Xi'an Economic and Technological Development Zone.

122.    DJI currently rents office space in the Xi'an High Tech Zone.  Contrary to the Report's assertion, the Xi'an High Tech Zone is not a military-civil fusion enterprise zone.

123.    The Xi'an High Tech Zone was established by the Xi'an municipal government in 1991 to promote the development of high-tech industries in the northwestern region of China.[74]  Spanning approximately 155 square kilometers, the zone supports a wide range of commercial and non-profit projects, including malls, parks, residences, and elderly-care centers.[75]

124.    The presence of major U.S. and other international companies in the zone demonstrates that the Xi'an High Tech Zone is not a "military-civil fusion enterprise zone." The zone is home to over 100 U.S. and international Fortune 500 companies, such as IBM (U.S.), Johnson & Johnson (U.S.), GE (U.S.), Applied Materials (U.S.), Micron (U.S.), Intel (U.S.), Sybase (U.S.), Vishay (U.S.), Infineon (Germany), Samsung (South Korea), NEC (Japan), and Fujitsu (Japan).[76]

125.    Given its sheer size, the Xi'an High Tech Zone is divided into subzones or

---

[73]    Xi'an Economic and Technological Development Zone, CHINA DAILY (last updated May 21, 2019) https://tinyurl.com/4pttmyuw.

[74]    *Xi'an High Tech Industries Development Zone*, AMCHAM SHANGHAI, https://tinyurl.com/5bjx2uhh (last visited Oct. 17, 2024).

[75]    *Supra* note 74; *Xi'an High-tech Zone signed projects at Silk Road expo*, CHINA DAILY (last updated May 16, 2018), https://tinyurl.com/yc2yd3te.

[76]    *Supra* note 74; Xian Gaoxin Jishu Chanye Kaifa Qu (西安高新技术产业开发区) [Xi'an High-tech Industrial Development Zone],   Shanxisheng Difangzhi Bangongshi (陕西省地方志办公室) [Shaanxi Province Local Office], https://tinyurl.com/44j6b5yc (last visited Oct. 17, 2024); *see also* Cao Yingying, *Applied Materials Supports Mega City's Growth*, CHINA DAILY https://tinyurl.com/yb6j5nyy; Yuan Shenggao, *Xi'an high-tech zone fosters massive growth and employment*, CHINA DAILY (Mar. 30, 2021), https://tinyurl.com/39ff74sr.

clusters by industry, and DJI's subzone is not related to military-civil fusion in any respect.[77] DJI is located in the National Service Outsourcing Demonstration Base in a software park, in Building G, Area 2, No. 34, Jinye 1st Road.[78] The National Outsourcing Demonstration Base, highlighted in green in **Figure 1** below, includes a number of Fortune 500 companies such as IBM (U.S.), Emerson (U.S.), SAP (Germany), NTT Data (Japan), and Fujitsu (Japan).[79]  *See also* Figure 1 Translation, attached hereto as Exhibit F.  DJI's presence in the Xi'an High Tech Zone no more makes it a CMC than any of these other U.S. and international companies.

---

[77]      *See* Exhibit E for a certificate by the Xi'an High-Tech Zone Investment Cooperation Bureau, which is part of the management of the High-Tech Zone.

[78]      Jinye Yilu 34 Hao Guojia Fuwu Waibao Shifan Jidi Erqu G Zuo (锦业一路 34 号国家服务外包示范基地二区 G 座) [Building G, Area 2, National Service Outsourcing Demonstration Base, No. 34, Jinye 1st Road].

[79]      Lai Touzi (来投资) [Investment], Yuanqu Jianjie (园区简介) [Introduction to the Software Park], Xian Gaoxin (西安高新) [Xian High Tech], https://tinyurl.com/2hnte2ck (last visited Oct. 17, 2024).



**Figure 1. National Service Outsourcing Demonstration Base**

126.   In addition, there are a number of additional U.S. and international

companies—including, for example, HSBC,[80] Standard Chartered Bank,[81] Shell Oil,[82] TUV,[83] and Texas Instruments[84]—that are DJI's neighbors, which further illustrates that DJI is not located in any military-civil fusion zone.

127.    In support of its claim that the Xi'an High Tech Zone is a "military-civil fusion enterprise zone," the Report cites a witness statement from a 2020 hearing before the Senate Committee on Banking, Housing, and Urban Affairs.  The witness, who worked at a consulting firm, referred to the Xi'an High Tech Zone as a "military-civil fusion enterprise zone" in the context of stating that a company called BYD had an R&D center in the zone.[85]  She explained that such a "military-civil fusion enterprise zone" is "dedicated to the incubation of, as well as, information exchange, among MCF [military civil fusion] entities."[86]

128.    The witness's characterization of the zone is inaccurate and contradicted by the presence of multiple U.S. and international companies located in the zone.  The Report

---

[80]    Guanyu Huifeng Yinhang (Zhongguo) Youxian Gongsi Xian Xidajie Zhihang Qianzhi Ji Gengming Gonggao (关于汇丰银行（中国）有限公司西安西大街支行 迁址及更名公告) [Announcement on the relocation and name change of Xi'an West Street Branch of HSBC Bank (China) Limited], Huifeng Yinhang (汇丰银行) [HSBC Bank] (May 16, 2024), https://tinyurl.com/59bunpdf.

[81]    Fenzhihang Chaxun (分支行查询) [Branch Inquiry], Zhada Yinhang (渣打银行) [Standard Chartered Bank], https://tinyurl.com/3nsw74s8 (last visited Oct. 17, 2024).

[82]    Yanchang Shell Petroleum Co., Ltd., Yanchang Qiaopai Shiyou Youxian Gongsi (延长壳牌石油有限公司) [Yanchang Shell Petroleum Co., Ltd.], https://tinyurl.com/26atsbnm (last visited Oct. 16, 2024).

[83]    Xian Bangongshi (西安办公室) [Xi'an Office], TÜV SÜD, https://tinyurl.com/8xzvx25e (last visited Oct. 17, 2024).

[84]    Zhongguoqu Lianxi Xinxi (中国区联系信息) [China contact information], Dezhou Yiqi (德州仪器) [Texas Instruments], https://tinyurl.com/4hr7aawy (last visited Oct. 17, 2024).

[85]    *Threats Posed by State-Owned and State-Supported Enterprises to Public Transportation: Hearing before the H. Comm. On Banking, Housing and Urban Affairs*, 116TH CONG. 2 at 47 (2020), https://tinyurl.com/4bdh3jxd.

[86]    *Id.*

makes no effort to verify the accuracy of the witness's claim.  *See City of New Orleans* v. *SEC*, 969 F.2d 1163, 1167 (D.C. Cir. 1992) ("[A]n agency's reliance on a report or study without ascertaining the accuracy of the data contained in the study or the methodology used to collect the data is arbitrary." (internal quotation marks omitted)).  In addition, as shown in **Figure 1** above, BYD (比亚迪) is located outside of the National Service Outsourcing Demonstration Base, where DJI and multiple U.S. and international companies are located.

129.    The witness likely conflated one subpart of the zone with the entire Xi'an High Tech Zone.  Based on a public search on Baidu Map, it appears that, while BYD is not located in a military-civil fusion industrial park, there is one such park located less than two kilometers from it.[87]

130.    By contrast, as shown in **Figure 2** below, DJI (in green) is located over six kilometers away from the apparent military-civil fusion industrial park (in red).  DoD cannot treat DJI—nor any of the companies in the National Service Outsourcing Demonstration Base—as residing in a military-civil fusion industrial park where it does not in fact reside.  *See also* Figure 2 Translation, attached hereto as Exhibit F.

---

[87]     Baidu Map Search for BYD and Military-Civil Fusion Industrial Park, Baidu Ditu (百度地图) [Baidu Map], https://tinyurl.com/ebad9djd (last visited Oct. 16, 2024).



**Figure 2. Distance Between DJI (green) and the Apparent Military-Civil Fusion Industrial Park (red) [88]**

131.    The Report further cites to an article that reports that the management committee of Xi'an High Tech Zone signed a memorandum of understanding ("MoU") with the Xi'an Consumer Quality Supervision Bureau and Shaanxi Aviation Industry Administration on jointly promoting the strategic work of military-civilian integration industry standardization.[89]   Report at 16.   Contrary to the Report's suggestion, the mere existence of that MoU does not render the Xi'an High Tech Zone as a whole, and certainly not the National Service Outsourcing Demonstration Base, a military-civil fusion zone.

---

[88]    Baidu Map Search for DJI and Military-Civil Fusion Industrial Park, Baidu Ditu (百度地图) [Baidu Map], tinyurl.com/yc72ebzu (last visited Oct. 17, 2024).

[89]    Gaojishu Chanyesi（高技术产业司）[High Technology Industry Department], Quanmian Chuangxin Gaige Shiyan Baijia Anli Zhi Sishiliu (全面创新改革试验百佳案例之四十六) [Forty-Six of the Top 100 Cases of Comprehensive Innovation and Reform Experiments], Guojia Fazhan He Gaige Weiyuanhui（国家发展和改革委员会）[National Development and Reform Commission], https://tinyurl.com/yc87nxym (last visited Oct. 17, 2024).

Rather, the MoU likely relates to the military-civil fusion industrial park, as to which DJI has no connection.

132.    In addition, the Report alleges that, in a 2017 municipal development plan, the Qujing City People's Government, located in Yunnan Province, identified DJI as a target civilian company for outreach to develop the local UAV industry and to facilitate the municipal government's plan to promote military-civil fusion. *Id.* However, the Report fails to mention that DJI did not take Qujing up on its offer; DJI has no presence in Qujing and has no relationship with the Qujing municipal government.

133.    Accordingly, the Report fails to demonstrate that DJI resides in or is affiliated with any military-civil fusion enterprise zone, nor that DJI receives government assistance through such zone.

> **(f)    Category 6: "Entities awarded with receipt of military production licenses by the Government of China, such as a Weapons and Equipment and Research and Production Unit Classified Qualification Permit, Weapons and Equipment Research and Production Certificate, Weapons and Equipment Quality Management System Certificate, or Equipment Manufacturing Unit Qualification."**

134.    The sixth category of a "military-civil fusion contributor" is an entity that is "awarded with receipt of military production licenses by the Government of China, such as a Weapons and Equipment and Research and Production Unit Classified Qualification Permit, Weapons and Equipment Research and Production Certificate, Weapons and Equipment Quality Management System Certificate, or Equipment Manufacturing Unit Qualification."  The Report makes no allegations under this category.

(g)    **Category 7: "Entities that advertise on national, provincial, and non-governmental military equipment procurement platforms in the People's Republic of China."**

135.    The seventh category of a "military-civil fusion contributor" is an entity that "advertise[s] on national, provincial, and non-governmental military equipment procurement platforms in the People's Republic of China."  The Report makes no allegations under this category.

(h)    **Category 8: "Any other entities the Secretary determines is appropriate."**

136.    The final category of a "military-civil fusion contributor" is any other entity that "the Secretary determines is appropriate."  The Report makes no allegations under this category.

* * * * *

137.    In sum, the Report's scattershot attempts to contrive a basis for designating DJI all fail.

I.    **DoD's Decision to Designate DJI as a Chinese Military Company Has Resulted in Significant and Ongoing Financial and Reputational Harm**

138.    As a result of DoD's unlawful and misguided decision to place and maintain DJI on the CMC List, DJI has suffered significant and ongoing financial and reputational harm.

139.    Because of the CMC designation, which marks DJI as a national security threat, U.S. and international customers have terminated existing contracts with DJI and refuse to enter into new ones.

140.    DJI and its employees now suffer frequent and pervasive stigmatization. U.S. employees of DJI have been repeatedly harassed and insulted in public places.

141.    These harms are neither random nor unexpected: they are the intended consequence of a CMC designation.  Congress created the CMC List to "name and shame" the designated companies in order to dissuade the U.S. and international community from doing business with them.[90]  As Reuters observed, designation as a CMC "can be a blow to designated companies' reputations and represents a stark warning to U.S. entities and companies about the risks of conducting business with them."[91]  Commentators have called DoD's designation of DJI "a warning to investors to steer clear of the company."[92]

142.    Entities across the U.S. have heeded DoD's warning.  Many state and local governments have decided to discontinue their relationships with DJI since its CMC designation.  Arkansas, Mississippi, and Tennessee have all restricted the use of, or funding for, DJI drones by state and local agencies.[93]  And Utah went even further, passing a law that prohibits entities on the CMC List, like DJI, from buying any land in that state.  Utah Code 63L-13-201-02 (2024).

143.    DoD's actions also harm users and the public at large.  As described above, *supra* paragraphs 23 through 26, DJI UAVs are the most popular drones among public-safety agencies and other first responders in the United States.  If they avoid using DJI drones due to reputational or national security concerns, this will negatively impact public-safety services and needlessly heighten dangers during emergency management. This

---

[90]    Brunner & Weinstein, *supra* note 23.

[91]    Idrees Ali, Alexandra Alper & Michael Martina, *Pentagon calls out Chinese companies it says are helping Beijing's military*, REUTERS (Feb. 1, 2024), https://tinyurl.com/4cmra6pn.

[92]    *US puts Chinese drone giant DJI on military ties blacklist*, AL JAZEERA (Oct. 7, 2022), https://tinyurl.com/2br5x2yz.

[93]    Mark Albert, *As states ban Chinese-made drones, officers raise alarm*, WVTM13 (July 25, 2023), https://tinyurl.com/se554n3t.

makes communities across the United States less safe, search and rescue missions more onerous, and disaster relief more difficult to accomplish.

144.    An injunction would stop the above harms by reversing and removing the CMC label, which ultimately stigmatizes a company that helps keep America safe and has other socially beneficial impacts.

145.    DJI thus challenges DoD's most recent redesignation on January 31, 2024, which, as the consummation of DoD's decision-making process with respect to DJI's placement on the CMC List, constitutes "final agency action" subject to judicial review.

146.    The APA furthermore instructs courts to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1); *see also id.* § 551(13) ("'[A]gency action' includes . . . failure to act[.]"). Section 1260H commands DoD to "make   . . . deletions to the most recent list  . . .  on an ongoing basis based on the latest information available." Sec. 1260H(b)(3). Thus, DoD's January 31, 2024 redesignation also qualifies as a failure to "delet[e]" DJI from the CMC List: agency action that DJI has requested and DoD has withheld.

## CLAIMS FOR RELIEF

### COUNT I

**Violation of the Administrative
Procedure Act: Arbitrary and Capricious Agency Action, Action in Excess of
Statutory Authority and Otherwise Not in Accordance with Law, 5 U.S.C. § 706(2)
(Against All Defendants)**

147.    Plaintiff realleges and incorporates by reference the allegations contained in all of the preceding paragraphs.

148.    The statute invoked by Defendants does not authorize their action.

149.     Defendants have authority under Section 1260H of the FY2021 NDAA to "identify each entity the Secretary determines, based on the most recent information available, is operating directly or indirectly in the United States or any of its territories and possessions, that is a Chinese Military Company" ("CMC").  Sec. 1260H(a).  They also "shall make additions or deletions" to that list "on an ongoing basis based on the latest information available."  *Id.* § 1260H(b).

150.     Section 1260H permits the Secretary of Defense to designate companies as CMCs if one of either two conditions is met.

151.     First, the Secretary may designate a company as a CMC if it is "directly, indirectly, or beneficially owned, controlled or acting on behalf of the People's Liberation Army or any other organization subordinate to the Central Military Commission."  Sec. 1260H(d).

152.     DJI is not owned, controlled, or acting on behalf of the People's Liberation Army or any other organization subordinate to the Central Military Commission.  Nor do Defendants assert otherwise, claiming instead that DJI is "indirectly owned by the Chinese Communist Party (CCP)."  Report at 5, 6.

153.     Even if that allegation were legally relevant (which it is not), DJI is not directly or indirectly owned by the Chinese Communist Party.

154.     Second, the Secretary may designate a company as a CMC if it is a "military-civil fusion contributor to the Chinese defense industrial base."  Sec. 1260H(d).  DJI does not satisfy this condition because it does not contribute to military-civil fusion, military modernization, or otherwise assist the Chinese defense industrial base.

155.     Moreover, DJI does not fit any of the categories listed by the statute for qualifying as a "military-civil fusion contributor."  *Id.* § 1260H(d)(2).

156.     DJI therefore does not qualify as a CMC, and, in failing to remove DJI from the CMC List, Defendants also failed to abide Congress's mandatory command that they "shall make . . . deletions" to the CMC List "on an ongoing basis based on the latest information available."  *Id.* § 1260H(b).

157.     Defendants' designation is therefore "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and is "in excess of statutory jurisdiction, authority, or limitations" under the APA.  5 U.S.C. § 706(2)(A), (C).

### COUNT II

**Violation of the Administrative Procedure Act: Arbitrary and Capricious Agency Action, Action Contrary to Required Procedure, Action Unsupported by Substantial Evidence, 5 U.S.C. § 706(2)**
**(Against All Defendants)**

158.     Plaintiff realleges and incorporates by reference the allegations contained in all of the preceding paragraphs.

159.     Defendants' failure to articulate a satisfactory explanation for designating DJI as a CMC is arbitrary and capricious, and their factual finding that DJI qualifies as a CMC is unsupported by substantial evidence and therefore is also arbitrary and capricious.

160.     "Reasoned decision-making requires that an agency 'articulate a satisfactory explanation for its action' with a 'rational connection between the facts found and the choice made.'"  *Xiaomi Corp.*, 2021 WL 950144 at *4 (quoting *Motor Vehicle Mfrs. Ass'n of U.S. Inc.* v. *State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).  Defendants' conclusory analysis does not provide a "rational connection" between the facts found and the decision to designate DJI as a CMC.  This includes, but is not limited to,

Defendants' failure to make the legal conclusion necessary under Section 1260H(d) that DJI is "directly, indirectly, or beneficially owned, controlled or acting on behalf of the People's Liberation Army or any other organization subordinate to the Central Military Commission," Report at 5-6; refusal to consider publicly available information and the July 27, 2023 delisting petition, which disproves their claims; and neglect of the APA's requirement to "articulate a comprehensible standard" for which entities qualify as CMCs. *ACA Int'l*, 885 F.3d at 700 (citation omitted).

161.   An agency's factual findings must also be "supported by substantial evidence." *Foster* v. *Mabus*, 103 F. Supp. 3d 95, 109 (D.D.C. 2015) (citation omitted). Here, the evidence that Defendants purport to rely upon is either false, contravened by the public record or DJI's delisting petition, or insufficient to support Defendants' factual finding that DJI is a CMC.   Defendants' factual findings are thus unsupported by substantial evidence.

162.   Defendants' designation of DJI is therefore "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "without observance of procedure as required by law," and "unsupported by substantial evidence[.]"  5 U.S.C. § 706(2)(A), (D)-(E).

## COUNT III

**Violation of the Administrative Procedure Act: Agency Action Unlawfully Withheld or Unreasonably Delayed, 5 U.S.C. § 706(1)**
**(Against All Defendants)**

163.   Plaintiff realleges and incorporates by reference the allegations contained in all of the preceding paragraphs.

164.   When redesignating DJI on January 31, 2024, Defendants failed to delete DJI from the CMC List, a discrete agency action that Section 1260H required.

165.   5 U.S.C. § 706(1) creates a cause of action to "compel agency action unlawfully withheld or unreasonably delayed."  Claims under Section 706(1) "can proceed only where a plaintiff asserts that an agency failed to take a discrete agency action that it is required to take."  *Ctr. for Biological Diversity* v. *Zinke*, 260 F. Supp. 3d 11, 20 (D.D.C. 2017) (citing *Norton* v. *Southern Utah Wilderness Alliance*, 542 U.S. 55, 62 (2004)).

166.   Here, Section 1260H(b) provides that requirement, stating that the Secretary of Defense "shall make . . . deletions to the most recent list" of Chinese Military Companies "on an ongoing basis based on the latest information available."

167.   On July 27, 2023, DJI provided Defendants evidence establishing that DJI did not meet the statutory criteria for designation as a CMC, but on January 31, 2024, Defendants nevertheless redesignated DJI as a CMC.

168.   The Report that Defendants relied upon to redesignate DJI neither references nor considers the evidence DJI submitted, indicating that Defendants did not rely on the latest information available.

169.   Furthermore, the Report also relies on evidence that is either false, contravened by the public record, or otherwise insufficient to make a factual finding that DJI is a CMC, thus indicating that Defendants did not rely on the latest information available.

170.   Defendants have therefore failed to remove DJI from the CMC List in violation of their mandatory duty under Section 1260H to make "deletions" in light of "the latest information available."

171.    Defendants' refusal to remove DJI from the CMC List thus qualifies as agency action "unlawfully withheld or unreasonably delayed" under the APA.  5 U.S.C. § 706(1).

## COUNT IV

**Violation of the Administrative Procedure Act: Arbitrary and Capricious Agency Action, Action Contrary to Constitutional Right, Power, Privilege, or Immunity, 5 U.S.C. § 706(2) (Against All Defendants)**

172.    Plaintiff realleges and incorporates by reference the allegations contained in all of the preceding paragraphs.

173.    The Fifth Amendment to the U.S. Constitution provides: "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law[.]"  U.S. Const. amend. V.  The Due Process Clause of the Fifth Amendment requires that parties deprived of their property receive adequate notice and an opportunity to be heard.  *Mathews* v. *Eldridge*, 424 U.S. 319, 334–35 (1976).

174.    As a result of Defendants' actions, DJI has lost business deals, been stigmatized as a national security threat, and been banned from contracting with multiple federal government agencies.  DJI has thus suffered a deprivation of liberty and property.

175.    DJI did not receive any notice or process prior to that deprivation of liberty and property, let alone due process of law.

176.    The denial of any pre-deprivation process whatsoever is unjustified by any national security interests, and the risk of erroneous deprivation of liberty or property from Defendants' action is intolerably high under the Fifth Amendment to the U.S. Constitution.

177.    Defendants' designation is therefore "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," and "contrary to constitutional right" under the APA.  5 U.S.C.§ 706(2)(A), (B).

## **PRAYER FOR RELIEF**

Plaintiff respectfully prays that this Court enter an order and judgment:

   A. Declaring that Defendants' designation is null, void, and with no force and effect;

   B. Declaring that Defendants' designation is not in accordance with law within the meaning of 5 U.S.C. § 706(2); in excess of statutory jurisdiction, authority, or limitations within the meaning of 5 U.S.C. § 706(2); and contrary to constitutional right within the meaning of 5 U.S.C. § 706(2);

   C. Declaring that Defendants' failure to delete DJI from the CMC List is action unlawfully withheld within the meaning of 5 U.S.C. § 706(1);

   D. Vacating and setting aside the designation;

   E. Compelling Defendants to delete DJI from the CMC List;

   F. Permanently enjoining Defendants and their officers, employees, and agents from enforcing, implementing, applying, or taking any action whatsoever under, or in reliance on, the designation;

   G. Awarding Plaintiff the costs of this litigation, including reasonable attorneys' fees; and

   H. Such other and further relief as this Court may deem just and proper.

Dated:    Washington, DC
          October 18, 2024

PAUL, WEISS, RIFKIND,
   WHARTON & GARRISON LLP

By:    */s/ Kannon K. Shanmugam*

Kannon K. Shanmugam (D.C. Bar No. 474304)
Roberto J. Gonzalez (D.C. Bar No. 501406)
Samuel Rebo, Application for admission Pro
Hac Vice forthcoming

2001 K Street, N.W.
Washington, DC 20006
Tel: (202) 223-7325
kshanmugam@paulweiss.com
rgonzalez@paulweiss.com
srebo@paulweiss.com


Loretta E. Lynch, Application for admission Pro
Hac Vice forthcoming
Simona Shimeng Xu, Application for admission
Pro Hac Vice forthcoming

1285 Avenue of the Americas
New York, NY 10019
Tel: (212) 373-3000
lelynch@paulweiss.com
sxu@paulweiss.com