# EXHIBIT A

# PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

1285 AVENUE OF THE AMERICAS
NEW YORK, NEW YORK 10019-6064
TELEPHONE (212) 373-3000

LLOYD K. GARRISON   (1946-1991)
RANDOLPH E. PAUL   (1946-1956)
SIMON H. RIFKIND   (1950-1995)
LOUIS S. WEISS   (1927-1950)
JOHN F. WHARTON   (1927-1977)

WRITER'S DIRECT DIAL NUMBER
(212) 373-3118

WRITER'S DIRECT FACSIMILE
(212) 492-0118

WRITER'S DIRECT E-MAIL ADDRESS
lelynch@paulweiss.com

UNIT 5201, FORTUNE FINANCIAL CENTER
5 DONGSANHUAN ZHONGLU
CHAOYANG DISTRICT, BEIJING 100020, CHINA
TELEPHONE (86-10) 5828-6300

SUITES 3601 – 3606 & 3610
36/F, GLOUCESTER TOWER
THE LANDMARK
15 QUEEN'S ROAD, CENTRAL
HONG KONG
TELEPHONE (852) 2846-0300

ALDER CASTLE
10 NOBLE STREET
LONDON EC2V 7JU, UNITED KINGDOM
TELEPHONE (44 20) 7367 1600

535 MISSION STREET, 24TH FLOOR
SAN FRANCISCO, CA 94105
TELEPHONE (628) 432-5100

FUKOKU SEIMEI BUILDING
2-2 UCHISAIWAICHO 2-CHOME
CHIYODA-KU, TOKYO 100-0011, JAPAN
TELEPHONE (81-3) 3597-8101

TORONTO-DOMINION CENTRE
77 KING STREET WEST, SUITE 3100
P.O. BOX 226
TORONTO, ONTARIO M5K 1J3
TELEPHONE (416) 504-0520

2001 K STREET, NW
WASHINGTON, DC 20006-1047
TELEPHONE (202) 223-7300

500 DELAWARE AVENUE, SUITE 200
POST OFFICE BOX 32
WILMINGTON, DE 19899-0032
TELEPHONE (302) 655-4410

MATTHEW W. ABBOTT
EDWARD T. ACKERMAN
JACOB A. ADLERSTEIN
JUSTIN ANDERSON
ALLAN J. ARFFA
JONATHAN H. ASHTOR
ROBERT A. ATKINS
SCOTT A. BARSHAY
PAUL M. BASTA
LYNN B. BAYARD
JOSEPH J. BIAL
BRUCE BIRENBOIM
H. CHRISTOPHER BOEHNING
BRIAN BOLIN
ANGELO BONVINO
ANDRE G. BOUCHARD*
PAUL D. BRACHMAN
GERALD BRANT
ROBERT A. BRITTON
WALTER F. BROWN*
SUSANNA M. BUERGEL
JESSICA S. CAREY
JOHN P. CARLIN
DAVID CARMONA
GEOFFREY R. CHEPIGA
ELLEN N. CHING
WILLIAM A. CLAREMAN
LEWIS R. CLAYTON
YAHONNES CLEARY
REBECCA S. COCCARO
JAY COHEN
KELLEY A. CORNISH
CHRISTOPHER J. CUMMINGS
TIHITINA DAGNEW
THOMAS V. DE LA BASTIDE III
MEREDITH R. DEARBORN*
ARIEL J. DECKELBAUM
KAREN L. DUNN
ALICE BELISLE EATON
ANDREW J. EHRLICH
GREGORY A. EZRING
ROSS A. FIELDSTON
ANDREW C. FINCH
BRAD J. FINKELSTEIN
BRIAN P. FINNEGAN
ROBERTO FINZI
PETER E. FISCH
HARRIS FISCHMAN
VICTORIA S. FORRESTER
HARRIS B. FREIDUS
MANUEL S. FREY
KENNETH A. GALLO
MICHAEL E. GERTZMAN
ADAM M. GIVERTZ
SALVATORE GOGLIORMELLA
NEIL GOLDMAN
MATTHEW B. GOLDSTEIN
ROBERTO J. GONZALEZ*
CATHERINE L. GOODALL
CHARLES H. GOOGE, JR.
ANDREW G. GORDON
BRIAN S. GRIEVE
UDI GROFMAN
MELINDA HAAG*
ALAN S. HALPERIN
CLAUDIA HAMMERMAN
IAN M. HAZLETT
BRIAN S. HERMANN
JOSHUA HILL JR.
MICHELE HIRSHMAN
JARRETT R. HOFFMAN
ROBERT HOLO
CHRISTOPHER HOPKINS
DAVID S. HUNTINGTON
AMRAN HUSSEIN
LORETTA A. IPPOLITO
WILLIAM A. ISAACSON*
JAREN JANGHORBANI
BRIAN M. JANSON
LUKE JENNINGS
JEH C. JOHNSON
MATTHEW B. JORDAN
CHRISTODOULOS KAOUTZANIS
BRAD S. KARP
PATRICK N. KARSNITZ
JOHN C. KENNEDY
ROBERT A. KILLIP
BRIAN KIM
KYLE J. KIMPLER
JEFFREY L. KOCHIAN
ALEXIA D. KORBERG
DANIEL J. KRAMER
ANDREW D. KRAUSE

BRIAN KRAUSE
CAITH KUSHNER
KAISA KUUSK
DAVID K. LAKHDHIR
GREGORY F. LAUFER
BRIAN C. LAVIN
XIAOYU GREG LIU
RANDY LUSKEY*
LORETTA E. LYNCH
JEFFREY D. MARELL
MARCO V. MASOTTI
DAVID W. MAYO
ELIZABETH R. McCOLM
JEAN M. McLOUGHLIN
ALVARO MEMBRILLERA
MARK F. MENDELSOHN
CLAUDINE MEREDITH-GOUJON
WILLIAM B. MICHAEL
ERIN J. MORGAN
JUDIE NG SHORTELL*
CATHERINE NYARADY
JANE B. O'BRIEN
BRAD R. OKUN
SUNG PAK
CRYSTAL L. PARKER
LINDSAY B. PARKS
ANDREW M. PARLEN
DANIELLE C. PENHALL
CHARLES J. PESANT
ANASTASIA V. PETERSON
JESSICA E. PHILLIPS*
AUSTIN S. POLLET*
VALERIE E. RADWANER
JEFFREY J. RECHER
LORIN L. REISNER
JEANNIE S. RHEE*
ANDREW N. ROSENBERG
JUSTIN ROSENBERG
JACQUELINE P. RUBIN
RAPHAEL H. RUSSO
ELIZABETH M. SACKSTEDER
JEFFREY B. SAMUELS
PAUL L. SANDLER
AARON J. SCHLAPHOFF
KENNETH M. SCHNEIDER
ROBERT B. SCHUMER
JOHN M. SCOTT
BRIAN SCRIVANI
KYLE T. SEIFRIED
KANNON K. SHANMUGAM
SUHAN SHIM
CULLEN L. SINCLAIR
ADAM M. SIVERTS
KYLE SMITH
AUDRA J. SOLOWAY
SCOTT M. SONTAG
JOSHUA H. SOVEN*
MEGAN SPELMAN
ROBERT Y. SPERLING
EYITAYO ST. MATTHEW-DANIEL
SARAH STASNY
AIDAN SYNNOTT
ROBERT D. TANANBAUM
BRETTE TANNENBAUM
RICHARD C. TARLOWE
DAVID TARR
MONICA K. THURMOND
DANIEL J. TOAL
LAURA C. TURANO
CONRAD VAN LOGGERENBERG
KRISHNA VEERARAGHAVAN
JEREMY M. VEIT
LIZA M. VELAZQUEZ
MICHAEL VOGEL
RAMY J. WAHBEH
JOHN WEBER
LAWRENCE G. WEE
THEODORE V. WELLS, JR.
SAMUEL J. WELT
LINDSEY L. WIERSMA
STEVEN J. WILLIAMS
LAWRENCE I. WITDORCHIC
MARK B. WLAZLO
ADAM WOLLSTEIN
STACI YABLON
BOSCO YIU*
KAYE N. YOSHINO
TONG YU
TRACEY A. ZACCONE
TAURIE M. ZEITZER
KENNETH S. ZIMAN
T. ROBERT ZOCHOWSKI, JR.

*NOT ADMITTED TO THE NEW YORK BAR

July 27, 2023

Dr. Laura D. Taylor-Kale
Assistant Secretary of Defense for Industrial Base Policy
Office of the Under Secretary of Defense
for Acquisition and Sustainment
U.S. Department of Defense
3010 Defense Pentagon
Washington, D.C. 20301

**Re: Request to Remove SZ DJI Technology Co., Ltd. from the CMC List**

**CONFIDENTIAL TREATMENT REQUESTED**

Dear Dr. Taylor-Kale:

    We respectfully submit this request to the U.S. Department of Defense ("DOD"), on behalf of our client SZ DJI Technology Co., Ltd. ("DJI" or the "Company"), to remove DJI from DOD's List of People's Republic of China (PRC) Military Companies ("CMC List").

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

2

## EXECUTIVE SUMMARY

DOD added DJI to the CMC List on October 5, 2022.[1]  DOD has a duty to make "deletions" from the list on an "ongoing basis based on the latest information available." *See* Section 1260H(b)(3) of the NDAA for Fiscal Year 2021 ("[T]he Secretary shall make additions or deletions to the most recent list submitted under paragraph (1) on an ongoing basis based on the latest information available.").[2]  In a related context, the Department of Treasury has recognized that the "power and integrity" of OFAC sanctions derives not only from the power to designate individuals and entities, but also from OFAC's willingness to remove persons from its sanctions lists where circumstances warrant.[3]  Likewise, the integrity of the CMC List depends on DOD's willingness to delete entries where the facts warrant.

We believe that DOD's original addition of DJI to the CMC List on October 5, 2022 was unwarranted.  But regardless of whether the designation was correct at the time that it was made, the information presented in this petition makes clear that DJI does not currently meet the statutory criteria and should be "delet[ed]" as required by Section 1260H(b)(3).

This petition proceeds as follows.  Part I is a general overview of DJI's business and its products.  Part II explains that the Section 1260H designation criteria do not apply to DJI and that DOD is therefore legally required to delete DJI from the list.  Part III demonstrates that DJI's designation violates, among other things, the Administrative Procedure Act, the NDAA for Fiscal Year 2021, and due process.  Part IV explains DJI's commitment to a cooperative relationship with the U.S. government, as evidenced by its strong sanctions and export controls policies and procedures.  Part V describes the harmful impact of DJI's designation on U.S. stakeholders, including numerous government agencies; large and small businesses; and the U.S. employees of DJI's U.S. subsidiaries.

---

[1]  *See* Press Release, U.S. DEP'T OF DEFENSE, *DOD Releases List of People' Republic of China (PRC) Military Companies in Accordance With Section 1260H of the National Defense Authorization Act for Fiscal Year 2021* (Oct. 5, 2022), https://www.defense.gov/News/Releases/Release/Article/3180636/dod-releases-list-of-peoples-republic-of-china-prc-military-companies-in-accord/ (last visited Jun. 1, 2023).

[2]  *See* William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021 (Pub. L. 116-283).

[3]  *See* https://ofac.treasury.gov/specially-designated-nationals-list-sdn-list/filing-a-petition-for-removal-from-an-ofac-list (last visited June 1, 2023).  Treasury further states:  "The ultimate goal of sanctions is not to punish, but to bring about a positive change in behavior.  Each year, OFAC removes hundreds of individuals and entities from the SDN List. . . .  Maintaining the integrity of U.S. sanctions is a high priority for OFAC and is the driving principle behind its rigorous review process that evaluates every request for removal individually on its merits and applies consistent standards to all of them."

**CONFIDENTIAL TREATMENT REQUESTED**

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

3

We respectfully request that DOD provide us with the full administrative record supporting DOD's addition of DJI to the CMC List, and that DOD act promptly to remove DJI from the CMC List.  We also reiterate our request for a meeting to discuss this matter.[4]

## I.     DJI Business and Product Overview

DJI is a technology company founded in 2006 that manufactures unmanned aerial vehicles ("UAVs"), cameras, and other software and technology.  DJI is privately held and was founded by Frank Wang, who serves as DJI's CEO.  Mr. Wang is a private citizen in China and does not hold any political office or titles.  Mr. Wang, and the Company's early-stage executives, Swift Xie and Henry Lu, together hold 97.02% of the Company's voting rights and 73.79% of the Company's shares.  The remaining investors are in the private sector.  The next largest group of shareholders includes U.S. investment firms Sequoia Capital and Accel.  Additionally, there are six state-owned enterprises in China (three state-owned banks, one state-owned insurance company, and two municipal investment funds) that comprise a small fraction of DJI's ownership, holding a 5.38% stake with 0.68% voting rights.  None of the directors of DJI or its parent company iFlight Technology Company Limited is a government official or a representative of a government or state-owned entity.

DJI is headquartered in Shenzhen, China.  DJI has three subsidiaries that operate in the United States, employing approximately 167 employees and servicing the Company's UAVs sold in North America.

The Company's drone products are used by consumers worldwide, as well as by enterprise and governmental customers with applications spanning agriculture, construction, engineering, environmental sciences, oil and gas, and public safety.  DJI sells its products to a variety of customers in the United States, including to numerous federal, state, and local government agencies, as well as to companies in various sectors.  For example, DJI UAVs are used by energy and utility companies in support of worker safety and power plant and equipment inspections and maintenance,[5] Pfizer in support of Covid-

---

[4]    We originally contacted DOD's General Counsel Caroline D. Krass concerning our request.  In an email of May 4, 2023, she stated that "no formal procedures have been established for parties to follow when requesting revisions" to the CMC List and stated that we should address our correspondence to the Office of the Under Secretary of Defense for Acquisition and Sustainment.  We then emailed that Office, requesting a meeting to learn the basis for DJI's addition to the CMC List so that we could frame a de-listing petition.  You responded by an email of May 31, 2023, declining that request and instead stating that we should make a submission articulating the rationale for why the statutory criteria do not apply to DJI.

[5]    For example, DJI drones are used by: Shell (worker safety) https://enterprise-insights.dji.com/blog/shell-using-drones-for-oil-gas-refinery-inspection (last visited Jan. 27, 2023); Exelon (power plant inspections) https://enterprise-insights.dji.com/blog/custom-drone-nuclear-inspection-exelon-empire-drone (last visited Jan. 27, 2023); and Southern Company (equipment inspections and maintenance) https://www.dji.com/newsroom/news/dji-and-southern-company-partner-to-expand-the-use-of-drone-technology-in-the-utility-industry (last visited Jan. 27, 2023).

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

4

19 vaccine distribution,[6] and Nevada Gold mines in support of land survey and stockpile measurement.[7]

DJI primarily distributes its products through third-party commercial resellers.  DJI also sells directly to customers, including by operating an online store.  In addition, DJI sells through third-party e-commerce sites such as Amazon and Alibaba for publicly available, off-the-shelf products.

DJI has been a market leader in safety and was the first major civil UAV manufacturer to implement geofencing.  Geofencing prevents DJI UAVs from taking off from or entering into restricted zones.  DJI determines restricted zones, including airports, power plants, and prisons based on aviation safety and public safety considerations, and works with local authorities on additional geofencing requests.  In less sensitive or restrictive airspace, the geofencing system warns the UAV controller and requires them to confirm their compliance with local aviation rules.  DJI has also implemented temporary geofencing around major stadium events (such as the Super Bowl), forest fires, or other emergency situations that prohibit flight.  In addition, since 2017, DJI has offered a comprehensive drone detection platform known as AeroScope, which allows government agencies and airports to identify DJI UAVs in real-time.  DJI is also the only company to install ADS-B receivers on all UAVs over 250 grams.  These receivers allow DJI users to detect crewed aircraft in their area and avoid any potential collisions.

DJI understands the importance of data security to its customers and gives users of its products control over the data they generate.  DJI drones do not need to connect to the internet to operate.  Following initial activation, DJI drones can be used entirely offline in "airplane mode."  DJI also offers a "local data mode" that prevents any data from being transmitted to or from DJI's flight apps and the internet, while allowing users to choose to access the internet for certain purposes, such as accessing map services.  Consulting companies such as Booz Allen Hamilton, FTI Consulting, and Kivu Consulting have analyzed various DJI products and validated their security, as have the U.S. Department of the Interior, the U.S. National Oceanic and Atmospheric Administration, and the U.S. Department of Homeland Security, and the U.S. Department of Defense.[8]

---

[6]  *See*  https://blog.werobotics.org/2021/01/12/teaming-up-with-pfizer-on-new-cargo-drone-project/ (last visited Jan. 19, 2023); https://dronexl.co/2021/01/26/pfizer-covid-19-vaccines-by-drone/ (last visited Jan. 19, 2023).

[7]  *See*  https://www.propelleraero.com/blog/how-nevada-gold-mines-uses-drones-to-measure-stockpiles-on-a-massive-scale/ (last visited Jan. 19, 2023).

[8]  More information about the scope of these security evaluations and their findings can be found at https://viewpoints.dji.com/blog/no-evidence-of-unexpected-data-transmission (last visited Feb. 3, 2023); *see also*, https://thehill.com/policy/defense/556370-pentagon-report-clears-use-of-drones-made-by-top-chinese-manufacturer/ ("An analysis of the two Da Jiang Innovations (DJI) drones built for government use found 'no malicious code or intent' and are 'recommended for use by government entities and forces working with US services,' the summary said.").  The report was later disavowed

CONFIDENTIAL TREATMENT REQUESTED

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

5

DJI's policy is that its products should not be sold or used for combat purposes, and it will not do business with entities that signal an intention to use its products for such purposes.  Consistent with this policy, on April 26, 2022, DJI temporarily suspended all business activities, including sales to distributors and business partners, in Russia and Ukraine, to prevent the use of DJI products in the ongoing conflict.

## II.     The Section 1260H Designation Criteria Do Not Apply to DJI

Section 1260H of the National Defense Authorization Act of Fiscal Year 2021 requires the public reporting of entities that DOD finds to be "Chinese military compan[ies]," as defined in the statute.  The Section provides for ongoing revisions by which "[t]he Secretary shall make additions or deletions to the most recent list . . . on an ongoing basis based on the latest information available."  Under Section 1260H, a company is defined as a "Chinese military company" according to the following definitions:

(1) Chinese military company.—The term "Chinese military company"—
    (A) does not include natural persons; and
    (B) means an entity that is—
        (i)(I) directly or indirectly owned, controlled, or beneficially owned by, or in an official or unofficial capacity acting as an agent of or on behalf of, the People's Liberation Army or any other organization subordinate to the Central Military Commission of the Chinese Communist Party; or
        (II) identified as a military-civil fusion contributor to the Chinese defense industrial base; and
        (ii) engaged in providing commercial services, manufacturing, producing, or exporting.

Section 1260H(d)(1)(B)(i)(I) does not apply to DJI.  DJI is not owned, controlled, or beneficially owned in any capacity, nor does it act as an agent of or on behalf of, the People's Liberation Army or any other organization subordinate to the Central Military Commission of the Chinese Communist Party.  As stated above, DJI's ownership is primarily concentrated in the hands of its founders and early-stage executives, none of whom are government officials or representatives of government or state-owned entities. The majority of DJI's other investors are in the private sector, including U.S. investment firms.  The remaining investor group, which owns a 5.38% stake with 0.68% voting rights, is comprised of six state-owned Chinese entities, none of which are related to the People's Liberation Army or the Central Military Commission.

---

without explanation in a subsequent press release, available at https://www.defense.gov/News/Releases/Release/Article/2706082/department-statement-on-dji-systems/.

**CONFIDENTIAL TREATMENT REQUESTED**

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

6

Nor does DJI qualify as a "military-civil fusion contributor to the Chinese defense industrial base" under Section 1260H(d)(1)(B)(i)(II).  That term is defined by Section 1260H(d)(2) in terms of eight separate categories, none of which applies to DJI.  Because DOD has not informed us of the basis for DJI's addition to the CMC List, we address each category in turn below.[9]

(A) "Entities knowingly receiving assistance from the Government of China or the Chinese Communist Party through science and technology efforts initiated under the Chinese military industrial planning apparatus."

DJI does not knowingly receive assistance from the Government of China or the Chinese Communist Party through science and technology efforts initiated under the Chinese military industrial planning apparatus.  Moreover, DJI has no knowledge about the aforementioned military industrial planning apparatus.

(B) "Entities affiliated with the Chinese Ministry of Industry and Information Technology, including research partnerships and projects."

DJI is not affiliated with the Chinese Ministry of Industry and Information.  DJI has no research partnerships or projects with the Chinese Ministry of Industry and Information.

(C) "Entities receiving assistance, operational direction or policy guidance from the State Administration for Science, Technology and Industry for National Defense."

DJI does not receive assistance, operational direction, or policy guidance from the State Administration for Science, Technology and Industry for National Defense.  DJI's understanding is that this agency is solely related to the defense industry, to which DJI does not belong.[10]

(D) "Any entities or subsidiaries defined as a 'defense enterprise' by the State Council of the People's Republic of China."

DJI is not defined as a "defense enterprise" by the State Council of the People's Republic of China.[11]  It is DJI's understanding that entities defined as "defense

---

[9]   Where relevant, DJI has provided additional considerations as to why a category does not apply.  But because DJI is not part of the defense or military sector, its understanding of this sector and its regulatory framework is limited.

[10]   DJI's understanding is that an official list of Chinese defense companies is available at http://chinadefense.sastind.gov.cn/english/n6759577/index.html; https://www.sastind.gov.cn/n448154/index.html.

[11]   The State Administration of Taxation, a subdivision of the State Council, defines "Military industry enterprises" as "enterprises and institutions affiliated to the Ministry of Electronics Industry, Aviation

**CONFIDENTIAL TREATMENT REQUESTED**

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

7

enterprises" are required to obtain "military production licenses," as described in Section 1260H(d)(2)(F).  DJI has not applied for or received any such licenses.

(E) "Entities residing in or affiliated with a military-civil fusion enterprise zone or receiving assistance from the Government of China through such enterprise zone."

DJI has reviewed all military-civil fusion enterprise zones located in cities in which DJI entities either reside or are affiliated and have not found any matches.[12]

(F) "Entities awarded with receipt of military production licenses by the Government of China, such as a Weapons and Equipment Research and Production Unit Classified Qualification Permit, Weapons and Equipment Research and Production Certificate, Weapons and Equipment Quality Management System Certificate, or Equipment Manufacturing Unit Qualification."

DJI has not been awarded any military production licenses.  DJI only produces civilian drones and by policy prohibits the use of its products for combat uses. Moreover, DJI notes that it would not even be eligible to apply for certain of these licenses, because DJI is controlled by a foreign shareholder given that its parent, iFlight Technology Company Limited, is based in Hong Kong.

(G) "Entities that advertise on national, provincial, and non-governmental military equipment procurement platforms in the People's Republic of China."

DJI does not advertise on any military equipment procurement platforms.

(H) "Any other entities the Secretary determines is appropriate."

There is no permissible basis whereby the Secretary may determine that DJI is a Chinese military company.  The Secretary does not have unlimited discretion to add any entity to the list.  Rather, the entity must in fact be a "Chinese military company," and, under the doctrine of *ejusdem generis*, the reason for adding the entity must be similar to the other categories in the list.  *See Yates* v. *United States*, 574 U.S. 528, 543–46 (2015) (under this doctrine, "[w]here general words follow specific words in a statutory enumeration, the general words are usually construed

---

Industry Corporation, Aerospace Industry Corporation, Ordnance Industry Corporation, Nuclear Industry Corporation, Shipbuilding Corporation, China Academy of Engineering Physics, and provincial defense industry offices that undertake military equipment, product development, and production planning tasks assigned by the state."  *See* http://fgcx.bjcourt.gov.cn:4601/law?fn=chl331s536.txt (last accessed July 21, 2023).

[12]  While DJI does not know of an official publication listing all military-civil fusion enterprise zones, DJI reviewed a list found at the following link: https://y.qianzhan.com/system/index?q=%E5%86%9B%E6%B0%91%E8%9E%8D%E5%90%88.  DJI has no business locations that match the locations listed.

**CONFIDENTIAL TREATMENT REQUESTED**

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

8

to embrace only objects similar in nature to those objects enumerated by the preceding specific words").  Moreover, without an intelligible standard to guide agency action, the statute would violate the nondelegation doctrine.  *See Gundy* v. *United States*, 139 S. Ct. 2116, 2123 (2019).  The lack of a "comprehensible standard for assessing the applicability of a statutory category" also renders agency action arbitrary.  *ACA Int'l* v. *FCC*, 885 F.3d 687, 700 (D.C. Cir. 2018).

## III.    DJI's Designation on the CMC List Violates the Law

Given that DJI does not satisfy the statutory criteria for a "Chinese military company," DJI's continued presence on the CMC List violates the Administrative Procedure Act (APA) and the NDAA for Fiscal Year 2021.  *See Xiaomi Corp.* v. *Dep't of Def.*, No. 21-280 (RC), 2021 WL 950104, at \*7 (D.D.C. Mar. 12, 2021) (holding that a company's failure to satisfy the statutory criteria for designation on the CCMC List exceeded the Department of Defense's statutory authority and lacked "substantial evidence"); *Luokung Tech. Corp.* v. *Dep't of Def.*, 538 F. Supp. 3d 174, (similar).  Moreover, the lack of an explanation for why DJI is on the CMC List independently violates the APA.  *See Physicians for Soc. Responsibility* v. *Wheeler*, 956 F.3d 634, 644 (D.C. Cir. 2020) ( "It is axiomatic that the APA requires an agency to explain its basis for a decision.").

The failure to provide DJI the evidence upon which the designation is based and the lack of an effective opportunity to challenge the designation also violates due process.  *See Ralls Corp.* v. *CFIUS*, 758 F.3d 296, 319 (D.C. Cir. 2014) ("due process requires, at the least, that an affected party be informed of the official action, be given access to the unclassified evidence on which the official actor relied and be afforded an opportunity to rebut that evidence."); *see also Reeve Aleutian Airways, Inc.* v. *United States*, 982 F.2d 594, 598 (D.C. Cir. 1993) (acknowledging a "liberty interest in avoiding[] damage to [a company's] reputation and business caused by" stigmatizing government action).

DJI reserves all of its rights to challenge judicially its designation if DOD fails to promptly delete DJI from the list as required by Section 1260H(b)(3).

## IV.    DJI is Committed to a Cooperative Relationship With the U.S. Government, as Evidenced by its Strong  U.S. Sanctions and Export Controls Compliance Framework and its Prohibition on Sales for Combat Use

The Company is committed to a cooperative relationship with the U.S. government, as evidenced by its strong U.S. sanctions and export controls policy to prevent direct and commercial reseller sales to entities and jurisdictions sanctioned by the United States and its longstanding prohibition on sales for combat use.  The Company's policies in this regard go beyond what U.S. law requires of non-U.S. companies.

**CONFIDENTIAL TREATMENT REQUESTED**

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

DJI has a dedicated compliance team consisting of seven legal professionals, overseen by the head of DJI's legal department, which primarily focuses on U.S. sanctions and U.S./E.U. export control compliance. The team consults as needed with U.S. outside counsel (Paul, Weiss, Rifkind, Wharton & Garrison LLP). The team is responsible for maintaining and updating internal compliance policy documents, training business teams, and conducting reviews of the implementation of compliance programs. The compliance team is empowered by DJI's senior management to work closely with business teams to implement compliance policies. Key business partners in DJI's logistics, sales, and finance teams work on a day-to-day basis with the compliance team to ensure that workflows align with compliance requirements. DJI also requires mandatory review sessions for compliance incidents in order to recognize mistakes and improve.

The Company's sanctions and export control policy, which was last revised this year, applies across DJI's operations and meets and exceeds U.S. governmental requirements. For example, the policy prohibits business with parties on the SDN list (and entities owned over 50% by an SDN and, for SDN governmental agencies, any governmental agencies under their indirect oversight including local and municipal agencies), even where there would not be a U.S. nexus to a potential transaction.[13] DJI also does not sell to U.S. comprehensively sanctioned jurisdictions.

The policy further requires that customers "never use DJI products for combat purposes." If DJI identifies a customer is located in a comprehensively sanctioned country or region, listed on the SDN List, or using DJI products for combat purposes, the Company will "suspend the transaction immediately and consult the legal Department."

Two aspects of DJI's sanctions policies and procedures bear emphasis. First, DJI conducts sanctions screening to ensure that it does not engage in any sales to any persons listed on the SDN List or any transactions that would violate the U.S. export control laws.[14] DJI historically had manually screened counterparties against the U.S. Consolidated Screening List since 2015. In 2021, DJI implemented an automated sanctions screening solution for its e-commerce site in all markets. Additionally, DJI has also manually screened for the involvement of U.S. comprehensively sanctioned jurisdictions since 2015.

Second, over the last 12 months DJI has taken a series of steps to enhance its policies and strengthen controls for its commercial resellers within China to prohibit sales to SDNs. DJI has required distributors in China to report prospective enterprise customers, which include governmental entities, to DJI in advance of a sale, as well as to screen customers themselves. Through these controls, DJI then screens the names of these prospective customers and, if they are sanctioned, DJI will block the transaction before it occurs. The Company also requires commercial distributors to sign distribution

---

[13] DJI has always prohibited transactions with parties on the SDN list where there was a U.S. nexus.

[14] This screening occurs regardless of U.S. nexus. None of DJI's products are U.S.-origin under the EAR, except to the extent DJI sells products from the United States (to the North American market).

**CONFIDENTIAL TREATMENT REQUESTED**

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

10

agreements and export control commitment letters, which have been revised and strengthened within the last year, that prevent DJI products from being sold to restricted parties. The distribution agreements contain an export and trade compliance clause that expressly requires compliance with applicable export controls, along with additional export compliance requirements as communicated by DJI, which include prohibitions on sales to SDNs (and entities owned over 50% by an SDN and, for SDN governmental agencies, any governmental agencies under their indirect oversight including local and municipal agencies) or other entities designated on other equivalent sanctions lists. The commitment letters further require that distributors agree to "never directly or indirectly use DJI products for the purposes of, with, or related to combat use, rocket or missile systems, long-range (equal to more than 300 KM) unmanned aerial vehicles, nuclear, biological and chemical weapons, or terrorism activities." The commitment letters, in turn, impose on commercial resellers end-user and end-use screening obligations, provide DJI access to the resellers records, and expressly require commercial resellers to comply with U.S. sanctions, the U.S. Export Administration Regulations ("EAR"), and EU sanctions. All of DJI's distributors worldwide are required to sign this commitment letter. Resellers further must agree to DJI's sales policies and enterprise resellers in the China market must seek prior approval before executing any sales contracts with Chinese enterprise entities, including governmental agencies.

In addition, DJI's compliance program incorporates periodic trainings regarding U.S. sanctions and export control compliance, as well as an annual audit process.

DJI remains committed to maintaining and strengthening its internal controls in consultation with outside counsel, including to the extent new issues arise or gaps in existing policies or procedures are identified.

## V.     Impact to U.S. Stakeholders

DOD's decision to place DJI on its CMC List has had negative consequences on a number of U.S. stakeholders that use and depend on DJI products and wish to continue to do so. Government agencies—as well as various large and small businesses and sole proprietors—have made significant investments in DJI products given their uniquely competitive pricing, high quality, and safety features. Additionally, U.S. software developers have created apps based on DJI products given DJI's broad market share. As a result of DOD's designation, DJI has been falsely stigmatized as a Chinese military company and a national security threat,[15] and there is now significant uncertainty among the customer base regarding DJI's future and the ability to use and access DJI products in the long term.

This stigmatization and uncertainty not only disrupts users who have already invested in DJI's products, but it also impacts users who would otherwise seek to acquire

---

[15]   DOD's designation of DJI was widely reported in the media.

CONFIDENTIAL TREATMENT REQUESTED

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

DJI products.  Given DJI products' unique combination of price point, quality, and safety features, customers who feel influenced or constrained by the DOD designation to not purchase DJI products experience a tangible harm—competitor drone companies do not provide products with the same operational functions at the same price points.  The results are higher costs and lower operational functionality experienced by a range of users in the United States.[16]  For some potential users, such as a local police or fire department, this could mean the difference between starting a drone program and not doing so.  As stated in one article:  "No other company's offerings come close to DJI's cheap, powerful drones, experts say—potentially leaving government agencies, police and first responders in the lurch if DJI is shut out."[17]  In addition, the designation has materially harmed and stigmatized the approximately 167 U.S. employees of DJI's U.S. subsidiaries.

Below, we provide an overview of the various U.S. stakeholders who have been and continue to be collaterally impacted by DJI's designation.

a.  State Governments

Numerous states government agencies make use of DJI products.  According to one study of drone use by public safety agencies, 924 out of the 1030 agencies surveyed used DJI drones.[18]  The next largest competitor only provided drones to 46 agencies.  For example, the Massachusetts Department of Transportation uses DJI drones regularly to assess and inspect state infrastructure and respond to emergencies.[19]  The New York State Department of Environmental Conservation also uses DJI drones for search and rescue,

---

[16]   *See also* Daniel Castro, *Using Country-of-Origin as a Litmus Test for Drone Security Is Bad Policy*, INFO. TECH. & INNOVATION FOUND. (Oct. 24, 2022), https://itif.org/publications/2022/10/24/using-country-of-origin-as-a-litmus-test-for-drone-security-is-bad-policy/ ("DJI is widely considered to make the best drones.  Indeed, the quality of these drones is the reason that so many federal agencies, from the FBI to DHS, have purchased DJI's foreign-made drones.") (last visited Feb. 5, 2023); Kiran Stacey, *Pentagon drones '8 to 14 times' costlier than banned Chinese craft*, FT TIMES (Jul. 18, 2021), https://www.ft.com/content/dd2e936e-5934-49f1-8aa6-29dea9a41b18 ("Camera drones developed by the Pentagon are more expensive and less capable than the Chinese-made models they were designed to replace, according to an internal US government memo seen by the Financial Times.") (last visited Feb. 5, 2023).

[17]   *See*  https://www.axios.com/2019/11/23/dji-chinese-drone-ban-vacuum-skydio  (last visited Feb. 5, 2023).  The article continued:  "'They make the best stuff,' says Chris Anderson, founder of 3DR, a Berkeley drone company that was DJI's primary competitor until it shuttered its hardware shop in 2016. It now builds software that works with DJI drones."

[18]   *See* DAN GETTINGER, PUBLIC SAFETY DRONES, CENTER FOR THE STUDY OF THE DRONE AT BARD COLLEGE (3d ed. 2020).

[19]   *See*,  https://www.mass.gov/service-details/about-the-drone-program  (last visited Jan. 19, 2023); https://data.aclum.org/government-drones-ma/ (using "transportation" as keyword) (last visited Jan. 19, 2023).

**CONFIDENTIAL TREATMENT REQUESTED**

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

12

wildlife protection and management, and environment surveys.[20]  Following DOD's designation, certain state government agencies have cancelled orders.

### b.  Local Law Enforcement

Local government agencies across the United States have made extensive use of DJI UAVs.[21]  Local law enforcement has made use of DJI UAVs to assist in assessing situations in which individuals have needed rescuing.[22]  UAVs have also assisted local law enforcement in fighting crime, by allowing law enforcement to make use of night vision and thermal imaging capabilities.[23]  DJI drones have also proved to be reliable tools in protecting law enforcement officers' safety.[24]

Often, small police departments invest in one or more DJI drones as a way of starting a drone program, and there are examples of police departments fund-raising in the community to be able to buy their first drone.  As the market currently stands, there is no other UAV that offers the combination of low price point, quality, and safety features as DJI drones.[25]  As a result, a police department's decision to not buy a DJI UAV—or to not

---

[20]  *See* https://content.govdelivery.com/accounts/NYSDEC/bulletins/1b94445 (last visited Jan. 19, 2023); https://www.nyclu.org/en/campaigns/prying-eyes-government-drone-data-across-new-york-state (last visited Jan. 19, 2023).

[21]  Local government users include: The Los Angeles Regional Training Center, Ross County Soil and Water District (Ohio), City of Alameda (California), State of Montana, City of Tuscan (Arizona), City of Waukesha (Wisconsin), Oklahoma City (Oklahoma), Roanoke County (Virginia), Sedgwick County (Kansas), Washington State Patrol, Los Angeles Fire Department, Southern Manatee Fire Rescue (Florida), New York City Police Department, Texas Department of Public Safety/Rangers, York County Sheriff (South Carolina), and the Irvine Police Department (California).

[22]  The Dallas police department has utilized DJI UAVs on at least 15 specifically designated missions in which the UAVs were used to fly into the interior of a building to assess the situation.

[23]  Local law enforcement in Saginaw, Michigan made use of thermal imaging in order to arrest a burglary suspect.

[24]  *See, e.g.,* https://okcfox.com/news/local/oklahoma-city-police-sees-success-with-drone-program (Oklahoma City Police used a DJI Mavic "to help locate an armed suspect, leading to a peaceful surrender.") (last visited Jan. 19, 2023); https://www.metrowestdailynews.com/story/news/2021/08/16/police-use-tactical-tool-drones-help-dangerous-situations/8095565002/ ("It's expensive, but if you look at the grand scheme of things, it's used a lot by a lot of our town departments…When you look at officer safety and fire safety, you can't put a cost on that.") (last visited Jan. 19, 2023); https://www.police1.com/police-products/police-drones/articles/nj-pd-demonstrates-new-drones-public-safety-capabilities-LOjpVOIhlfuZbsV3/ ("Recently we've used our program to locate lost and missing people, apprehend criminals and most importantly, for officer safety, that's one of our main concerns in deployment"); https://dronexl.co/2021/08/16/vallejo-police-department-expands-successful-drone-program/ (last visited Jan. 19, 2023).

[25]  *See, e.g.,* https://www.lancasterny.gov/document-center/town-board-minutes-agendas/pre-filed-resolutions/2023/5732-1-3-2023-pre-filed-resolutions/file.html (last visited Jan. 19, 2023).

**CONFIDENTIAL TREATMENT REQUESTED**

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

13

further maintain and add to its current fleet of DJI UAVs—due to DJI's stigmatization results in a tangible harm to these agencies and their public safety missions.

### c. Local Fire Departments/First Responders

DJI UAVs are used by many local first responders in the United States, and are often crucial in aiding disaster relief teams during natural disasters.  Relief teams have made use of DJI UAVs following tornadoes and flooding to view debris, as well as to strategize how to assist homeowners and determine the proper equipment needed to provide aid.[26]  In the wake of Hurricane Ida, the Cranford Police Department in New Jersey used DJI UAVs as a key component of disaster relief efforts by helping debris removal teams plan resource allocation by locating debris fires not visible from the ground, as well as to locate and direct rescue boats to victims.  UAVs have also been used by local police and fire departments to assist in fire rescue.  In Salinas, California, the Salinas Police Department and fire crews used DJI UAVs to collect infrared images during a fire at a processing plant that risked igniting over 35,000 pounds of ammonia, allowing fire crews to identify the source of the fire and to prevent additional damage.

### d. Agriculture

DJI agricultural drones have replaced manned aircrafts for crop spraying purposes across the country, including in Salem, Arkansas; Centralia, Missouri; Unity, Ohio; and Paris, Tennessee.  DJI UAVs have also been used for agricultural research; for example, the Alabama Cooperative Extension System and Washington State University use DJI UAVs for precision agriculture research.

### e. Environmental Protection

DJI UAVs have been used by scientists and researchers in multiple regions of the United States to aid with the study of environmental phenomena, including climate change, water level erosion of the Great Lakes, and volcanic eruptions in Hawaii, as well as with mapping geological hazards.[27]

---

[26]  *See, e.g.*, https://twitter.com/NorthwestFire/status/1491493665587425281 ("Tucson, AZ fire department used DJI drone to find a cyclist that had crashed into cactus") (last visited Jan. 19, 2023); https://www.wdbj7.com/2021/12/26/drones-thermal-camera-finds-2-lost-hikers-bedford/ ("Bedford, VA fire department used DJI drone to find two missing hikers") (last visited Jan. 19, 2023); https://www.wevv.com/news/kentucky/drone-used-to-locate-90-year-old-missing-niagara-man-whod-been-trapped-under-utv/article_7faf080f-13de-5667-84cb-1e3a66a761aa.html ("Niagara, KY County Sheriff's Office used DJI drone to find a missing 90-year old") (last visited Jan. 19, 2023); https://www.baptiststandard.com/news/baptists/tennessee-association-first-to-use-drone-in-disaster-relief/ ("Morristown, TN's Nolachucky Baptist Association Disaster Relief used DJI drone to find missing teenager") (last visited Jan. 19, 2023).

[27]  Researchers from Colorado State University used fleets of UAVs to monitor updrafts during thunderstorms.  Civil engineering researchers at Purdue University and the University of Hawaii have used DJI UAVs to capture satellite images and track coastal erosion around Lake Michigan and the

CONFIDENTIAL TREATMENT REQUESTED

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

14

Researchers and conservationists have also used DJI UAVs to survey populations of whale and fish species, as well as amphibian species.[28]  In these cases, UAVs provide researchers with the opportunity to gain situational awareness and observation without risking the safety of either the wildlife or the researchers.

> f.   Developers/Software

Since DJI is the largest UAV manufacturer, the majority of drone app developers within the United States work with DJI products and create software specifically for use with DJI UAVs and payloads. To date, approximately 4,800 U.S.-based developers have created their own software or hardware solutions based on DJI products.[29]  DOD's designation of DJI has created disruption and uncertainty for these app developers, who have already invested in development around DJI and who question whether they should continue to work on DJI's platform or attempt to switch to another drone platform.  As there is no clear competitor with a substantial portion of the market, this would lead to an effective splintering of app developers.

> g.   Large and Small Businesses

Numerous businesses within the United States make extensive use of DJI UAVs, ranging for large corporations like Shell, Chevron, and Pfizer, to small businesses and sole proprietors.  Businesses in the oil and gas industry use UAVs to conduct pipeline inspections that are too dangerous for workers to manually perform, surveyors use UAVs to expedite their work, and businesses in the creative industries, such as cinematographers, incorporate UAVs into their array of work-related tools.[30]  These businesses are negatively

---

island of Hawaii, respectively.  The United States Geological Survey used DJI UAVs for data collection in the wake of the eruption of the Kilaeua volcano in Hawaii when the active volcano made it impossible for manned aircraft to obtain information necessary for the emergency response.  The State of Oregon's Department of Geology and Mineral Industries also uses a fleet of UAVs for routine monitoring and response to natural disasters such as landslides and earthquakes.

[28]   Oceans Unmanned, a California-based conservation organization, working alongside the National Oceanic and Atmospheric Agency, made use of DJI UAVs in order to help an entangled humpback whale in Alaska.  Similarly, the Massachusetts-based Ocean Alliance has made use of DJI UAVs for years in monitoring and collecting data on whales in the Pacific Ocean.  Biologists with the Alaska Department of Fish and Game and at the University of Alabama have used DJI UAVs to monitor reproductive behavior of coho salmon and green sea turtles, respectively, as well as to monitor population size.

[29]   *See, e.g.*, DroneDeploy – aerial mapping and modeling solutions https://www.dronedeploy.com/ (last visited Jan. 19, 2023); Pix4D – photogrammetry software https://www.pix4d.com/ (last visited Jan. 19, 2023); DroneLink – mission planning, autonomous fleet control https://www.dronelink.com/ (last visited Jan. 19, 2023).

[30]   *See,   e.g.*,   https://enterprise-insights.dji.com/blog/shell-using-drones-for-oil-gas-refinery-inspection (Shell used DJI UAVs for inspection of a refinery in Houston, Texas at a height that was risky for human operation)   (last   visited   Jan.   19,   2023);   https://www.chevron.com/-/media/shared-

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

15

impacted by the uncertainty around DJI and may feel compelled to purchase more expensive UAVs with lower quality.  The perceived unavailability of DJI options could lead some businesses to decide to not make use of UAVs at all, which would negatively impact the quality of their services and their ultimate bottom line.

Further, DJI makes use of approximately 900 distributors and retailers within the United States, most of which are small businesses, which are also impacted by DJI's designation.

h.   U.S.-based DJI personnel

As stated above, DJI employs approximately 167 employees in the United States. Partly due to DJI's designation on the CMC List, U.S. employees have faced harassment in public, including being called traitors and experiencing other insults.  In addition to the emotional impact on these employees, there is risk that they will be stigmatized in the longer term if they seek employment at other firms.

**CONCLUSION**

DJI has demonstrated that it does not fit the Section 1260H criteria and that DOD should therefore promptly "delet[e]" DJI from the CMC List as required by the statute. Further, DJI's designation on the CMC List violates the Administrative Procedure Act, the NDAA for Fiscal Year 2021, and due process.  The wide use and dependence on DJI products by a variety of U.S. stakeholders reinforces the importance and urgency of deleting DJI from the list.

DJI respectfully requests the administrative record underlying DJI's designation and a meeting to discuss this matter.

\*          \*          \*

This submission contains business confidential commercial and financial information regarding DJI that is exempt from disclosure pursuant to the Freedom of Information Act (5 U.S.C. § 552, *et seq*.), 31 C.F.R. Part 1, and 31 C.F.R. § 501.805.  If a request is made to release this information, DJI respectfully requests an opportunity to be notified and heard prior to any decision on release.

---

media/documents/chevron-methane-report.pdf (Chevron has used DJI UAVs for methane detection) (last visited Jan. 19, 2023); https://dronelife.com/2022/10/12/dronedeploy-and-bnsf-on-autonomous-reality-capture-drone-mapping/ (BNSF Railway has used DJI UAVs for bridge and rail infrastructure inspection) (last visited Jan. 19, 2023); https://blog.werobotics.org/2021/01/12/teaming-up-with-pfizer-on-new-cargo-drone-project/ (Pfizer has used DJI UAVs to distribute essential medicine to remote health facilities) (last visited Jan. 19, 2023); https://dronexl.co/2021/01/26/pfizer-covid-19-vaccines-by-drone/ (Pfizer used DJI UAVs to distribute the Covid-19 vaccine) (last visited Jan. 19, 2023).

**CONFIDENTIAL TREATMENT REQUESTED**

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

16

Respectfully submitted,

/s/ Loretta Lynch

Loretta Lynch
Michael Gertzman
Roberto Gonzalez

Paul, Weiss, Rifkind, Wharton & Garrison LLP

**CONFIDENTIAL TREATMENT REQUESTED**

# EXHIBIT B

**THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

SZ DJI TECHNOLOGY CO., LTD., et al.,

                Plaintiffs,

           - v -

U.S. DEPARTMENT OF DEFENSE, et al.,

                Defendants.

Index No.

---

## DECLARATION OF ZHANG TAO

Zhang Tao (张涛) declares pursuant to 28 U.S.C. § 1746:

1.     I was a software testing engineer at SZ DJI Technology Co., Ltd. ("DJI") from January 2018 to June 2021.

2.     During my time as a software testing engineer at DJI, I was responsible for testing software applications supporting DJI's Enterprise line products.   In connection with this work, I developed patents WO2021146875A1 and WO2021253247A1 with my colleagues at DJI.   WO2021146875A1, titled "Device Control Method, Image Display Method, Device, and Storage Medium," involves a method for controlling the shutter of cameras.   The patent was filed in January 2020. WO2021253247A1, titled "Inspection Method and Apparatus for Movable Platform, and Movable Platform and Storage Medium," involves technology for a movable platform—such as a drone—for cameras.   The patent was filed in June 2020.

3.     I left DJI in June 2021 to work for Shenzhen Meituan Technology Co., Ltd. ("Meituan"), where I served as a software testing engineer until April 2023.   Meituan

2

provides a Chinese domestic online shopping platform for local consumer products and retail services.

4.      After Meituan, I worked for Shenzhen Dayu Wuxian Technology Co., Ltd. ("Mobiuspace") as a software testing engineer from July 2023 to January 2024. Mobiuspace is an internet company that develops mobile applications for global users.

5.      After Mobiuspace, I came to work as a software testing engineer at Shenzhen Myotee Science and Technology Co., Ltd. ("Myotee"), where I have been since January 2024.  Myotee develops and provides video editing applications.

6.      None of Mobiuspace, Meituan, and Myotee is affiliated with DJI.

7.      I understand that there is a patent (CN114061763A) related to a temperature measuring device that cites another person called "Zhang Tao" as an inventor.  I had no involvement in this patent and do not know any of its inventors.  The patent appears to have been filed by the National Defense Engineering Research Institute of the Chinese People's Liberation Army Academy of Military Sciences (the "Academy") in December 2021.  I was working for Meituan in December 2021.  I have no connection with the Academy and have not participated in any research for the Academy.

8.      I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

9.      Executed on October 8, 2024 in Shenzhen, China.

/s/ _____

Zhang Tao (张涛)

**EXHIBIT C**

**THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

SZ DJI TECHNOLOGY CO., LTD., et al.,

                Plaintiffs,

             - v -

U.S. DEPARTMENT OF DEFENSE, et al.,

                Defendants.

Index No.

## DECLARATION OF ZHENG WEI

Zheng Wei (郑伟) declares pursuant to 28 U.S.C. § 1746:

1.      I am an embedded software engineer at the Imaging Department of Xi'an DJI Technology Co., Ltd. ("Xi'an DJI"). I have been in this position since June 2018. Previously, I was an embedded software engineer at SZ DJI Technology Co., Ltd. ("DJI") from March 2018 to May 2018.

2.      The Imaging Department is responsible for software development and maintenance of imaging systems used in products sold by DJI and its affiliates. As an embedded software engineer, I have participated in embedded software development for professional cameras, consumer drones, and consumer handheld imaging products.

3.      In the course of my work for Xi'an DJI, my team and I developed a patent WO2022126415A1, titled "Method and Apparatus for Operating Tracking Algorithm, and Electronic Device and Computer-Readable Storage Medium," which relates to a method for operating a computer tracking algorithm that can be used in cameras. The patent was filed in December 2020.

2

4.      I understand that there is a patent (CN112344798B) titled "Ogre Spider Bio-Inspired Flexible Capture System for Non-Cooperative Flying" that cites to an inventor also named "Zheng Wei."  I was not involved in the development of this patent and do not recognize any of the listed inventors.  The National University of Defense Technology appears to have filed this patent in November 2020.  I have no connection to this university. I am not aware of any connection between DJI and this university.  Moreover, this patent appears to relate to the field of aircraft capture, which falls outside of my area of expertise; I am a software engineer for imaging systems, not an aeronautical engineer.

5.      I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

6.      Executed on October 8, 2024 in Xi'an, China.

/s/
Zheng Wei (郑伟)

**EXHIBIT D**

**THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

SZ DJI TECHNOLOGY CO., LTD., et al.,

                  Plaintiffs,

                  - v -

U.S. DEPARTMENT OF DEFENSE, et al.,

                  Defendants.

Index No.

---

## <u>DECLARATION OF ZHANG YUXIN</u>

Zhang Yuxin (张玉新) declares pursuant to 28 U.S.C. § 1746:

1.      I am an Associate Professor at the College of Automotive Engineering at Jilin University ("JLU") in China.  I am also an outside automotive safety consultant for SZ Zhuoyu Technology Co., Ltd. ("Zhuoyu"), an affiliate of SZ DJI Technology Co., Ltd. ("DJI") that offers Advanced Driver-Assistance System (ADAS) products to passenger car makers.

2.      I graduated from JLU in 2016 with a joint Ph.D. in mechanical engineering with the University of California, Berkeley.  After graduation, I remained at JLU, first as a postdoctoral researcher in automated driving systems safety engineering, and then an Associate Professor at the JLU State Key Laboratory of Automotive Simulation and Control (the "Laboratory").  Designation as a "State Key Laboratory" entitles the Laboratory to receive research grants from the government and industry, akin to the national laboratory system in the United States.

3.      My main areas of research include automated car safety system engineering, as well as smart car functional safety and safety of the intended functionality (SOTIF).  I have published in a number of journals including the IEEE Transaction on Intelligent Vehicles, Journal of Intelligent and Connected Vehicles, Journal of Applied Energy, Journal of Mechanical Systems and Processing, and Journal of the Franklin Institute, among others.

4.      Given my areas of expertise, I have advised a number of private companies on safety issues related to automated driving systems.  Among them, I have served as an outside automotive safety consultant at Zhuoyu since January 2023, and previously at DJI from July 2019 to December 2022 before Zhuoyu spun off from DJI.  As an automotive safety consultant, I advise the company on compliance with relevant automotive safety standards, as well as identification and mitigation of potential safety hazards related to ADAS systems.  In this role, I also developed 19 patents and/or patent applications related to the safety and testing of ADAS systems in cars, which have been assigned to DJI or Zhuoyu.  None of these patents were developed for military or defense applications.

5.      As an academic, I regularly apply for funding for my research projects.  I have participated in over a dozen research projects during the course of my academic career that were funded by various institutions, including for example, the National Natural Science Foundation of China and the SAIC Motor Corp., Ltd Innovation Fund.  Between October 2020 and October 2022, I led a research project on the topic of "Construction and Safety Assessment of SOTIF Scenarios of Automated Driving Systems of Passenger Cars" funded by the Ministry of Industry and Information Technology (MIIT).  As the name

suggests, this research project focused on the safety assessment of automated driving systems for passenger cars; it was not related to any military or defense applications.

6.      This research project was also independent from my consulting role for Zhuoyu or DJI.  Neither Zhuoyu nor DJI participated in this project.  Moreover, since this is a government-funded project, I am prohibited from disclosing the details of this project to any third-party, including Zhuoyu and DJI.  I have not participated in any other research projects funded by MIIT since October 2022.

7.      I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

8.      Executed on October 8, 2024 in Jilin, China.

/s/ *Yuxin Zhang*

Zhang Yuxin (张玉新)

# EXHIBIT E

# 西安高新区投资合作局

## 证　明

　　西安大疆创新科技有限公司注册地址为：西安市高新区锦业一路34号国家服务外包示范基地二区，该注册地址所在园区不是军民融合产业园区。

　　特此证明。



西安高新区投资合作局

2024 年 9 月 29 日



# Tribeca Translations, Inc.

## CERTIFICATION OF ACCURACY OF TRANSLATION

Tribeca Translations, Inc. hereby certifies that the attached translations have been translated by a language expert competent in the translation of Chinese language documents into English, and is to the best of its knowledge and belief, a complete and accurate translation into English of the document titled **"Xi'an High-Tech Industrial Development Zone, Investment Cooperation Bureau, Certificate"** dated April 29, 2024, originally written in Chinese.

Signed: _Madoka M_____

Madoka Murakami
Tribeca Translations, Inc.

Date: October 18, 2024

Notarization:

State of _Colorado_
County of _____

The foregoing instrument was acknowledged before me this _17_ day of _October_, 20 _24_ by _Madoka Murakami_.

_✓_ Personally known or ___ produced _____ as identification.

**EUGENE SONG
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID 20214042347
MY COMMISSION EXPIRES 10/27/2025**

# Xi'an High-Tech Industrial Development Zone Investment Cooperation Bureau

## Certificate

Xi'an DJI Technology Co., Ltd. has the registered address of National Service Outsourcing Demonstration Base Zone 2, No. 34, Jinye 1st Road, Xi'an High-Tech Industrial Development Zone. The park where the registered address is located is not a military-civilian fusion enterprise zone.

This is hereby to certify that the above information is true and accurate.

Investment Cooperation Bureau

Xi'an High-Tech Industrial Development Zone

September 29, 2024

[Stamp: Investment Cooperation Bureau, Xi'an High-Tech Industrial Development Zone 6101990505158]

# EXHIBIT F



Tribeca Translations, Inc.

CERTIFICATION OF ACCURACY OF TRANSLATION

Tribeca Translations, Inc. hereby certifies that the attached translations have been translated by a language expert competent in the translation of Chinese language documents into English, and is to the best of its knowledge and belief, a complete and accurate translation into English of two maps named **"Figure 1. National Service Outsourcing Demonstration Base"** and **"Figure 2. Distance Between DJI (green) and the Apparent Military-Civil Fusion Industrial Park (red)"** respectively, originally written in Chinese.

Signed: _____

Madoka Murakami
Tribeca Translations, Inc.

Date: October 18, 2024

Notarization:

State of COLORADO
County of _____

The foregoing instrument was acknowledged before me this 1Y day of October , 2024 by MADOKA MURAKAMI .

✓ Personally known or ___ produced _____ as identification.

**EUGENE SONG**
**NOTARY PUBLIC**
**STATE OF COLORADO**
**NOTARY ID 20214042347**
**MY COMMISSION EXPIRES 10/27/2025**

8354 Northfield Blvd., Suite 3700, Denver, Colorado 80238 USA   www.tribecatranslations.com

[TRANSLATION]



**Figure 1. National Service Outsourcing Demonstration Base**

[TRANSLATION]



**Figure 2. Distance Between DJI (green) and the Apparent Military-Civil Fusion Industrial Park (red)**