# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SZ DJI TECHNOLOGY CO., LTD., *et al*., | |
| Plaintiffs, | No. 1:24-cv-02970-PLF |
| v. | |
| U.S. DEPARTMENT OF DEFENSE, *et al.,* | |
| Defendants. | |

## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Plaintiffs SZ DJI Technology Co., Ltd. ("SZ DJI") and its wholly owned subsidiary Shenzhen Dajiang Baiwang Technology Co., Ltd. ("Baiwang") (collectively, "DJI"), by and through their undersigned counsel, hereby respectfully move for summary judgment against Defendants, the U.S. Department of Defense ("DoD"), Pete Hegseth, in his official capacity as Secretary of Defense, U.S. Department of Defense, and Dr. Vic S. Ramdass, in his official capacity as Acting Assistant Secretary of Defense for Industrial Base Policy.

Plaintiffs respectfully request that the Court grant summary judgment to Plaintiffs, declare that Defendants violated the Administrative Procedure Act and Plaintiffs' rights to due process in designating DJI as a "Chinese Military Company" ("CMC") under Section 1260H of the William M. (Mac) Thornberry National Defense Authorization Act ("NDAA") for Fiscal Year 2021, Pub. L. No. 116-283, 134 Stat. 3388, 3965–3966 (Jan. 1, 2021), hold unlawful and set aside Defendants' decision to designate DJI as a CMC, and order Defendants to remove DJI from the CMC list.

In support of this motion, Plaintiffs submit the accompanying Memorandum of Points and Authorities. A proposed order is attached. Plaintiffs request that an oral hearing be held to aid the Court's resolution of this motion.

Dated:  March 14, 2025                    QUINN   EMANUEL   URQUHART   &
                                          SULLIVAN, LLP


                                          /s/ Samuel G. Williamson
                                          Samuel G. Williamson (D.C. Bar No. 984748)
                                          2601 South Bayshore Drive, Suite 1550
                                          Miami, Florida 33133
                                          samwilliamson@quinnemanuel.com
                                          Tel.: (305) 402-4880
                                          Fax: (305) 901-2975

                                          Derek L. Shaffer (D.C. Bar No. 478775)
                                          1300 I Street, Suite 900
                                          Washington, DC 20005
                                          derekshaffer@quinnemanuel.com
                                          Tel.: (202) 538-8000
                                          Fax: (202) 538-8100

                                          Samuel P. Nitze (Registration No. 4859443)
                                          Quinn Emanuel Urquhart & Sullivan, LLP
                                          295 5th Avenue, 9th Floor
                                          New York, New York 10016
                                          Tel: (212) 849-7000

                                          *Attorneys for Plaintiffs*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

SZ DJI TECHNOLOGY CO., LTD., *et al.*,

               Plaintiffs,

     v.

U.S. DEPARTMENT OF DEFENSE, *et al.*,

               Defendants.

No. 1:24-cv-02970-PLF

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................1

STATEMENT OF FACTS .......................................................................................2

    A.    Statutory Framework ....................................................................2

    B.    Factual Background and Procedural History ...............................4

        1.    DJI's Ownership And Business ...................................4

        2.    DoD's Designation And Redesignation Of DJI As A CMC.....................8

        3.    DoD's Action Harms Plaintiffs And The U.S. Public ..............................11

STANDARD OF REVIEW ...................................................................................13

ARGUMENT .......................................................................................................15

I.      DOD APPLIED THE INCORRECT LEGAL STANDARD ...........................................16

II.    DOD IGNORED CONTRADICTORY RECORD EVIDENCE ......................................17

III.   DOD'S DECISION IS CONTRARY TO DJI'S DUE PROCESS RIGHTS ...................18

IV.   DOD FAILS TO PROVIDE A RATIONAL CONNECTION BETWEEN FACTS SUPPORTED BY SUBSTANTIAL EVIDENCE AND ITS DECISION TO LIST DJI AS A CMC .....................................................................................20

    A.    DJI Is Not Owned By The SASAC.....................................21

        1.    DJI Is Not A State-Owned Enterprise Directly Owned By The SASAC.....................................21

        2.    DJI Is Not Indirectly Owned By The SASAC ...........................................23

    B.    DJI Is Not A Military-Civil Fusion Contributor To The Chinese Defense Industrial Base .......................................................26

        1.    DJI Does Not Contribute To The Chinese Defense Industrial Base..........27

        2.    DJI Does Not Receive Assistance From The Government Of China Under The Chinese Military Planning Apparatus.....................................28

            (a)    The NETC Program Is Not Part Of Any Military Industrial Planning Apparatus .........................................................30

            (b)    DJI Has No Relationship With XMD Or Any Military District.........................................................................32

        3.    DJI Is Not Affiliated With The MIIT .......................................32

            (a)    DJI's Participation In Safety-Standard Drafting Is Insufficient ......................................................................33

            (b)    A University Professor Serving As Consultant To DJI And MIIT Is Insufficient.........................................................35

        4.      DJI Does Not Reside In And Is Not Affiliated With A Military-Civil Fusion Enterprise Zone ..................................................36

    C.    To The Extent Relevant, DoD's Prior Grounds That Are Now In The Background Section And Its Claim Regarding DJI Product Exports To Ukraine Are Incorrect. ...........................................................38

V.      BECAUSE DJI DOES NOT QUALIFY AS A CMC, DOD'S DECISION TO LIST DJI AS ONE EXCEEDED DOD'S AUTHORITY .................................40

VI.    THE COURT SHOULD SET ASIDE DOD'S DECISION TO LIST DJI AS A CMC AND COMPEL DOD TO DELETE DJI FROM THE CMC LIST .......................40

CONCLUSION....................................................................................................41

# TABLE OF AUTHORITIES

## Cases

*ACA Int'l v. FCC*,
    885 F.3d 687 (D.C. Cir. 2018) ............................................................................ 24, 29, 36

*Airmotive Eng'g Corp. v. Fed. Aviation Admin.*,
    882 F.3d 1157 (D.C. Cir. 2018) ............................................................................ 14

*Allina Health Servs. v. Sebelius*,
    746 F.3d 1102 (D.C. Cir. 2014) ............................................................................ 40

*Battineni v. Mayorkas*,
    2024 WL 4367522 (D.D.C. Oct. 2, 2024) ............................................................ 13, 14, 15

*Bridgeport Hosp. v. Becerra*,
    108 F.4th 882 (D.C. Cir. 2024) ............................................................................ 40

*Buffalo Field Campaign v. Zinke*,
    289 F. Supp. 3d 103 (D.D.C. 2018) ...................................................................... 16, 17

*Butte Cnty. v. Hogen*,
    613 F.3d 190 (D.C. Cir. 2010) .............................................................................. 17, 18

*Cablevision Sys. Corp. v. FCC*,
    649 F.3d 695 (D.C. Cir. 2011) .............................................................................. 14

*In re Chinese-Manufactured Drywall Prods. Liab. Litig.*,
    MDL No. 2047, 2014 WL 4809520 (E.D. La. Sep. 26, 2014) ............................... 22

*Cmtys. for a Better Env't v. EPA*,
    748 F.3d 333 (D.C. Cir. 2014) .............................................................................. 14

*Colo. River Cutthroat Trout v. Salazar*,
    898 F. Supp. 2d 191 (D.D.C. 2012) ...................................................................... 14

*Ctr. for Biological Diversity v. Zinke*,
    260 F. Supp. 3d 11 (D.D.C. 2017) ........................................................................ 41

*Dickinson v. Zurko*,
    527 U.S. 150 (1999) .............................................................................................. 14

*Duncan v. Walker*,
    533 U.S. 167 (2001) .............................................................................................. 27

*Eagle Cnty. v. Surface Transp. Bd.*,
    82 F.4th 1152 (D.C. Cir. 2023) ............................................................................ 18

*Fred Meyer Stores, Inc. v. NLRB*,
    865 F.3d 630 (D.C. Cir. 2017) .............................................................................. 17, 18

*Gen. Chem. Corp. v. United States*,
    817 F.2d 844 (D.C. Cir. 1987) .............................................................................. 14, 21, 28

*Getty v. Fed. Sav. & Loan Ins. Corp.*,
   805 F.2d 1050 (D.C. Cir. 1986) ........................................................................ 18

*Greene v. McElroy*,
   360 U.S. 474 (1959) ........................................................................................ 19

*Hesai Tech. Co. Ltd., v. DoD*,
   2024 WL 3673574 (D.D.C. Aug. 5, 2024) ...................................................... 17

*Judulang v. Holder*,
   565 U.S. 42 (2011) ........................................................................................... 14

*Luokung Tech. Corp. v. DoD*,
   538 F. Supp. 3d 174 (D.D.C. 2021) ................................................ 13, 14, 15, 19

*Manin v. Nat'l Transp. Safety Bd.*,
   627 F.3d 1239 (D.C. Cir. 2011) ....................................................................... 15

*Marshall Cnty. Health Care Auth. v. Shalala*,
   988 F.2d 1221 (D.C. Cir. 1993) ....................................................................... 13

*Mathews v. Eldridge*,
   424 U.S. 319 (1976) ........................................................................................ 19

*Nat'l Council of Resistance of Iran v. U.S. Dep't of State*,
   251 F.3d 192 (D.C. Cir. 2001) ........................................................................ 19

*Northern Sec. Co. v. United States*,
   24 S. Ct. 436 (1904) ....................................................................................... 19

*Norton v. Southern Utah Wilderness Alliance*,
   542 U.S. 55 (2004) .......................................................................................... 41

*Petroleum Commc'ns, Inc. v. FCC*,
   22 F.3d 1164 (D.C. Cir. 1994) ........................................... 14, 23, 26, 32, 35

*Poett v. United States*,
   657 F. Supp. 2d 230 (D.D.C. 2009) ................................................................ 16

*Ralls Corp. v. Comm. on Foreign Inv. in the U.S.*,
   758 F.3d 296 (D.C. Cir. 2014) ........................................................................ 19

*Rempfer v. Sharfstein*,
   583 F.3d 860 (D.C. Cir. 2009) ........................................................................ 13

*Sierra Club v. Mainella*,
   459 F. Supp. 2d 76 (D.D.C. 2006) .................................................................. 13

*TikTok Inc. v. Garland*,
   145 S. Ct. 57 (2025) (Gorsuch, J., concurring) ............................................... 19

*Water Quality Ins. Syndicate v. United States*,
   225 F. Supp. 3d 41 (D.D.C. 2016) .................................................................. 17

*Xiaomi Corp. v. DoD*,
   2021 WL 950144 (D.D.C. Mar. 12, 2021) ........................................ 15, 17, 19, 31

## **Statutes**

5 U.S.C. § 706(1) ...............................................................................................13, 40, 41

5 U.S.C. § 706(2)(A)-(C) ........................................................................................13, 40

28 U.S.C. § 1603 ...............................................................................................................22

50 U.S.C. § 4565 ...............................................................................................................25

50 U.S.C. § 4815(d)(3) .....................................................................................................27

Pub. L. No. 105-261, 112 Stat. 1920 (1998) § 1237 ....................................................2

Pub. L. No. 116-283, § 1260H, 134 Stat. 3388 (2021) ...............................................1

Pub. L. No. 116-283, § 1260H, 134 Stat. 3388 (2021), as amended by Pub. L. No.
   118-159, § 1346, 138 Stat. 1773 (2024) ........................................................ *passim*

Utah Code Ann. § 63L-13-201 (2024)..........................................................................12

## PRELIMINARY STATEMENT

Plaintiff SZ DJI Technology Co., Ltd. ("SZ DJI") is the world's largest privately owned manufacturer of consumer and commercial drones. Its products are relied upon in the United States and abroad by police and fire departments, first responders, large corporations, small businesses, and hobbyists alike. This lawsuit challenges Defendant the U.S. Department of Defense's ("DoD") designation of SZ DJI and its wholly owned subsidiary Shenzhen Dajiang Baiwang Technology Co., Ltd. ("Baiwang") (collectively, "DJI") as "Chinese Military Companies" ("CMCs") pursuant to Section 1260H of the William M. (Mac) Thornberry National Defense Authorization Act ("NDAA") for Fiscal Year 2021, Pub. L. No. 116-283, 134 Stat. 3388, 3965-66 (Jan. 1, 2021).

The NDAA permits DoD to designate companies that, among other things, are owned by or affiliated with the Chinese military or are "military-civil contributor[s] to the Chinese defense industrial base." DJI is neither. Its original founder and three of his earliest supporters in the venture, friends from university days, own more than 88% of the company's stock and 99.3% of voting rights, as DoD is aware. Moreover, as DoD itself has acknowledged, DJI makes drones exclusively "for commercial and recreational" (i.e., non-military) use, and DJI has strict policies that prevent its drones from being used for any combat purpose.

DoD's determination that DJI is a CMC was arbitrary and capricious and in violation of the Administrative Procedure Act for multiple reasons; this decision was not based on rational conclusions supported by substantial evidence. Rather, DoD ignored relevant evidence, including a comprehensive delisting petition submitted by DJI establishing that DJI did not meet any of the statutory criteria for qualification as a CMC. DoD also applied the incorrect legal standard; failed to articulate a reasoned basis for its decision; made its determination without providing adequate

notice or a meaningful opportunity for DJI to be heard, in violation of DJI's due-process rights; and singled DJI out for differential treatment. In so doing, DoD exceeded its statutory authority.

Over the course of the nearly two and a half years since DoD first designated DJI in October 2022, without prior warning, DJI has repeatedly tried to meet with DoD, learn the agency's rationale for the designation, obtain the underlying administrative record, and provide DoD with facts demonstrating that DJI is not a CMC and should not have been so designated. DoD has stonewalled at nearly every turn. Only with litigation imminent did DoD finally engage, and then barely so. All the while, DJI's designation as a CMC has effectively branded it a national security threat, causing ongoing economic and reputational harm to the company.

For the foregoing reasons, DJI moves this Court to set aside DoD's arbitrary and capricious action, as the APA requires.

## STATEMENT OF FACTS

### A.    Statutory Framework

DoD's authority to designate DJI as a CMC derives from Section 1260H of the NDAA for Fiscal Year 2021. Pub. L. No. 116-283, 134 Stat. 3388, 3965-66 (Jan. 1, 2021), as amended by Pub. L. No. 118-159, Div. A, Title XIII, sec. 1346, 138 Stat. 1773, 2123-26 (Dec. 23, 2024) ("Section 1260H").[1] Section 1260H requires DoD to publish an annual list of Chinese military companies, or "CMCs," that operate in the United States. Section 1260H(a), (b). DoD also must "make additions or deletions" to that list "based on the most recent information available." *Id.* In

---

[1]    Section 1260H's provisions originated in a now unused statute, Section 1237 of the Strom Thurmond National Defense Authorization Act for Fiscal Year 1999. *See* Pub. L. No. 105-261, 112 Stat. 1920, 2160-61 (1998), as amended by Pub. L. No. 106-398, § 1233, 114 Stat. 1654, 1654A-330 (2000), and Pub. L. No. 108-375, § 1222, 118 Stat. 1811, 2089 (2004) ("Section 1237"); *see also* Jordan Brunner, *Communist Chinese Military Companies and Section 1237: A Primer*, THE LAWFARE INST. (Mar. 22, 2021), https://tinyurl.com/2s4aaajs (describing the background and history of Section 1237).

addition, Congress amended Section 1260H on December 23, 2024, to provide that the unclassified portion of the CMC List published in the Federal Register "shall include, for each entity included in the unclassified portion of such list, the justification for inclusion in such list."  Section 1260H(b)(2).

In substance, Section 1260H permits DoD to designate a company "engaged in providing commercial services, manufacturing, producing, or exporting" as a CMC if the company meets either of two conditions: (1) it is "directly or indirectly owned by, controlled by, or beneficially owned by, affiliated with, or in an official or unofficial capacity acting as an agent of or on behalf of, the People's Liberation Army, Chinese military and paramilitary elements, security forces, police, law enforcement, border control, the People's Armed Police, the Ministry of State Security (MSS), or any other organization subordinate to the Central Military Commission of the Chinese Communist Party, the Chinese Ministry of Industry and Information Technology (MIIT), the State-Owned Assets Supervision and Administration Commission of the State Council (SASAC), or the State Administration of Science, Technology, and Industry for National Defense (SASTIND)," or (2) it is "identified as a military-civil fusion contributor to the Chinese defense industrial base." Section 1260H(g)(2)(B)(i).  Congress has defined "military-civil fusion contributor[s]" to include the following:

a. Entities knowingly receiving assistance from the Government of China or the Chinese Communist Party through science, technology, research, and industrial efforts initiated, granted, or created by, or provided under, or related to, the Chinese military industrial planning apparatus, or in furtherance of Chinese military industrial planning objectives, including selection or designation as a 'Single Champion', 'Little Giant', or any other successor selection or designation as an enterprise associated with industrial planning or military-civil fusion efforts.

b. Entities managed, overseen, or supervised by, otherwise under the control of, or affiliated with (including by means of formal participation in research partnerships and projects)—

(i)     the Chinese Ministry of Industry and Information Technology (MIIT);

(ii)    the State-Owned Assets Supervision and Administration Commission of the State Council (SASAC);

(iii)   the State Administration of Science, Technology and Industry for National Defense (SASTIND);

(iv)    the Ministry of State Security (MSS); or

(v)     the People's Liberation Army.

c.   Entities receiving assistance, operational direction, or policy guidance from the State Administration for Science, Technology and Industry for National Defense.

d.   Any entities or subsidiaries defined as a 'defense enterprise' by the State Council of the People's Republic of China.

e.   Entities residing in or affiliated with a military-civil fusion enterprise zone or receiving assistance from the Government of China through such enterprise zone.

f.   Entities awarded with receipt of military production licenses by the Government of China, including a Weapons and Equipment Research and Production Unit Classified Qualification Permit, Weapons and Equipment Research and Production Certificate, Weapons and Equipment Quality Management System Certificate, or Equipment Manufacturing Unit Qualification.

g.   Entities that advertise on national, provincial, and non-governmental military equipment procurement platforms in the People's Republic of China.

h.   Any other entities the Secretary determines is appropriate.

Section 1260H(g)(3).

**B.    Factual Background and Procedural History**

**1.    DJI's Ownership And Business**

DJI was founded in 2006 by then-university student Frank Wang.  Wang's early drone models drew the attention of one of his professors, Li Zexiang, who, in turn, provided Frank with early-stage funding for DJI.  Among the early participants in the development of DJI were Frank's family friend Henry Lu, who managed DJI's finances, and high-school friend Swift Xie, who managed the company's marketing.

4

From those humble beginnings, DJI has grown into the largest manufacturer of consumer and commercial drones in the world, with several U.S. affiliates that together employ more than 150 technicians and other personnel who provide service in connection with drones sold in North America.  As DoD acknowledges, DJI does not produce military drones (which would feature fixed wings and high-powered engines) but, rather, produces smaller, remote-controlled drones "for commercial and recreational use."  AR 24.[2]  DJI's products are widely available through retailers such as Amazon and Sam's Club.  *See*, *e.g.*, AR 1299, 1300, 1340.

One reason for DJI's popularity is that DJI is the market leader in drone safety.  For example, DJI was the first major civilian drone manufacturer to implement geofencing, a mechanism that keeps drones away from restricted zones.  AR 1340.  Since 2017, DJI has also offered governments and airports "AeroScope," a platform that can detect DJI drones in real time. *Id.*  And DJI is the first drone company to integrate ADS-B receivers on drones, allowing DJI users to detect crewed aircraft and avoid potential collisions.  *Id.*

Moreover, DJI appreciates the importance of data security and gives its users control over the data they generate.  DJI drones need not connect to the Internet to operate.  *Id.*  Following initial activation, DJI drones can be used entirely offline in "airplane mode."  *Id.*  DJI also offers a "local data mode" that prevents any data from being transmitted to or from DJI's flight applications and servers, while still allowing users to access the Internet for particular purposes like map services.  *Id.*  Third-party consulting firms such as Booz Allen Hamilton, FTI Consulting,

---

[2]  *See* Craig Phillips, *A Drone by Any Other Name: The Different Kinds of Drones*, PBS (Apr. 27, 2017), https://tinyurl.com/3yr367jw; *How Are Military Drones Different From Commercial Drones?*, ZENADRONE, https://tinyurl.com/bd2d78ae (last visited Mar. 2, 2025); *What is a Drone?*, FLYING (May 20, 2024), https://tinyurl.com/2dk9nhtj (noting that some consumer or "personal" drones can be purchased for just $30 while Northrop-Grumman produces a military drone priced "at just under half a billion [dollars]").

and Kivu Consulting have analyzed various DJI products and validated their security. *Id.* So, too, have the U.S. Department of the Interior, the U.S. National Oceanic and Atmospheric Administration, the U.S. Department of Homeland Security and even DoD, which also all found no evidence of data transmission to the Chinese government or any unexpected party and recommended the use of DJI drones by government entities. *Id.* & n.8.

U.S. and state government agencies, businesses, and hobbyists have safely and successfully used DJI drones for years. AR 1340-41, 1348-51. For instance, police departments, fire departments, and other first responders in the United States frequently use DJI drones. AR 1348-49. DJI drones improve these agencies' public safety capabilities by, for example, enhancing emergency response times, reducing operational costs, and improving decision-making by affording greater situational insight. "No other company's offerings come close to DJI's cheap, powerful drones, experts say—potentially leaving government agencies, police and first responders in the lurch if DJI is shut out." AR 1347. As the U.S. Government Accountability Office ("GAO") described in a September 2024 report, the U.S. Department of the Interior's decision to refrain from using Chinese-made drones (which primarily means DJI drones) has left its component bureaus starved of sufficient drones to mount an effective response in critical emergency situations. U.S. GOV'T ACCOUNTABILITY OFF., GAO-24-106924, FEDERAL LANDS: EFFECTS OF INTERIOR'S POLICIES ON FOREIGN-MADE DRONES 6 (Sep. 25, 2024) (observing that Interior's average per drone cost increased from about $2,600 in fiscal years 2017 through 2020, to over $15,000 in fiscal year 2023); *id.* at 7 ("It has been difficult to find compliant drones with sufficient technological capabilities to fully meet mission needs.").

Similarly, large and small businesses and hobbyists across different industrial sectors, from agriculture to pharmaceutics, use DJI drones to accomplish dangerous or difficult tasks and enhance their products and services.  AR 1340-41, 1349-50.

Throughout all of these applications, DJI has demonstrated its commitment to ensuring that its drones are not used for combat purposes.  Through a multi-faceted compliance program that employs automated screening and other controls, DJI prohibits doing business with entities that intend to use DJI products for combat.  AR 1341, 1345-46.  In line with this policy, in April 2022, DJI announced the suspension of drone sales and other business in Russia and Ukraine in order to prevent its products from being jerry-rigged for use in combat operations in the ongoing war.  AR 1341.

Finally, DJI's ownership and corporate governance structure help ensure DJI's independence.  Today, the above-mentioned Lu, Xie, Professor Li, and Wang together own more than 88% of the company's stock and 99.3% of voting rights.  AR 1339.[3]  The next largest group of investors comprises entities in the private sector and collectively holds 0.2% of the voting rights and 7.7% of the shares.  *Id.*  The smallest shareholding group, holding a combined 0.5% of the voting rights and 4.3% of the shares, comprises four state-owned enterprises ("SOEs") in China (one state-owned bank, one state-owned insurance company, and two municipal investment funds).  *Id.*  One of the municipal investment funds is the Shanghai Free Trade Zone Fund, which owns less than 1% of DJI's shares and less than 0.1% of its voting rights.  AR 1368; ECF 27 ¶¶ 38-40.  None of the directors of DJI or its parent company, iFlight Technology Company Limited,

---

[3]  The figures DJI provided to DoD differ slightly and immaterially due to routine fluctuations in ownership.

is a government official, a representative of a government or state-owned entity, or a member or officer of the Chinese Communist Party ("CCP").  AR 1339.

### 2.    DoD's Designation And Redesignation Of DJI As A CMC

In October 2022, without providing notice, an opportunity to be heard, or an explanation of its decision, DoD included DJI on the list of entities designated pursuant to Section 1260H as CMCs operating in the United States.  AR 1338.  By incorrectly designating DJI, the government branded DJI as a national security threat and caused DJI's business to suffer serious harm.

In May 2023, DJI contacted DoD, through outside counsel, to state that its inclusion on the CMC List was in error and to ask that DoD provide its rationale for the designation so that DJI could respond with specificity.  AR 1339 n.4.  DJI made multiple requests for an opportunity to be heard, but DoD declined to entertain even a phone call.  *See id.*; AR 1354 & n.4.  Instead, in May 2023, DoD indicated by email that DJI should articulate the rationale for why the statutory criteria do not apply to DJI and provide any additional information supporting DJI's removal from the CMC list.  AR 1339 n.4; AR 1354 & n.4.

On July 27, 2023, DJI submitted a petition to DoD seeking the removal of DJI from the CMC List.  AR 1337-52.  DJI's delisting petition demonstrated why the Section 1260H designation criteria do not apply, explained the harmful impact that DJI's designation has had on the company and on U.S. stakeholders, and requested the administrative record compiled in support of the designation.  *Id.*

In September 2023, after yet more stonewalling by DoD, DJI requested a meeting with DoD to discuss the petition and again requested a copy of the administrative record relied upon in support of DJI's designation.  AR 1354 n.3.  DoD did not respond to the request for a meeting and declined to provide a copy of the relevant administrative materials, instead directing DJI to submit a Freedom of Information Act ("FOIA") request to obtain the record.  *Id.*

DJI promptly filed a FOIA request on October 18, 2023. *Id.* DoD set December 31, 2023 as the date by which it expected to respond to DJI's FOIA request, but the deadline came and went with no response. *Id.* DoD next projected that it would produce the administrative record by July 19, 2024. *Id.* DoD missed the deadline again and provided a revised production date of November 25, 2024. *Id.* The FOIA request remains pending with no response provided to date.

In January 2024, DoD redesignated DJI as a CMC, notwithstanding DJI's comprehensive petition detailing the reasons why such a designation was unsupported by the facts and applicable statutory criteria. U.S. Dep't of Defense, Entities Identified as Chinese Military Companies Operating in the United States in accordance with Section 1260H of the William M. ("Mac") Thornberry National Defense Authorization Act for Fiscal Year 2021 (Jan. 31, 2024), https://tinyurl.com/d926urvt. Again, DoD provided DJI with no explanation for the redesignation, nor did it provide any warning, notice, or opportunity to be heard.

DJI filed a second FOIA request in March 2024 seeking, among other things, the administrative record pertaining to DJI's redesignation. AR 1354 n.5. DoD has yet to produce any documents in response to this FOIA request. In September 2024, DJI, through outside counsel, sent a letter to DoD stating that, while DJI had sought to engage with DoD in good faith for more than sixteen months, DoD had failed to meaningfully respond and had refused to provide any rationale for DJI's designation. AR 1353-55. DJI indicated that it had been left with no choice but to seek judicial relief unless DoD promptly removed it from the list. AR 1354.

Four days later, on September 10, 2024, the then-Assistant Secretary of Defense for Industrial Base Policy finally provided DJI a "courtesy copy" of a 26-page report, dated November 29, 2023, that purported to explain DoD's decision to redesignate DJI on January 31, 2024. AR

1356, 1359. No valid explanation has been articulated for why DoD failed to provide the 2023 report at any time throughout earlier months, in spite of repeated requests from DJI.

At the same time that it provided the 2023 report—and for the very first time—DoD agreed to DJI's request for an opportunity to discuss the designation. The then-Assistant Secretary stated in an email dated September 10, 2024 that, while her "staff remains ready to schedule a mutually convenient meeting," "[DJI's] staff has not attempted to schedule a meeting despite the Department's continual offers in our prior communications to meet … ." AR 1356, 1359, 1365, 1377. This statement was incorrect: as noted, DoD had by this time ignored DJI's multiple requests to meet to discuss this matter.

During a September 23, 2024 teleconference and in a September 30, 2024 letter, DJI informed DoD that the 2023 Report contained numerous factual errors and failed to establish that DJI satisfied the statutory criteria for inclusion on the CMC List. AR 1367-71. DoD nevertheless declined to remove DJI from the CMC List. AR 1372-73.

In October 2024, following DoD's refusal to remove DJI's designation as a CMC, DJI brought this action seeking to vacate DJI's designation and to compel DoD to delete DJI from the list. The following month, DoD informed DJI that it was evaluating whether DJI would be redesignated as a CMC in 2025. DoD indicated that, in the event DJI were redesignated, DJI would be required to file an amended complaint to challenge the new agency action.

On January 7, 2025, DoD published its updated CMC List, in which it redesignated DJI but failed to provide any public justification for doing so. AR 14-20. DoD again redesignated DJI without providing an opportunity to be heard. Although DoD signed and published the CMC List in January 2025, DoD cited and relied upon the ***predecessor*** version of Section 1260H that ***predated*** the December 2024 amendments to Section 1260H. *Id.*

On January 31, 2025, after rejecting DJI's repeated requests that it produce the administrative report quickly so that this case might be resolved through informed discussion, DoD provided DJI with a report dated December 6, 2024 (the "Report") that included a revised analysis that purported to explain the inclusion of DJI on the CMC list.  AR 21-42.  The Report addressed some, but by no means all, of the glaring factual errors contained in the 2023 report.  In addition, DoD did not formally list DJI as a CMC until January 7, 2025, by which time 1260H had been amended, rendering the analysis set forth in the 2024 Report obsolete to the extent it relied on the version of the statute in effect before the December 23, 2024 amendment.

In light of the ongoing harm caused by DoD's improper designation of DJI as a CMC entity, DJI asked DoD to agree to an expedited briefing schedule, and the parties jointly proposed a schedule to this Court.  ECF 24.  Consistent with that schedule, *see* ECF 25, DoD produced the administrative record on February 24, 2025, *see* ECF 26 (certified list), though it omitted certain email correspondence between DJI and DoD.  On March 3, 2025, DJI then filed an amended complaint seeking to vacate DoD's decision to include it on the CMC list and compel DoD to delete DJI from the list.  ECF 27.

### 3.    DoD's Action Harms Plaintiffs And The U.S. Public

As a result of DoD's unlawful and misguided decision to place and maintain DJI on the CMC List, which marks DJI as a national security threat, DJI has suffered significant and ongoing financial and reputational harm.

In particular, U.S. and international customers have terminated existing contracts with DJI and are refusing to enter into new ones.  In addition, legislative enactments and proposals across the country have taken aim at DJI's business.  Many state and local governments have decided to discontinue their relationships with DJI in light of its CMC designation.  Arkansas, Florida, Mississippi, and Tennessee have restricted the use of, or funding for, DJI drones by state and local

agencies.  *See* Mark Albert, *As states ban Chinese-made drones, officers raise alarm*, WVTM13 (Jul. 25, 2023), https://tinyurl.com/se554n3t.  Utah went even further, passing a law that prohibits entities on the CMC List, like DJI, from buying any land in that state.  UTAH C. § 63L-13-201-02 (2024).

Moreover, since 2021, Congress has passed several restrictions on entities designated as CMCs.  Under the NDAA for Fiscal Year 2024, Congress banned DoD from contracting with any CMC.  Pub. L. No. 118-31, § 805(a)(1), 137 Stat. 136, 315 (Dec. 22, 2023).  Under the Further Consolidated Appropriations Act for 2024, Congress prohibited the Department of Homeland Security from doing the same.  Pub. L. No. 118-47, § 536, 138 Stat. 460, 622 (Mar. 23, 2024). Congress also has begun to consider new tariffs specifically on drones manufactured by CMCs and could block their future import altogether.  Drones for First Responders Act, H.R. 8416, 118th Cong. (May 15, 2024).

In addition, DJI and its employees now suffer frequent and pervasive stigmatization.  U.S. employees of DJI have been repeatedly harassed and insulted in public places.

These harms are neither random nor surprising:  they are the intended and expected consequence of a CMC designation.  Congress created the CMC List to "name and shame" the designated companies in order to dissuade the U.S. and international community from doing business with them.  *See* Jordan Brunner & Emily Weinstein, *Chinese Military-Civil Fusion and Section 1260H*, THE LAWFARE INST. (May 4, 2021), https://tinyurl.com/mw7fm7sr.  As Reuters observed, designation as a CMC "can be a blow to designated companies' reputations and represents a stark warning to U.S. entities and companies about the risks of conducting business with them."  Idrees Ali, Alexandra Alper, & Michael Martina, *Pentagon calls out Chinese*

*companies it says are helping Beijing's military*, REUTERS (Feb. 1, 2024), https://tinyurl.com/4cmra6pn.

Finally, DoD's actions also harm users of DJI's products and the public at large. As described above, among public-safety agencies and first responders in the United States, DJI's products are the world's most popular drones. By causing such public-service providers to avoid using DJI drones, DJI's designation as a CMC undermines public safety and heightens dangers posed by any number of emergencies, including by burdening search and rescue missions and impairing disaster relief across the United States.

## STANDARD OF REVIEW

"[W]hen a party seeks review of agency action under the [APA] ... the district judge sits as an appellate tribunal." *Battineni v. Mayorkas*, 2024 WL 4367522, at *7 (D.D.C. Oct. 2, 2024) (Friedman, J.) (quoting *Rempfer v. Sharfstein*, 583 F.3d 860, 865 (D.C. Cir. 2009)). "The general standard for summary judgment … does not apply," but "[s]ummary judgment nonetheless 'serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review.'" *Id.* (quoting *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 90 (D.D.C. 2006)). For that reason, "[t]he entire case on review is a question of law." *Id.* (quoting *Marshall Cnty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 (D.C. Cir. 1993)).

Under the APA, courts must "compel agency action unlawfully withheld" and "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "contrary to constitutional right," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(1), (2)(A)-(C). Courts therefore play an "important" role "in ensuring that agencies have engaged in reasoned decisionmaking." *Luokung Tech. Corp. v. DoD*, 538 F. Supp. 3d 174, 182

(D.D.C. 2021) (quoting *Judulang v. Holder*, 565 U.S. 42, 53 (2011)).  That means agency action must "be 'reasonable and reasonably explained.'" *Battineni*, 2024 WL 4367522, at *7 (quoting *Cmtys. for a Better Env't v. EPA*, 748 F.3d 333, 335 (D.C. Cir. 2014)).  An agency must "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Id.* (quoting *Airmotive Eng'g Corp. v. Fed. Aviation Admin.*, 882 F.3d 1157, 1159 (D.C. Cir. 2018)).

As a result, "[a]n agency decision is arbitrary and capricious if it 'relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Id.* (quoting *Cablevision Sys. Corp. v. FCC*, 649 F.3d 695, 714 (D.C. Cir. 2011)).  "For 'record-based factual conclusion[s]' this requires that an agency's final determination be 'supported by substantial evidence.'" *Luokung Tech. Corp.*, 538 F. Supp. 3d at 183 (quoting *Dickinson v. Zurko*, 527 U.S. 150, 164 (1999)).

Additionally, the APA's requirement of a rational connection between facts and conclusions means that an agency must be consistent in all respects.  First, its explanation of a decision cannot be "internally inconsistent" and thus "inadequately explained." *Gen. Chem. Corp. v. United States*, 817 F.2d 844, 846 (D.C. Cir. 1987).  Second, an agency cannot "treat[] similarly situated parties differently" without an "adequate explanation." *Petroleum Commc'ns, Inc. v. FCC*, 22 F.3d 1164, 1172 (D.C. Cir. 1994).

Last, a court's review of agency action "must be 'searching and careful.'" *Battineni*, 2024 WL 4367522, at *7 (quoting *Colo. River Cutthroat Trout v. Salazar*, 898 F. Supp. 2d 191, 199 (D.D.C. 2012)).  A court "may not 'affirm an agency decision on a ground other than that relied

14

upon by the agency.'" *Id.* (quoting *Manin v. Nat'l Transp. Safety Bd.*, 627 F.3d 1239, 1243 (D.C. Cir. 2011)).

Applying those requirements, this Court has already twice enjoined DoD from adding private companies to a prior version of the CMC list. *See Xiaomi Corp. v. DoD*, 2021 WL 950144, at *13 (D.D.C. Mar. 12, 2021); *Luokung*, 538 F. Supp. 3d at 195-96. In those cases, the Court determined that DoD's designations of the companies were "deeply flawed" and "failed to adhere to several different [APA] requirements." *Xiaomi*, 2021 WL 950144 at *8; *see also Luokung*, 538 F. Supp. 3d at 191. Namely, DoD's analysis was "conclusory" and did little more than "parrot[] the language of [the] statute." *Xiaomi*, 2021 WL 950144 at *5 (citations omitted). DoD "skipped the most 'critical step' of an agency 'connecting the facts to the conclusion.'" *Id.* Its alleged evidence failed to differentiate the companies from "American technology companies such as Apple." *Luokung*, 538 F. Supp. 3d at 189-90. And although Congress did not intend DoD to designate any Chinese company with a loose connection to the Chinese government but only those "engaged in Chinese military modernization," DoD's proposed application of Section 1260H's predecessor "would potentially encompass all Chinese government contractors, even those that … produce products with no direct military applications." *Id.* at 187.

## ARGUMENT

DoD's designation of DJI as a CMC was arbitrary and capricious for a host of reasons. To start, DoD's decision suffers three threshold flaws that independently require vacatur before assessing the merits. First, DoD applied the wrong law. Although it designated DJI in its latest CMC list published on January 7, 2025, DoD relied, both in the Report supporting DJI's designation and the 2025 list itself, on the version of Section 1260H that existed before its December 23, 2024 amendments. Second, DoD neglected to address DJI's July 2023 delisting petition, which provided copious information establishing that DJI does not qualify as a CMC.

Third, by listing DJI without any notice or opportunity to be heard, and based on secret, classified evidence, DoD deprived DJI of its right to due process.

Even if DoD's designation could somehow overcome those three fundamental defects, its decision was, on the merits, arbitrary and capricious because DoD failed to provide any reasoned basis supported by substantial evidence for listing DJI as a CMC. Moreover, because DJI does not meet the statutory criteria to qualify as a CMC, DoD's decision to list DJI exceeded DoD's authority. Accordingly, DoD's decision must be set aside and the agency should be compelled to delete DJI from the CMC list, as Section 1260H requires.

## I.    DOD APPLIED THE INCORRECT LEGAL STANDARD

An agency's decision is necessarily an arbitrary and capricious "abuse of discretion if the agency has applied an incorrect legal standard in making its decision." *Buffalo Field Campaign v. Zinke*, 289 F. Supp. 3d 103, 109 (D.D.C. 2018); *see also, e.g.*, *Poett v. United States*, 657 F. Supp. 2d 230, 237 (D.D.C. 2009) (determining agency action was arbitrary and capricious because of a "key flaw[]" in applying "an incorrect definition" of a statutory term).

In the latest CMC list published on January 7, 2025, DoD cited and, via the 2024 Report supporting DJI's inclusion on that list, DoD relied on the version of Section 1260H that existed before substantial statutory amendments took effect on December 23, 2024. AR 14-42; *see* Pub. L. No. 116-283, 134 Stat. 3388, 3965-66 (Jan. 1, 2021), as amended Pub. L. No. 118-159, Div. A, Title XIII, sec. 1346, 138 Stat. 1773, 2123-26 (Dec. 23, 2024). That reliance on the wrong law has significantly hampered DJI's ability to know and rebut DoD's reasons for listing DJI, forcing DJI to guess how the alleged facts in the 2024 Report map on to the applicable version of Section 1260H.

As shown below, DJI's designation is improper under either variant of the statute. But the Court need not reach that question. DoD's failure to apply the correct legal standard by definition

renders its decision to list DJI an arbitrary and capricious abuse of discretion that this Court should set aside. *Buffalo*, 289 F. Supp. 3d at 108-09. In all events, such errors "do not inspire confidence in the fastidiousness of the agency's decision-making process." *Xiaomi*, 2021 WL 950144 at *5.

## II.    DOD IGNORED CONTRADICTORY RECORD EVIDENCE

It is hornbook APA law that "an agency's refusal to consider evidence bearing on the issue before it constitutes arbitrary agency action." *Butte Cnty. v. Hogen*, 613 F.3d 190, 194 (D.C. Cir. 2010). What is more, an agency "disregard[s] entirely the need for reasoned decisionmaking" when it "fail[s] to reasonably reflect upon the information contained in the record and grapple with contrary evidence." *Fred Meyer Stores, Inc. v. NLRB*, 865 F.3d 630, 638 (D.C. Cir. 2017). The D.C. Circuit therefore "has not hesitated to reject agency determinations" when an agency ignores evidence contrary to its position or "offered only [a] mere assertion that [its determination] accounted for contrary evidence." *Water Quality Ins. Syndicate v. United States*, 225 F. Supp. 3d 41, 68 (D.D.C. 2016) (quotation marks and alterations omitted) (citing cases).

In the context of a Section 1260H determination, that principle is especially powerful because the statute requires DoD to "make additions or deletions" to the CMC list "based on the latest information available." Section 1260H(b)(3). Indeed, in the related *Hesai* matter, this Court has held that DoD "is obligated to consider" all "documents [submitted by the listed company] when evaluating [a] request to remove the company from the list, and DoD has represented to the Court that it will do so." *Hesai Tech. Co. Ltd., v. DoD*, 2024 WL 3673574, at *4-5 n.1 (D.D.C. Aug. 5, 2024).

DoD failed to consider all of the evidence before it here. In July 2023, after DoD had listed DJI as a CMC, DJI submitted a comprehensive petition to DoD explaining that DJI did not belong on the CMC list. AR 1337-52. Remarkably, DoD's Report does not mention the extensive evidence that DJI's delisting petition set out showing that it did not belong on the CMC list. That

"refusal to consider evidence bearing on the issue before it" alone "constitutes arbitrary agency action" that the Court should set aside. *Butte*, 613 F.3d at 194.

Beyond that, DoD completely disregarded the "need for reasoned decisionmaking" by failing to deal with the evidence in DJI's delisting petition that contradicts many of DoD's findings and positions. *Fred Meyer*, 865 F.3d at 638. For instance, DJI's petition explained its complete ownership structure and established that it is not owned by the Chinese Communist Party or the SASAC, contrary to the conclusions set forth in the 2024 Report. AR1337-41; AR 29. Similarly, DJI's delisting petition explained DJI's commitment to preventing its drones from being used in combat and its suspension of all sales to business partners in Russia and Ukraine to ensure its drones were not used in the conflict there. AR 1341. Nonetheless, DoD's Report incoherently faults DJI for Ukraine's alleged procurement of its drones. AR 34.

DoD may respond that the Report contains the *ipse dixit* that DoD "considered all the latest information, including information provided by DJI." AR 27. But such a bare "assurance" without any "citations that explicitly reference" DJI's petition, *Eagle Cnty. v. Surface Transp. Bd.*, 82 F.4th 1152, 1184 (D.C. Cir. 2023), or any other "analysis of [the facts submitted] and how they influenced [DoD]'s decision," is insufficient to satisfy the requirement of reasoned decisionmaking, *Getty v. Fed. Sav. & Loan Ins. Corp.*, 805 F.2d 1050, 1057 (D.C. Cir. 1986). In fact, DoD's many factual errors described below *confirm* that DoD did not actually consider DJI's petition or the contrary, accurate facts that it established.

## III.    DOD'S DECISION IS CONTRARY TO DJI'S DUE PROCESS RIGHTS

The Fifth Amendment to the U.S. Constitution provides that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law." U.S. CONST. amend. V. Most fundamentally, that provision requires that parties deprived of their liberty or property interests receive adequate notice and an opportunity to be heard. *See Mathews v. Eldridge*, 424 U.S. 319,

334-35 (1976).  Before DoD lists an entity as a CMC and so deprives it of various liberty and property interests, it must give the entity an opportunity to show that it does not belong on the list. *See Xiaomi*, 2021 WL 950144, at *8 n.8 (noting, in the context of prior versions of CMC lists, that DoD's listing without notice and an opportunity to be heard raised "serious" due-process concerns); *Luokung*, 538 F. Supp. 3d at 191 n.13 (similar).

Further, "in all types of cases where administrative and regulatory actions [a]re under scrutiny," "the evidence used to prove the Government's case must be disclosed to the [regulated] individual so that he has an opportunity to show that it is untrue."  *Greene v. McElroy*, 360 U.S. 474, 496-97 (1959).  Accordingly, "[e]fforts to inject secret evidence into judicial proceedings present obvious constitutional concerns."  *TikTok Inc. v. Garland*, 145 S. Ct. 57, 74 (2025) (Gorsuch, J., concurring).

DJI is entitled to the protections of the Due Process Clause in light of its substantial connections with the United States, including the presence of its U.S. affiliates—such as DJI Technology Inc., DJI Service LLC, DJI Research LLC, DJI Creative Studio LLC, and DJI Industrial Inc.—and the employment of more than 150 individuals in the country.  *See Northern Sec. Co. v. United States*, 24 S. Ct. 436, 444 (1904) ("Corporations are persons within the meaning of the constitutional provision forbidding the deprivation of property without due process of law, as well as a denial of the equal protection of the laws."); *Nat'l Council of Resistance of Iran v. U.S. Dep't of State*, 251 F.3d 192, 203 (D.C. Cir. 2001) (foreign organizations that have "entered the territory of the United States and established substantial connections with this country . . . are entitled to the protections of the Constitution"); *see also Ralls Corp. v. Comm. on Foreign Inv. in the U.S.*, 758 F.3d 296, 312-21 (D.C. Cir. 2014) (entities have procedural due process rights even in the context of national security determinations).

Additionally, as a result of DoD's actions, DJI has lost business deals, been branded a national security threat, and been stigmatized in the private marketplace while banned from contracting with multiple federal government agencies.  *See* pp. 11-13, *supra*.  DoD has thus deprived DJI of liberty and property interests.

In violation of its obligations under the Fifth Amendment, however, DoD did not afford DJI any notice or opportunity to be heard prior to depriving DJI of liberty and property, let alone full due process of law.  Had DoD afforded DJI even minimal process, DJI could have explained early on why it does not qualify as a CMC under Section 1260H.  Instead, DJI was forced to haul DoD into court, at significant cost to DJI, DoD, and the public interest.

Defendant's reliance on classified information as a basis for designating DJI as a CMC while refusing to make that information available to DJI also deprives DJI of its due-process right to an opportunity to be heard and defend itself.  DJI has requested that its counsel with adequate security clearance be permitted to review the classified material in the Report so that DJI can defend itself, but DoD has inexplicably denied that request.  ECF 29.  Again, that action violates the basic requirements of the Fifth Amendment.

## IV. DOD FAILS TO PROVIDE A RATIONAL CONNECTION BETWEEN FACTS SUPPORTED BY SUBSTANTIAL EVIDENCE AND ITS DECISION TO LIST DJI AS A CMC

As relevant here, to qualify as a CMC, DJI must be either "directly or indirectly owned by … the State-Owned Assets Supervision and Administration Commission of the State Council (SASAC)" or "identified as a military-civil fusion contributor to the Chinese defense industrial base."  Section 1260H(g)(2)(B)(i).  The Report's analysis of whether DJI meets those criteria is rife with incorrect findings that are unsupported by substantial evidence and faulty conclusions that are not rationally connected to the (incorrect) facts found.

A.    **DJI Is Not Owned By The SASAC**

DoD's assertions regarding DJI's ownership are confounding.  DoD's claims regarding DJI's ownership rest on the allegation that DJI is owned by the SASAC.  *See* AR 27 ("DJI is indirectly owned, controlled, or beneficially owned by the PLA or an organization subordinate to the CMC of the CCP *because it is a State-Owned Entity (SOE) directly owned by the State-owned Assets Supervision and Administration Commission (SASAC)* of the State Council and is beneficially owned by the CMC.") (emphasis added); AR 34 (same); AR 28 ("DJI is beneficially owned by the CMC *because it is indirectly owned by the SASAC*" as a result of "DJI receiv[ing] an unknown amount of funds from three PRC state owned entities owned and actively managed by SASAC.").  On that front, DoD states both that DJI "is a State-Owned Entity (SOE) <u>directly</u> owned by the State-owned Assets Supervision and Administration Commission (SASAC)" and that DJI "is beneficially owned by the [Central Military Commission] because it is <u>indirectly</u> owned by the SASAC."  AR 24, 28, 34 (emphasis added).

DoD's ownership analysis is incoherent.  DJI cannot be both "directly" and "indirectly" owned by the SASAC as DoD suggests, and DoD's "internally inconsistent" assertions regarding DJI's ownership demonstrate that DoD did not engage in reasoned decision making.  *Gen. Chem.*, 817 F.2d at 846.  That alone is grounds to disregard DoD's haphazard findings and conclusions about DJI's ownership.  Setting that root problem to the side, not one of DoD's assertions regarding DJI's ownership, even taken on its own terms, is supported by substantial evidence or provides a rational basis for listing DJI as a CMC.

1.    **DJI Is Not A State-Owned Enterprise Directly Owned By The SASAC**

As a matter of plain meaning (which DoD has elsewhere said applies to all undefined terms, *Hesai*, No. 24-1381, ECF 46-1, at 22), "[a] state[]-owned enterprise is defined as the agency or instrumentality of a foreign state."  Yongping Xiao & Zhengxin Huo, *Ordre Public in China's*

*Private International Law*, 53 Am. J. Comp. L. 653, 666 n.44 (2005) (referencing Foreign Sovereign Immunities Act, 28 U.S.C. § 1603 (1976)).  An "agency or instrumentality of a foreign state" is, among other things, "a separate legal person, corporate or otherwise … *a majority of* whose shares or other ownership interest is owned by a foreign state or political subdivision thereof."  28 U.S.C. § 1603(b) (emphasis added).

DoD cannot and does not try to show that DJI meets that, or any, definition of a state-owned enterprise.  Neither the Chinese government nor any political subdivision of the Chinese government owns *any* part of DJI.  DoD does not assert otherwise.

Similarly, DoD provides no support whatsoever for its claim that DJI is one of the particular state-owned enterprises in the small pool that are directly owned by the SASAC.  *See In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, MDL No. 2047, 2014 WL 4809520, at *5 (E.D. La. Sep. 26, 2014) ("SASAC oversees and controls 150 large central SOEs").  Indeed, DoD does not purport to explain that SASAC *directly* owns DJI in any way.  Consequently, DoD's claim that DJI is itself a state-owned entity directly owned by the SASAC is unsupported by substantial evidence, not rationally connected to any facts found, and therefore arbitrary and capricious.

In fact, the arbitrary and capricious nature of this aspect of DoD's rationale is all the more stark because in the same January 2025 CMC list in which DoD redesignated DJI, it simultaneously removed from the list at least three SOEs that *are* in fact directly owned and controlled by the SASAC—China Railway Construction Corporation Ltd., China State Construction Group Co., and China Telecommunications Corporation.  AR 11; SASAC, Yangqi Minglu [List of SOEs] (Oct. 18, 2024), https://tinyurl.com/yc3689y6.  DoD cannot treat "similarly

situated parties" differently without an "adequate explanation," which it has not even tried to provide. *Petroleum Commc'ns*, 22 F.3d at 1172.

## 2.    DJI Is Not Indirectly Owned By The SASAC

In support of its assertion that DJI "is indirectly owned by the SASAC," DoD cites alleged minority investments in DJI made by three state-owned investment funds managed by the SASAC: China Chengtong Holdings Group and/or its subsidiary Chengtong Fund Management Co., Ltd. (together, the "Chengtong Fund"), Guangdong Hengjian Investment Holdings (the "Hengjian Fund"), and SDIC Unity Capital ("SDIC"). AR 28-29.   Those three alleged supporting facts are both wrong and irrelevant.

*First*, none of the underlying allegations is true and thus none constitutes substantial evidence supporting DoD's assertion that DJI is indirectly owned by the SASAC.  To start, the Chengtong Fund ceased to be an investor in DJI as of June 2023.  *See* AR 1339; 1368.  DoD seems to be relying on outdated data that still appears on certain websites that DoD accessed over the past year.  AR 589-96.  The recency of DoD's website visitations, however, does not make the outdated data any less stale or improper as a basis for decision-making.  Beyond that, the Hengjian Fund and SDIC have never been investors in DJI.  *See* AR 1339.  SDIC had some historical involvement limited to an indirect investment through a U.S.-based fund that was not under its control, and that investment ended by January 2021 when the fund sold its stake in DJI.  *Id.*

These basic errors could and should have been easily resolved had DoD either addressed DJI's ownership structure as laid out in DJI's delisting petition or provided DJI with any other process by which it could give DoD a complete and accurate picture of its business.  DoD, however, shunned DJI's many attempts to engage and therefore, unsurprisingly, made plain factual errors in reaching its decision.

*Second*, even assuming the alleged facts were true (they are not), DoD failed to draw a rational connection between those facts and its conclusion that DJI is "indirectly owned" by the SASAC. Initially, DoD fails to articulate any standard for "ownership" under Section 1260H. That failure itself evinces a serious gap in DoD's reasoning. *ACA Int'l v. FCC*, 885 F.3d 687, 700 (D.C. Cir. 2018) (noting that agency action is "arbitrary and capricious if it fails to articulate a comprehensible standard" (citation omitted)).

Setting that failure aside, DoD also fails to show that the SASAC's purported investment in DJI through these three funds satisfies *any* reasonable standard or definition of ownership. As a matter of plain meaning, which, again, DoD has conceded should guide the inquiry, to "own" means "to have or hold as property" or "to have power or mastery over." *Own*, MERRIAM-WEBSTER.COM, https://www.merriam-webster.com/dictionary/own (last visited Mar. 13, 2025). In the analogous sanctions context, the U.S. Department of Treasury's OFAC has consistently applied the "50 Percent Rule," under which only an entity that is 50% or more owned by a sanctioned entity is considered sanctioned as well. OFAC, ENTITIES OWNED BY BLOCKED PERSONS (50% RULE) (Aug. 13, 2014), https://tinyurl.com/hw45rewy. As a result, a 50% stake is the most reasonable line for establishing ownership because anything less would not allow a would-be owner to say that it "has or holds" an entity as property or "has power or mastery" over it. That is why, for instance, it makes perfect sense to say that Apple is "owned by" its shareholders collectively, but it would not make sense to say that Apple is "owned by" a single shareholder with a .1% stake. That minority shareholder owns *a piece of* Apple but does not own Apple itself.

If the Court disagrees that the line for establishing ownership should be a 50% stake, under no circumstance could a stake of less than 10% constitute ownership for purposes of interpreting Section 1260H. That is so because in specifying when the U.S. Committee on Foreign Investment

(on which the head of DoD sits) must review transactions involving foreign entities to assess national security concerns, Congress has provided that anything less than "a 10 percent voting interest" is not even a "substantial interest" in a business, much less an interest constituting ownership. 50 U.S.C. § 4565.

DoD's apparent position here, though, is that *any* stake is sufficient to establish ownership. It did not purport to find the size of the alleged stake in DJI held by the three state-owned investment funds managed by the SASAC. All it found was that DJI received an "unknown amount of" money from those three funds. AR 28. As a result, DoD believes that the size of the investment is irrelevant—DJI is "owned" by any and all of its stakeholders, even a hypothetical holder with a $1 investment.

That position cannot mesh with the plain meaning of "owned by" and would lead to absurd results. For instance, under DoD's standard, the SASAC would own Morgan Stanley because the China Investment Corporation ("CIC"), which is one of the SOEs directly controlled by the SASAC, purchased shares in Morgan Stanley in 2007.[4] Similar issues would arise in the context of investments in companies like the Blackstone Group[5] and AirBnB,[6] to name just two. Accordingly, DoD has failed to show how its purported facts found—that three SASAC-controlled funds have invested an unspecified amount in DJI—establish its conclusion that DJI is "owned by" the SASAC.

---

[4]  *CIC sells $264 mln worth Morgan Stanley shares in past week*, REUTERS (Jul. 28, 2010), https://tinyurl.com/429seajt.

[5]  Sumeet Chatterjee & Matthew Miller, *China sovereign fund exits Blackstone investment after 11 years*, REUTERS (May 14, 2018), https://tinyurl.com/ym32tbp8.

[6]  Robert Lavine, *CIC hands over $100m to Airbnb*, GLOBAL CORPORATE VENTURING (Mar. 14, 2017), https://tinyurl.com/387a53bp.

At best, DoD could have (incorrectly) surmised from DJI's delisting petition that the investment funds held a "5.38% stake with 0.68% voting rights" in DJI. AR 1339. But even then, DoD's line for ownership would be well below the absolute floor of a 10% stake.

Finally, if DoD somehow made it past all of the above issues with its determination that DJI is indirectly owned by the SASAC, DoD's decision would still be arbitrary and capricious because DoD cannot treat "similarly situated parties differently"—as it has here by listing DJI but (correctly) not listing Morgan Stanley, Blackstone, and AirBnB, among many others—without an "adequate explanation." *Petroleum Commc'ns*, 22 F.3d at 1172.

### B.    DJI Is Not A Military-Civil Fusion Contributor To The Chinese Defense Industrial Base

The second way in which a company may qualify as a CMC is if it is "identified as a military-civil fusion contributor to the Chinese defense industrial base." Section 1260H(g)(2)(B)(i)(II). Congress has defined the first part of that sentence, "military-civil fusion contributor," to include the following relevant entities:

> (A)   Entities knowingly receiving assistance from the Government of China or the Chinese Communist Party through science, technology, research, and industrial efforts initiated, granted, or created by, or provided under, or related to, the Chinese military industrial planning apparatus … .

> (B)   Entities managed, overseen, or supervised by, otherwise under the control of, or affiliated with (including by means of formal participation in research partnerships and projects)—(i)  the Chinese Ministry of Industry and Information Technology (MIIT); … .

> (E)   Entities residing in or affiliated with a military-civil fusion enterprise zone.

Section 1260H(g)(3).

DoD has not pointed to any substantial evidence or reasonable basis supporting its conclusion that DJI meets the threshold requirement of contributing to the Chinese defense industrial base or qualifies as any of the above-described entities.

### 1.    DJI Does Not Contribute To The Chinese Defense Industrial Base

An initial requirement for an entity to meet the definition of a "military-civil fusion contributor to the Chinese defense industrial base" is that it contributes to the Chinese defense industrial base, as the text plainly says.  In the related *Hesai* matter, DoD has argued that "[t]he straightforward reading of" this provision in Section 1260H is that any qualifying entity must "be a contributor to the Chinese military that also has civil/commercial purposes."  *Hesai*, No. 24-1381, ECF 23.[7]  Exactly correct.  The commonly understood meaning of "defense industrial base" (which applies because DoD once more did not define any standard) in the analogous U.S. context is "organizations, facilities, and resources that supply the U.S. government … with materials, products, and services for defense purposes."  LUKE A. NICASTRO, CONG. RSCH. SERV., R47751, THE U.S. DEFENSE INDUSTRIAL BASE: BACKGROUND AND ISSUES FOR CONGRESS 1 (2024); *see* 50 U.S.C. § 4815(d)(3) (indicating the "United States defense industrial base" involves acquisition or funding by the U.S. government "for the advancement of the national security of the United States").  In fact, DoD itself has defined the term in reference to those entities "with capabilities to perform research and development, design, produce, and maintain military weapon systems,

---

[7]  DoD has since reversed course in the *Hesai* matter and argued that Section 1260H does not have a separate requirement that an entity contribute to the Chinese defense industrial base.  *Hesai*, No. 24-1381, ECF 52, at 16-20.  To the extent DoD might raise that argument here, it is frivolous.  Congress specifically defined the term "military-civil fusion contributor" but not what it means for a company to contribute "to the Chinese defense industrial base."  Thus that term means something different from "military-civil fusion contributor."  Otherwise, the Court would render it mere surplusage.  *See Duncan v. Walker*, 533 U.S. 167, 174 (2001) (explaining "duty" to "give effect, if possible, to every clause and word of a statute" so no term is rendered "superfluous" (citation omitted)).

subsystems, components, or parts to meet military requirements."  DoD, DOD DICTIONARY OF MILITARY & ASSOCIATED TERMS 64 (Mar. 2017), https://tinyurl.com/4vmeyy3a.

On this requirement, DoD asserts in a heading of its Report that DJI "[c]ontributes to the Chinese Defense Industrial Base," but the paragraph of text supporting that erroneous proposition is redacted.  AR 27-28.

While DoD's redactions make it impossible for DJI to understand and address with precision that claimed basis for designating DJI as a CMC, the heading is obviously false because DJI produces only "commercial and recreational"—not military—drones, as the Report itself acknowledges.  AR 24.  Moreover, as mentioned above, DJI has strict policies against doing business with entities that intend to use DJI products for combat and has no relationship with the defense industry of China.  A finding that DJI contributes to the Chinese Defense Industrial Base therefore cannot possibly be supported by substantial evidence.  Further, this finding disregards and is "internally inconsistent" with the Report's own, correct observation that DJI is a "commercial and recreational," rather than military, company.  *Id.*; *Gen. Chem.*, 817 F.2d at 846.

Finally, because DoD does not provide a reasonable basis supported by substantial evidence to conclude that DJI contributes to the Chinese defense industrial base, the Court need go no further.  This failure alone bars any rational determination that DJI is a "military-civil fusion contributor to the Chinese defense industrial base."

## 2.    DJI Does Not Receive Assistance From The Government Of China Under The Chinese Military Planning Apparatus

Assuming DoD could somehow show that DJI contributes to the Chinese defense industrial base, the first relevant category of entities that qualify as "military-civil fusion contributors" is "[e]ntities knowingly receiving assistance from the Government of China or the Chinese Communist Party through science, technology, research, and industrial efforts initiated, granted,

or created by, or provided under, or related to, the Chinese military industrial planning apparatus." Section 1260H(g)(3). As is endemic to much of DoD's Report, DoD fails to articulate what any of these phrases mean, and in particular fails to explain what "the Chinese military industrial planning apparatus" is. Again, that alone is a material failure. *ACA*, 885 F.3d at 700 ("If a purported standard is indiscriminate and offers no meaningful guidance to affected parties, it will fail the requirement of reasoned decisionmaking." (quotations omitted)).

In any event, DoD has asserted in the *Hesai* matter that "assistance that is 'initiated under the Chinese military industrial planning apparatus' means that it has been provided in accordance with the totality of means by which China carries out its goals, policies, and procedures for the use of manufactured products that help support its military establishment." *Hesai*, No. 24-1381, ECF 46-1, at 26. Then, presumably using that definition, DoD asserts here that DJI "knowingly receiv[es] assistance from the Government of China through science and technology efforts initiated under the Chinese military industrial planning apparatus" and is therefore a "military-civil fusion contributor to the Chinese defense industrial base" for two reasons: (1) "the National Development and Reform Commission (NDRC) recognized DJI as a National Enterprise Technology Center (NETC)"; and (2) DJI's supposed relationship with something called "XMD." AR 29-30.[8] Those assertions are wrong, unsupported by substantial evidence, and fail to establish that DJI is receiving assistance from the Chinese Government under the Chinese military planning apparatus.

---

[8] It appears that the version of DoD's Report in the administrative record was over-redacted, but the version DJI received from DOJ on January 31, 2025 includes unredacted, unclassified paragraphs mentioning XMD.

**(a)      The NETC Program Is Not Part Of Any Military Industrial Planning Apparatus**

The Report claims that NDRC's recognition of DJI as an NETC means DJI "knowingly receiv[es] assistance from the Government of China … initiated under the Chinese military industrial planning apparatus" because:  (1) the NDRC is allegedly "an organ of the military industrial planning apparatus as it … serves as the economic planning organization … to support the National Defense Mobilization Commission's (NDMC) objectives"; and (2) DJI benefits from the NETC qualification.  AR 29-30.

Even assuming those two stated facts were true and supported (at least the first is not[9]), DoD's determination is still arbitrary and capricious because DoD has not provided any substantial evidence or reasonable explanation showing that the *NETC program*—the only connection between DJI and NDRC—is part of any "military industrial planning apparatus."  That is because it cannot do so.  Rather, the NETC program focuses solely on corporate innovation and R&D investment, as evidenced by the fact that numerous major corporations that are not CMCs have received NETC recognition.  For example, Volkswagen, Mitsubishi, Nissan, Nokia Bell Labs, and Whirlpool have all received NETC recognition.  *See* NDRC, GUOJIA QIYE JISHU ZHONGXIN MINGDAN (QUANBU) [List of NETCs (All)], https://tinyurl.com/jk896yhw (last visited Mar. 13, 2025).  In addition, many apparel and food companies are recognized as NETCs such as Sanyuan Group (dairy products), Yurun Group (sausages and meat), Dynasty Fine Wines Group and Xinghuacun Fenjiu Group (alcohol), Hangzhou Wahaha Group (beverages), Hengyuanxiang Group (textiles and bedding), Youngor Group and Hongdou Group (clothing), and ANTA Sports (sportswear).  *See id.*

---

[9]   Indeed, NDRC has held round table sessions with US companies since 2021. STATE COUNCIL OF THE PEOPLE'S REPUBLIC OF CHINA, https://tinyurl.com/wpnvtb9n (mentioning Cummins, GE, Walmart, and American Chamber of Commerce as joining the 2024 session).

The Court dealt with almost this exact scenario in *Xiaomi*. There, the Court concluded that DoD's designation of a CMC under a prior statute was not supported by "substantial evidence" because an "award" that the company received and DoD relied on for its designation "was granted to private sector entrepreneurs in recognition of contributions to China's economic development." *Xiaomi*, 2021 WL 950144, at *8. In particular, its recipients included "the leaders of a Chinese powdered milk and infant formula company, the maker of a well-known chili sauce brand, and a barley wine producer." *Id.* This case is no different. Many companies that are in no way "involved in the military-civil fusion that is of concern here" have received NETC recognition. *Id.* Consequently, DJI's NETC recognition says nothing about its connection to the Chinese military industrial planning apparatus and is not substantial evidence supporting its CMC designation.

The defining regulations that govern the NETC program also show that it is not part of any "military industrial planning apparatus." For instance, neither the Administrative Measures for the Recognition of National Enterprise Technology Centers nor the Guidelines for the Evaluation of National Enterprise Technology Center Recognition reference the military or national defense at all. *See* NDRC, *Guojia Qiye Jishu Zhongxin Rending Guanli Banfa* [Administrative Measures for the Recognition of National Enterprise Technology Centers] (Feb. 26, 2016), https://tinyurl.com/yp8wc5pe; NDRC, GUOJIA QIYE JISHU ZHONGXIN RENDING PINGJIA GONGZUO ZHINAN (SHIXING) [Guidelines for the Recognition and Evaluation of National Enterprise Technology Centers (Trial)], https://tinyurl.com/3xr2e7nu (last visited Mar. 13, 2025). Correspondingly, the NETC evaluations within the NDRC are handled by its Department of Innovation and High-Tech Development and have no connection to military industrial planning. *See* NDRC, *2023 Nian (Di 30 Pi) Guojia Qiye Jishu Zhongxin Ni Rending Mingdan Gongshi* [Announcement of the list of proposed NETCs in 2023 (30th batch)] (Jul. 24, 2023),

https://tinyurl.com/fju6sk86; NDRC, *Department of Innovation and High-Tech Development*, https://tinyurl.com/2t92fudn (last visited Mar. 13, 2025).

As a result, DoD has provided no reasoned basis or substantial evidence for its conclusion that DJI received assistance from China "initiated under the Chinese military industrial planning apparatus" because it received NETC recognition that has *nothing to do* with China's "goals, policies, and procedures for the use of manufactured products that help support its military establishment." *Hesai*, No. 24-1381, ECF 46-1, at 26.

That said, if NETC recognition did make a company a CMC, then DoD's decision to list DJI would nonetheless be arbitrary and capricious because the above-listed companies such as Volkswagen, Nissan, and Whirlpool—among many others—have similarly received NETC recognition but, unlike DJI, are (correctly) not included on the CMC list. Once more, the APA does not allow such unexplained differential treatment. *Petroleum Commc'ns*, 22 F.3d at 1172.

### (b)    DJI Has No Relationship With XMD Or Any Military District

The Report asserts that there is some relationship between DJI and an "XMD" that is not defined in the unclassified part of the report but appears to be a military district. AR 30. The paragraph discussing that alleged relationship is redacted, making it impossible for DJI to understand and refute any specific factual allegations in this regard. Nevertheless, DJI has no ties to anything known as "XMD" or to any military district anywhere. Furthermore, as explained above, DJI enforces a strict policy prohibiting combat use of its products. DoD's conclusion that DJI has some relationship with "XMD" is therefore unsupported by substantial evidence, and its reliance on this nonexistent relationship between DJI and "XMD" is arbitrary and capricious.

### 3.    DJI Is Not Affiliated With The MIIT

The second relevant category of entities that qualify as "military-civil fusion contributors" under Section 1260H are "[e]ntities … affiliated with (including by means of formal participation

in research partnerships and projects)—(i) the Chinese Ministry of Industry and Information Technology (MIIT)."  Under Section 1260H, "[t]he term 'affiliated with' means in close formal or informal association."  Section 1260H(g)(1).  Critically, not just any association will do—only a "close" association between entities renders them "affiliated with" each other.  As DoD has stated elsewhere, that definition "demonstrates Congress's intent that the term bears its plain meaning." *Hesai*, No. 24-1381, ECF 46-1, at 13.  And per DoD, that plain meaning is "closely associated with another typically in a dependent or subordinate position" or associated "on the basis of a common purpose or of shared characteristics."  *Hesai*, No. 24-1381, ECF 52, at 5.

DoD claims that DJI is "affiliated with the Chinese Ministry of Industry and Information Technology (MIIT)" due to (1) DJI's participation in the drafting of an industry standard, "Safety Requirements for Civilian Unmanned Aircraft Systems," promulgated by the MIIT; and (2) a professor at a university laboratory serving simultaneously as a DJI "Functional Safety Department Lead" and a subproject leader for an MIIT automotive-safety project.  AR 27, 30-31.

Neither of these allegations establishes the requisite affiliation between DJI and the MIIT. Moreover, DoD's allegations have no connection to the military.  Thus DoD has not provided a rational connection between facts supported by substantial evidence and the decision made that DJI is a "military-civil fusion contributor[]" by any affiliation with MIIT.

**(a)**     **DJI's Participation In Safety-Standard Drafting Is Insufficient**

DJI's participation in drafting the "Safety Requirements for Civilian Unmanned Aircraft Systems" cannot establish the necessary affiliation between DJI and the MIIT for three reasons. *First*, that standard is a safety standard for civilian, not military, drones.  AR 30 (noting the standard is on "Safety Requirements for *Civilian* Unmanned Aircraft Systems" (emphasis added)). Accordingly, it is not substantial evidence nor a reasoned basis for DoD's conclusion that DJI is a

33

"*military*-civil fusion contributor" as DoD inexplicably concludes.  Section 1260H(g)(2)(B)(i)(II) (emphasis added).

*Second*, participation in drafting an industry safety standard cannot establish the requisite affiliation between a private company and the MIIT.  It simply does not suggest any "close" association and especially not any "dependent or subordinate position," "common purpose, or … shared characteristics."  *Hesai*, No. 24-1381, ECF 52, at 5.

Last, if this standard-drafting were sufficient evidence of "affiliation" under Section 1260H, then DJI's listing of DJI is arbitrary and capricious because many major U.S. and international companies would qualify for the CMC list for that reason but are not on it.  For instance:

- **Nokia** has participated in the drafting of **514** MIIT standards for the communications sector;

- **Ericsson** has participated in the drafting of **290** MIIT standards for the communications sector;

- **Siemens** has participated in the drafting of **188** MIIT standards for sectors including machinery, communications, and petrochemical;

- **Samsung** has participated in the drafting of **148** MIIT standards for sectors including communications and electronics;

- **Emerson** has participated in the drafting of **108** MIIT standards for sectors including communications and machinery;

- **Qualcomm** has participated in the drafting of **70** MIIT standards for the communication sector;

- **Ford** has participated in the drafting of **37** MIIT standards for sectors including automotive, light industry, and nonferrous metals;

- **Volkswagen** has participated in the drafting of **37** MIIT standards for sectors including machinery and automotive;

- **Intel** has participated in the drafting of **17** MIIT standards for the communications and electronics sectors; and

- **Procter & Gamble** has participated in the drafting of **14** MIIT standards for the light industry sector.

Hangye Biaozhun Chaxun [Search for Industry Standards], https://tinyurl.com/yc635edc (last visited Mar. 13, 2025).  Absent a reasonable explanation, which DoD has not provided, DoD cannot treat DJI differently from those similarly situated companies, who are also clearly not Chinese Military Companies.  *Petroleum Commc'ns*, 22 F.3d at 1172.

### (b)    A University Professor Serving As Consultant To DJI And MIIT Is Insufficient

Contrary to the Report's assertion, the simultaneous service of Associate Professor Zhang Yuxin at Jilin University as a "Functional Safety Department Lead" for DJI and subproject leader for an automotive safety project funded by the MIIT from October 2020 to October 2022 does not establish the necessary affiliation between DJI and the MIIT.  AR 31.

To start, Section 1260H requires that DJI constitute an "entity" affiliated with MIIT.  The existence of one DJI contractor who may *himself* have an affiliation with the MIIT does not satisfy that requirement as to DJI.  That is especially true here because academics frequently hold positions in both the private and public sectors without the relevant private and public entities becoming "affiliated" with each other.  It would be preposterous, for example, to suggest that Bloomberg had an affiliation with DoD because Harvard Professor Cass Sunstein worked for Bloomberg at the same time that he advised DoD.[10]

---

[10]    Cass R. Sunstein, *Curriculum Vitae*, HARVARD UNIV., https://tinyurl.com/3akjx9um (last visited Mar. 13, 2025) (noting that Sunstein served on the Defense Innovation Board of the U.S. Department of Defense from 2016 to 2017); U.S. OFF. OF GOV. ETHICS, EXECUTIVE BRANCH PERSONNEL PUBLIC FINANCIAL DISCLOSURE REPORT (OGE FORM 278E): CASS SUNSTEIN 3, https://tinyurl.com/3b65mbje (last visited Mar. 13, 2025) (noting that Sunstein worked for Bloomberg from 2013 to 2021).

Further, the Report states that the MIIT research project that Professor Zhang was involved with was the "2020 Industrial Technology Basic Public Service Platform Project, Vehicle-mounted Intelligent Computing System Simulation Test Verification Service Platform" and that the specific sub-topic was "Construction and safety of expected functional safety scenarios for autonomous driving systems." AR 31. It thus facially was not related to any military or defense applications, and DoD does not show otherwise.

Finally, as the Report states, that MIIT project concluded in October 2022, rendering it irrelevant to DJI's relationship with the MIIT as of the January 2025 redesignation. AR 31.

For all those reasons, Professor Zhang's simultaneous service for DJI and as subproject leader for an automotive safety project funded by the MIIT is not substantial evidence supporting nor a reasoned basis for DoD's conclusion that DJI is, currently, a "*military*-civil fusion contributor," as DoD inexplicably concludes. Section 1260H(g)(2)(B)(i)(II) (emphasis added).

### 4.    DJI Does Not Reside In And Is Not Affiliated With A Military-Civil Fusion Enterprise Zone

The final relevant category of entities that are "military-civil fusion contributors" are "[e]ntities residing in or affiliated with a military-civil fusion enterprise zone." Section 1260H(g)(3)(E). Again, DoD improperly fails to provide any definition of "military-civil fusion enterprise zone." *ACA*, 885 F.3d at 700. DoD has stated in its *Hesai* papers, however, that "a 'military-civil fusion enterprise zone' is a section of territory established by the Chinese government for the purpose of advancing its policy of military-civil fusion through economic activity." *Hesai*, No 24-1381, ECF 46-1, at 30.

With that meaning apparently in mind, DoD asserts that DJI "resides in or is affiliated with a military-civil fusion enterprise zone" because DJI in 2019 was planning to "build its Innovation Center and Global Technical Support Center in the Xi'an Economic and Technological

Development Zone"—which DoD says is a "military-civil fusion enterprise zone"—"within five years," and "[t]he new DJI headquarters, called the DJI Sky City Innovation Hub, has been open since September 2022." AR 32. The Report further claims that the "Xi'an High-Tech Industrial Development Zone" is "also known as the Xi'an Economic and Technological Development Zone." AR 33. Once more, those claims are both wrong and irrelevant and therefore cannot supply the APA's required reasoned basis for DoD's decision.

*First*, DoD's suggestion that the new DJI headquarters is in the Xi'an Economic and Technological Development Zone is facially wrong and unsupported by substantial evidence. DJI's headquarters is not in Xi'an at all. Rather, as stated in the very article DoD cites to support its claim, the new DJI headquarters is in Shenzhen—a different city in China more than 1,000 miles from Xi'an. AR 1123 ("The two buildings . . . are . . . in Shenzhen, China."); *see* Stefan Angelovski, *DJI's New Headquarters: Where Drones Meet Architecture*, THE DRONES WORLD (Jul. 15, 2018), https://tinyurl.com/yc6vfcvv. Accordingly, the Report fails to show any way in which DJI resides in the Xi'an Economic and Technological Development Zone. In fact, DJI has no connection to that zone at all. As a result, none of the Report's assertions that the Xi'an Economic and Technological Development Zone is a military-civil fusion enterprise zone has any relevance to DJI.

*Second*, the Xi'an High-Tech Industrial Development Zone ("Xi'an High-Tech Zone") is not the same as the Xi'an Economic and Technological Development Zone. A quick Google search in either English or Chinese reveals that these two zones are completely different despite starting with the word "Xi'an," which is a large city in China. *See Xi'an Economic and Technological Development Zone*, CHINA DAILY (May 21, 2019), https://tinyurl.com/4pttmyuw. Indeed, the Report's statements regarding the "Xi'an Ordnance Base" show that the Xi'an

Economic and Technological Development Zone and the Xi'an High Tech Zone are not the same. AR 32-33. In the "Geography and Transportation" tab on the left-hand side-bar of the website that DoD cites to support this claim, there is an introduction to the geographical location of the Xi'an Economic and Technological Development Zone where the Xi'an Ordnance Base is situated. The introduction says: "The Xi'an Ordnance Industry Base is located within the Jingwei Industrial Park of the Xi'an Economic and Technological Development Zone, situated in the northern part of Xi'an, west of Gaoling County, with the Xitong Expressway to the west and the Xiyan Expressway to the east."[11] The Xi'an High Tech Zone, by contrast, is located in the southwest part of Xi'an.[12]

Apart from all of the above, DoD alleges that in a 2017 municipal development plan, the Qujing City People's Government, located in Yunnan Province, identified DJI as a target civilian company for outreach to develop the local drone industry and to facilitate the municipal government's plan to promote military-civil fusion. AR 33. However, the Report omits to mention that DJI did not take Qujing up on its offer; DJI has no presence in Qujing and has no relationship with the Qujing municipal government.

C.    **To The Extent Relevant, DoD's Prior Grounds That Are Now In The Background Section And Its Claim Regarding DJI Product Exports To Ukraine Are Incorrect.**

The allegations above are the sole allegations DoD claims support its decision to list DJI as a CMC. Nonetheless, DJI also notes that various other facts set forth by DoD are incorrect and

---

[11]    *See Yuanqu Jianjie* [Introduction to the Park], NORINCO GROUP, https://tinyurl.com/5b3c5xr4 (last visited Mar. 13, 2025).

[12]    *Xi'an Hi-Tech Industries Development Zone*, AMCHAM SHANGHAI, https://tinyurl.com/5bjx2uhh (last visited Mar. 13, 2025).

unsupported by substantial evidence, notwithstanding that DoD makes no claim to draw a rational connection between these facts and its decision to list DJI.

The Report alleges in the background section that "[t]he People's Liberation Army Military Science Academy used DJI drones, such as the DJI Livox solid-state LiDAR, to develop and patent a three-dimensional temperature measuring device with multi-sensor fusion (patent CN114061763A)." AR 24. The Report further alleges that "[t]he National University of Defense Technology used DJI drones, such as the DJI M600 Pro UAS, DJI M300 UAS, and the DJI Zenmuse X3, to develop and patent inventions." AR 25.

Those allegations are demonstrably wrong. Patent CN114061763A does not mention "drones" at all. CN Patent No. 114061763A, https://tinyurl.com/3xztb8n5. Indeed, Livox solid-state LiDAR is not a drone. Moreover, DJI has no control over whether a research university purchases and uses an off-the-shelf DJI product in developing and submitting a patent application. Such use in no way suggests any relationship, much less an established relationship, between DJI and the People's Liberation Army Military Science Academy or The National University of Defense Technology. DJI products have in fact been frequently used by researchers, including those from the U.S. Air Force. DoD's logic would thus lead to the untenable conclusion that DJI is also an "American military company."

Further, any decision to list DJI as a CMC on the basis of patent CN114061763A would be arbitrary and capricious because, while that patent does not mention DJI drones, it does mention Sony and Nvidia products, yet DoD (correctly) did not list those entities as CMCs. CN Patent No. 114061763A, at [0016]-[0017], https://tinyurl.com/3xztb8n5.

Last, the Report relies on a news article for the proposition that Ukraine has bought thousands of DJI products. The article itself, though, makes clear that the procurement was

conducted through "competitive auctions" on the Prozorro platform, which is "a fully electronic and open-source platform that allows global participation in public tenders." *See Ukraine buys 8,200 Chinese drones in $27.5M deal*, DEFENSE HERE (May 22, 2024), https://tinyurl.com/mr87kzvx.   To be clear, DJI has never participated in any Ukraine tender on the Prozorro platform or any other platform.  DJI instead strictly prohibits doing business with entities that intend to use DJI products for combat.  Specifically, in April 2022, DJI publicly announced the suspension of drone sales and all business activities in both Russia and Ukraine to prevent its products from being used in the ongoing war.  AR 1341.  DoD's reliance on third-party transactions over which DJI had no control is not evidence of any conduct whatsoever on DJI's part.

## V.   BECAUSE DJI DOES NOT QUALIFY AS A CMC, DOD'S DECISION TO LIST DJI AS ONE EXCEEDED DOD'S AUTHORITY

For all of the reasons provided above, DJI does not qualify as a Chinese Military Company.  At the most basic level, that is so because DJI has nothing to do with the military at all.  It instead produces "commercial and recreational" drones and proscribes their combat use.   AR 24.  Accordingly, DoD lacks the authority under Section 1260H to designate DJI as a CMC, and its action in excess of its authority was arbitrary and capricious under APA Section 706(2)(C).

## VI.   THE COURT SHOULD SET ASIDE DOD'S DECISION TO LIST DJI AS A CMC AND COMPEL DOD TO DELETE DJI FROM THE CMC LIST

"When an agency's action is unlawful, 'vacatur is the normal remedy.'"  *Bridgeport Hosp. v. Becerra*, 108 F.4th 882, 890 (D.C. Cir. 2024) (quoting *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1110 (D.C. Cir. 2014)).  Consequently, and consistent with many other decisions from this district, DoD's unlawful decision to list DJI as a CMC must be vacated.

More than that, 5 U.S.C. § 706(1) creates a cause of action to "compel agency action unlawfully withheld or unreasonably delayed."  Claims under Section 706(1) "can proceed only

where a plaintiff asserts that an agency failed to take a discrete agency action that it is required to take." *Ctr. for Biological Diversity v. Zinke*, 260 F. Supp. 3d 11, 20 (D.D.C. 2017) (citing *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55, 62 (2004)).

Here, Section 1260H(b) lays down such a requirement, stating that the Secretary of Defense "shall make . . . deletions" to the CMC list "based on the latest information available." Section 1260H(b)(3).

On July 27, 2023, DJI provided DoD evidence establishing that DJI did not meet the statutory criteria for designation as a CMC. Nevertheless, on January 7, 2025, DoD redesignated DJI as a CMC. The Report that DoD relied on to redesignate DJI neither references nor considers the evidence DJI submitted, showing that DoD failed to account for the latest information available. Furthermore, the Report also relies on evidence that is either false, contradicted by the uniform public record, or otherwise insufficient to make a factual finding that DJI is a CMC, which again show that Defendants did not rely on the latest information.

In these circumstances, Defendants have failed to remove DJI from the CMC List in violation of their mandatory duty under Section 1260H. Defendants' refusal to remove DJI from the CMC list accordingly qualifies as agency action "unlawfully withheld or unreasonably delayed" that the Court should compel under the APA. 5 U.S.C. § 706(1).

## **CONCLUSION**

The Court should set aside DoD's listing of DJI as a CMC and compel DoD to delete DJI from the CMC list.

Dated:  March 14, 2025

QUINN EMANUEL URQUHART &
SULLIVAN, LLP


/s/   Samuel G. Williamson
Samuel G. Williamson (D.C. Bar No. 984748)
2601 South Bayshore Drive, Suite 1550
Miami, Florida 33133
samwilliamson@quinnemanuel.com
Tel.:  (305) 402-4880
Fax:  (305) 901-2975

Derek L. Shaffer (D.C. Bar No. 478775)
1300 I Street, Suite 900
Washington, DC 20005
derekshaffer@quinnemanuel.com
Tel.:  (202) 538-8000
Fax:  (202) 538-8100

Samuel P. Nitze (Registration No. 4859443)
Quinn Emanuel Urquhart & Sullivan, LLP
295 5th Avenue, 9th Floor
New York, New York 10016
Tel: (212) 849-7000

*Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 14, 2025, a true and correct copy of the foregoing was electronically filed and served via this Court's CM/ECF system upon any parties or counsel of record registered with the CM/ECF system.

/s/   Samuel G. Williamson
Samuel G. Williamson (Bar No. 984748)
samwilliamson@quinnemanuel.com

43