# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

SZ DJI TECHNOLOGY CO., LTD, *et al.*,

               *Plaintiffs*,

v.

U.S. DEPARTMENT OF DEFENSE, *et al.*,

               *Defendants*.

**Civ. Action No. 1:24-cv-02970-PLF**

## MEMORANDUM IN SUPPORT OF DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO <u>PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT</u>

**TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................................1

STATEMENT OF FACTS ....................................................................................................2

I.      The United States' Concerns About Chinese Military-Civil Integration ....................2

II.     The William M. ("Mac") Thornberry National Defense Authorization Act for Fiscal Year 2021 (Public Law 116-283) ..........................................................................4

III.    DoD's Placement of DJI on the Section 1260H List ................................................4

IV.    The Present Case .......................................................................................................5

STANDARD OF REVIEW ...................................................................................................6

ARGUMENT ........................................................................................................................7

I.      DoD Applied The Correct Legal Standard ...............................................................7

II.     DoD Considered Submissions From DJI in Its Re-Listing Decision. ......................8

III.    DoD's Decision Is Consistent With Due Process Principles. ..................................11

IV.    Substantial Evidence Supports DoD's Conclusion That DJI Is a "Military-Civil Fusion Contributor to the Chinese Defense Industrial Base." ................................16

        A.    DJI Is Indirectly Owned By The Central Military Commission of the Chinese Communist Party. ..............................................................................16

        B.    DoD Has Provided Substantial Evidence to Support Its Finding That DJI Is a Military-Civil Fusion Contributor to the Chinese Defense Industrial Base. ...........22

                1.    DoD's Finding That DJI Is a "Military-Civil Fusion Contributor to the Chinese Defense Industrial Base" Falls Within Its Statutory Authority. ................................................................................22

                2.    DoD Reasonably Determined That DJI Knowingly Received Science and Technology-Related Assistance from the Government of China. ...........24

                3.    Substantial Evidence Supports the Finding That DJI Is "Affiliated With" China's Ministry of Industry and Information Technology. ...............28

                4.    DoD's Finding That DJI Resides in or Is Affiliated with a Military-Civil Fusion Enterprise Zone Is Supported by Substantial Evidence. ...........32

V.      DoD's Decision to Re-List Plaintiffs Did Not Exceed Its Statutory Authority ......35

VI.    Any Relief Should Be Limited To Remand Without Vacatur ....................................35

CONCLUSION ...................................................................................................................37

## <u>TABLE OF AUTHORITIES</u>

**CASES**

*Aid Ass'n for Lutherans v. U.S. Postal Serv.,*
    321 F.3d 1166 (D.C. Cir. 2003)......................................................................................20

*Am. Great Lakes Ports Ass'n v. Schultz,*
    962 F.3d 510 (D.C. Cir. 2020)......................................................................................35

*Angel-Ramos v. Reno,*
    227 F.3d 942 (7th Cir. 2000) .........................................................................................8

*Archer W. Contractors, LLC v. U.S. Dep't of Transp.,*
    45 F.4th 1 (D.C. Cir. 2022)................................................................................... 7, 11

*Banks v. Booth,*
    3 F.4th 445 (D.C. Cir. 2021)........................................................................................21

*Battineni v. Mayorkas,*
    752 F. Supp. 3d 195 (D.D.C. 2024) ...............................................................................7

*Bd. of Cnty. Comm'rs of Kay Cnty., Okla. v. Fed. Hous. Fin. Agency,*
    754 F.3d 1025 (D.C. Cir. 2014)....................................................................................23

*Bloomberg, L.P. v. SEC,*
    45 F.4th 462 (D.C. Cir. 2022) ........................................................................................6

*Bowen v. Georgetown Univ. Hosp.,*
    488 U.S. 204 (1988) ........................................................................................................8

*Bradley v. Sch. Bd. of City of Richmond,*
    416 U.S. 696 (1974) ........................................................................................................8

*Cafeteria & Restaurant Workers Union v. McElroy,*
    367 U.S. 886 (1961) ......................................................................................................15

*Catawba Cnty. v. EPA,*
    571 F.3d 20 (D.C. Cir. 2009).........................................................................................20

*Citizens to Preserve Overton Park, Inc. v. Volpe,*
    401 U.S. 402 (1971) ........................................................................................................6

*Clapper v. Amnesty Int'l USA,*
    568 U.S. 398 (2013) ......................................................................................................14

*Classic Cab, Inc. v. Dist. of Columbia,*
    288 F. Supp. 3d 218 (D.D.C. 2018) ........................................................................12

*Ctr. for Biological Diversity v. Zinke,*
    260 F. Supp. 3d 11 (D.D.C. 2017)...........................................................................36

*Doe v. Rogers,*
    139 F. Supp. 3d 120 (D.D.C. 2015) .........................................................................19

*Eagle County v. Surface Transportation Board,*
    82 F.4th 1152 (D.C. Cir. 2023), *cert. granted sub nom.*
    *Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 144 S. Ct. 2688 (2024).......................10

*Erwin v. FAA,*
    23 F.4th 999 (D.C. Cir. 2022) .................................................................................35

*FBME Bank Ltd. v. Lew,*
    209 F. Supp. 3d 299 (D.D.C. 2016) .........................................................................36

*FCC v. AT&T Inc.,*
    562 U.S. 397 (2011) .......................................................................................19, 32

*Food Mktg. Inst. v. Argus Leader Media,*
    588 U.S. 427 (2019) ...............................................................................................22

*General Chemical Corp. v. United States,*
    817 F.2d 844 (D.C. Cir. 1987)...................................................................................7

*Getty v. Federal Savings & Loan Insurance Corp.,*
    805 F.2d 1050 (D.C. Cir. 1986)...............................................................................10

*Goodman v. Colvin,*
    233 F. Supp. 3d 88 (D.D.C. 2017)..............................................................................9

*Greene v. McElroy,*
    360 U.S. 474 (1959) ...............................................................................................14

*Holder v. Humanitarian Law Project,*
    561 U.S. 1 (2010).......................................................................................................7

*Hollingsworth v. Perry,*
    570 U.S. 693 (2013) ...............................................................................................14

*Holloran v. Duncan,*
    92 F. Supp. 3d 774 (W.D. Tenn. 2015) ...................................................................23

*In re Grand Jury Investigation,*
    916 F.3d 1047 (D.C. Cir. 2019)...............................................................................22

*Islamic Am. Relief Agency v. Gonzales,*
  477 F.3d 728 (D.C. Cir. 2007)................................................................................7

*Jama v. Immigr. & Customs Enf't,*
  543 U.S. 335 (2005) ..............................................................................................21

*Johnson v. United States,*
  559 U.S. 133 (2010) ..............................................................................................19

*Kirkland v. McAleenan,*
  No. 13-194, 2019 WL 7067046 (D.D.C. Dec. 23, 2019) ......................................19

*Krzywicki v. Del Toro*
  __F. Supp. 3d__, 2024 WL 4598338 (D.D.C. Oct. 29, 2024)................................9

*La. Pub. Serv. Comm'n v. Fed. Energy Regul. Comm'n,*
  20 F.4th 1 (D.C. Cir. 2021)....................................................................................6

*Landgraf v. USI Film Prods.,*
  511 U.S. 244 (1994) ..............................................................................................8

*Lopez Bello v. Smith,*
  651 F. Supp. 3d 20 (D.D.C. 2022), *aff'd sub nom.*
  *Bello v. Gacki,* 94 F.4th 1067 (D.C. Cir. 2024) ..................................................15

*Luokung Tech. Corp. v. Dep't of Def.,*
  538 F. Supp. 3d 174 (D.D.C. 2021) ............................................................... 7, 14

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
  463 U.S. 29 (1983) ................................................................................................6

*Nat'l Council of Resistance of Iran ("NCRI") v. U.S. Dep't of State,*
  251 F.3d 192 (D.C. Cir. 2001)........................................................................ 13, 15

*Nevada v. Dep't of Energy,*
  457 F.3d 78 (D.C. Cir. 2006)................................................................................10

*Norton v. S. Utah Wilderness All.,*
  542 U.S. 55 (2004) ................................................................................................36

*Paul v. Davis,*
  424 U.S. 693 (1976) ..............................................................................................12

*Pham v. Nat'l Transp. Safety Bd.,*
  33 F.4th 576 (D.C. Cir. 2022) ..............................................................................6

*Roberts v. United States,*
  741 F.3d 152 (D.C. Cir. 2014)........................................................................ 11, 16

*Saline Parents v. Garland,*
    88 F.4th 298 (D.C. Cir. 2023), *cert. granted*, 145 S. Ct. 144 (2024) ........................................13

*Smith v. Garland,*
    103 F.4th 1244 (7th Cir. 2024), *cert. granted*, 2025 WL 76486 (U.S. Jan. 13, 2025) .............................9

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs,*
    985 F.3d 1032 (D.C. Cir. 2021)........................................................................35

*TikTok Inc. v. Garland,*
    122 F.4th 930 (D.C. Cir. 2024), *aff'd*, 145 S. Ct. 57 (2025)....................................28

*TikTok Inc. v. Garland,*
    145 S. Ct. 57 (2025) ..........................................................................20, 22, 28

*Ralls Corp. v. Comm. on Foreign Inv. in U.S.,*
    758 F.3d 296 (D.C. Cir. 2014)......................................................................12, 15

*UMC Dev. v. Dist. of Columbia,*
    401 F. Supp. 3d 140 (D.D.C. 2019) ..............................................................12

*United States v. Three Sums Totaling $241,386.58 in Seized U.S. Currency,*
    Civ. A. No. 18-750, 2021 WL 2255174 (D.D.C. June 3, 2021) ........................................21

*U.S. Postal Serv. v. Postal Regul. Comm'n,*
    785 F.3d 740 (D.C. Cir. 2015)......................................................................36

*Water Quality Insurance Syndicate v. United States,*
    225 F. Supp. 3d 41 (D.D.C. 2016)................................................................10

*Xcel Energy Servs. Inc. v. Fed. Energy Regul. Comm'n,*
    41 F.4th 548 (D.C. Cir. 2022) ......................................................................9

*Xiaomi Corp. v. Dep't of Def.,*
    No. 21-280, 2021 WL 950144 (D.D.C. Mar. 12, 2021)..........................................7, 14, 28

## STATUTES

5 U.S.C. § 706 ......................................................................................10, 35, 36

12 U.S.C. § 1730a ....................................................................................10

22 U.S.C. § 7002......................................................................................3

42 U.S.C. §§ 4321 *et seq*............................................................................10

50 U.S.C. § 4565......................................................................................20, 21

50 U.S.C. § 4815......................................................................................22

National Defense Authorization Act for Fiscal Year 1999,
 Pub. L. No. 105-261, 112 Stat. 1920 (1998)................................................................2, 3, 7, 28

Floyd D. Spence National Defense Authorization Act for Fiscal Year 2001,
 Pub. L. No. 106-398, 114 Stat. 1654 (2000)..............................................................................3

William M. ("Mac") Thornberry National Defense Authorization Act for Fiscal Year 2021,
 Pub. L. No. 116-283, § 1260H, 134 Stat. 3388 (2021) ....................................................*passim*

Further Consolidated Appropriations Act, 2024,
 Pub. L. No. 118-47, 138 Stat. 460 ............................................................................................8

Servicemember Quality of Life Improvement & National Defense Authorization Act for
 Fiscal Year 2025,
 Pub. L. No. 118-159, 138 Stat. 1773 (2024)...........................................................15, 21, 29

## REGULATIONS

1 C.F.R. § 17.2 ............................................................................................................................8

31 C.F.R. § 800.404......................................................................................................................21

Notice of Availability of Designation of Chinese Military Companies,
 90 Fed. Reg. 1105 (Jan. 7, 2025) .........................................................................................14

## OTHER AUTHORITIES

*Affiliated*, Merriam-Webster's Collegiate Dictionary,
 https://www.merriam-webster.com/dictionary/affiliated....................................................29

*Affiliated*, Oxford English Dictionary,
 https://www.oed.com/dictionary/ affiliated_adj?tab=meaning_and_use#9323083.......................29

*Apparatus*, Am. Heritage Dictionary (5th ed. 2022),
 https://ahdictionary.com/word/search.html?q=apparatus ...............................................25

*Base*, Am. Heritage Dictionary (5th ed. 2022),
 https://ahdictionary.com/ word/search.html?q=base ........................................................23

*Base*, Merriam-Webster's Collegiate Dictionary,
 merriam-webster.com/base ..................................................................................................23

Black's Law Dictionary (12th ed. 2024)..............................................................................19, 23

Brandon Vigiliarolo, *US Closes Subsidiary Loophole in Dozens of Chinese Entity List Members*,
 The Register, March 26, 2025,
 https://www.theregister.com/2025/03/26/us_entity_list_subsidiaries ...........................15

*Contributor*, Merriam-Webster's Collegiate Dictionary,
merriam-webster.com/ dictionary/contributor ...................................................................23

*Defense*, Am. Heritage Dictionary (5th ed. 2022),
https://ahdictionary.com/word/search.html?q=defense ......................................................23

*Defense*, Merriam-Webster's Collegiate Dictionary,
merriam-webster.com/dictionary/defense .............................................................................23

Dep't of Def., Off. of the Sec'y of Def., Annual Report to Congress: Military & Security
Developments Involving the People's Republic of China, 2011,
https://apps.dtic.mil/sti/tr/pdf/ADA547551.pdf ................................................................3

Dep't of Def., Off. of the Sec'y of Def., Annual Report to Congress: Military & Security
Developments Involving the People's Republic of China, 2020,
https://media.defense.gov/ 2020/sep/01/2002488689/-1/-1/1/2020-dod-china-
military-power-report-final.pdf ...............................................................................................3

*Enterprise*, Merriam-Webster's Collegiate Dictionary,
https://www.merriam-webster.com/dictionary/enterprise...................................................33

H.R. Rep. No. 108-491 (2004) ...........................................................................................................3

*Industrial*, Am. Heritage Dictionary (5th ed. 2022),
https://ahdictionary.com/word/search.html?q=industrial ................................................23

*Industrial*, Merriam-Webster's Collegiate Dictionary,
merriam-webster.com/dictionary/industrial .......................................................................23

Mark Albert, *As states ban Chinese-made drones, officers raise alarm*, WVTM13 (July 25, 2023),
https://www.wvtm13.com/article/chinese-drone-bans-in-us/44614233.........................12

*Own*, Merriam-Webster Collegiate Dictionary,
https://www.merriam-webster.com/dictionary/own .........................................................19

*Planning*, Merriam-Webster's Collegiate Dictionary,
merriam-webster.com/planning..............................................................................................25

U.S.-China Econ. & Sec. Rev. Comm'n, 2018 Ann. Rep., Ch. 3 § 2 – Emerging Technologies and
Military-Civil Fusion: Artificial Intelligence, New Materials, and New Energy,
https://perma.cc/X5GG-5ZYV................................................................................................3

*Zone,* Am. Heritage Dictionary (5th ed. 2022),
https://ahdictionary.com/word/search.html?q=zone........................................................33

## INTRODUCTION

The United States Government has determined that the Chinese Communist Party's symbiotic relationships with certain Chinese technology companies present a national security threat. In response, and consistent with Congress's mandate in Section 1260H of the William M. ("Mac") Thornberry National Defense Authorization Act for Fiscal Year 2021, Pub. L. No. 116-283, § 1260H(a), 134 Stat. 3388, 3965 (2021) ("FY2021 NDAA") to submit to Congress a list of companies identified as "Chinese military companies" ("Section 1260H List" or "the List"), the Deputy Secretary of Defense notified Congress that the Department of Defense ("DoD" or the "Department") had identified SZ DJI Technology Co., Ltd. ("DJI") as a "Chinese military company." The administrative record underlying the determination of the Deputy Secretary of Defense provides substantial evidence that DJI is a "Chinese military company" because DJI is indirectly owned by an organization subordinate to the Central Military Commission of the Chinese Communist Party. § 1260H(d)(1)(B)(i)(I). The record also provides substantial evidence supporting the Deputy Secretary of Defense's determination that DJI is a "military-civil fusion contributor to the Chinese defense industrial base," and thus a "Chinese military company," because DJI (1) "knowingly receive[d] assistance from the Government of China . . . through science and technology efforts initiated under the Chinese military industrial planning apparatus[,]" (2) is "affiliated with the Chinese Ministry of Industry and Information Technology," and (3) "resid[es] in or [is] affiliated with a military-civil fusion enterprise zone[.]" § 1260H(d)(1)(B)(i)(II), (d)(2)(A), (B), (E). Any one of these four rationales is sufficient to place DJI on the Section 1260H List.

DJI and its wholly owned subsidiary corporation, Shenzhen Baiwang Technology Co., Ltd. (collectively "Plaintiffs") challenge this determination, contending that DoD's decision is erroneous because the Department applied the incorrect legal standard, based its decision on irrational

conclusions not supported by substantial evidence, and failed to provide DJI with notice and an opportunity to be heard. None of Plaintiffs' arguments have merit.

*First*, Plaintiffs contend that DoD erred in applying the version of Section 1260H that existed before its December 23, 2024 amendments. DoD made the decision to include DJI on the Section 1260H List, however, on December 16, 2024, seven days *before* the statute was amended. It is well-settled that an agency should apply the law in effect at the time it renders its decision.

*Second*, Plaintiffs argue that DoD's decision is not based on substantial evidence because the Department ignored evidence submitted by their prior counsel as part of their request for reconsideration. But in reaching its decision, DoD did consider the evidence submitted by Plaintiffs' prior counsel and determined that despite the submission, there is a wide range of probative evidence from a variety of sources to support its determination that DJI is a "Chinese military company."

*Third*, Plaintiffs ask the Court to declare a constitutional due process violation. DoD's decision, however, was issued consistently with principles of due process, and Plaintiffs neither show that DoD deprived them of a constitutionally protected interest nor show that any process was lacking.

*Fourth,* Plaintiffs contend that DoD did not adequately support its conclusion that DJI is a "military-civil fusion contributor to the Chinese defense industrial base." But as explained below, DoD has provided substantial evidence supporting its findings under Section 1260H.

For these reasons, the Court should grant Defendants' Cross-Motion for Summary Judgment and deny Plaintiffs' Motion for Summary Judgment.

## STATEMENT OF FACTS

## I.    The United States' Concerns About Chinese Military-Civil Integration

The United States Government has long expressed significant concerns about the national security threat posed by the relationship between Chinese technology companies and the Chinese state. In the National Defense Authorization Act for Fiscal Year 1999 ("FY99 NDAA"), Congress

2

directed the President to create a list identifying entities that meet the statutory definition of a Communist Chinese Military Company ("CCMC"). *See* FY99 NDAA, Pub. L. No. 105-261, § 1237(a), (b), 112 Stat. 1920, 2160 (1998). In 2005, Congress expanded the definition of a CCMC because the then-existing definition, which depended on a company's relationship to the Chinese People's Liberation Army ("PLA"), was too narrow—it "exclud[ed] a class of firms engaged in Chinese military modernization." H.R. Rep. No. 108-491 at 367 (2004).

These concerns persist up to the present day. In its 2011 Annual Report to Congress, the Department observed that "China's defense industry has benefited from integration with a rapidly expanding civilian economy and science and technology sector, particularly elements that have access to foreign technologies."[1] *Id.* A decade later, DoD again noted that China's strategy seeks to "fuse[] . . . China's defense industrial base and its civilian technology and industrial base."[2] The U.S.-China Economic and Security Review Commission ("U.S.-China Commission")[3] has articulated similar concerns, noting that "[t]he Chinese government's military–civil fusion policy aims to spur innovation and economic growth through an array of policies . . . while leveraging the fruits of civilian innovation for China's defense sector."[4]

---

[1] Dep't of Def., Off. of the Sec'y of Def., Annual Report to Congress: Military & Security Developments Involving the People's Republic of China, 2011, at 42, https://apps.dtic.mil/sti/tr/pdf/ADA547551.pdf

[2] Dep't of Def., Off. of the Sec'y of Def., Annual Report to Congress: Military & Security Developments Involving the People's Republic of China, 2020, at 18, https://media.defense.gov/2020/sep/01/2002488689/-1/-1/1/2020-dod-china-military-power-report-final.pdf

[3] The U.S.-China Commission, established by statute in the NDAA for FY 2001, Pub. L. No. 106-398, 114 Stat. 1654 (2000), is intended "to monitor, investigate, and report to Congress on the national security implications of the bilateral trade and economic relationship between the United States and the People's Republic of China [PRC]," 22 U.S.C. § 7002(b)(2).

[4] *See* U.S.-China Econ. & Sec. Rev. Comm'n, 2018 Ann. Rep., Ch. 3 § 2 – Emerging Technologies and Military-Civil Fusion: Artificial Intelligence, New Materials, and New Energy at 205, https://perma.cc/X5GG-5ZYV

## II.    The William M. ("Mac") Thornberry National Defense Authorization Act for Fiscal Year 2021 (Public Law 116-283)

The FY 2021 NDAA provides for the identification of "each entity the Secretary [of Defense] determines, based on the most recent information available, is operating directly or indirectly in the United States . . . that is a Chinese military company." § 1260H(a).[5] A "Chinese military company" means an entity that is either "(I) directly or indirectly owned, controlled, or beneficially owned by, or in an official or unofficial capacity acting as an agent of or on behalf of, the People's Liberation Army or any other organization subordinate to the Central Military Commission of the Chinese Communist Party; or (II) identified as a military-civil fusion contributor to the Chinese defense industrial base," and that is "engaged in providing commercial services, manufacturing, producing, or exporting." § 1260H(d)(1)(B)(i)(I)-(II),  (d)(1)(B)(ii).  In turn, Congress has defined "military-civil fusion contributor" to include (as relevant here):

- "[e]ntities knowingly receiving assistance from the Government of China or the Chinese Communist Party through science and technology efforts initiated under the Chinese military industrial planning apparatus," § 1260H(d)(2)(A);

- "[e]ntities affiliated with the Chinese Ministry of Industry and Information Technology, including research partnerships and projects," § 1260H(d)(2)(B); and

- "[e]ntities residing in or affiliated with a military-civil fusion enterprise zone or receiving assistance from the Government of China through such enterprise zone," § 1260H(d)(2)(E).

## III.    DoD's Placement of DJI on the Section 1260H List

Plaintiffs are a corporation, SZ DJI Technology Co., Ltd., and its wholly owned subsidiary corporation, Shenzhen Baiwang Technology Co., Ltd. (collectively, "DJI"), with headquarters in Shenzhen, China. Am. Compl. ¶¶ 15-16, ECF No. 27. Plaintiffs allege that DJI "is the world's largest

---

[5] Defendants have included as Ex. 1 to this memorandum the original, pre-amendment version of Section 1260H. This is the version of Section 1260H that applies to DoD's designation of DJI. *See infra* at I.

4

privately owned manufacturer of consumer and commercial drones by volume." *Id.* ¶ 1. On October 3, 2022 and January 18, 2024, the Deputy Secretary of Defense notified Congress that DoD had designated DJI, among other entities, as a Chinese military company on the Section 1260H List for 2022 and 2023, respectively. On December 17, 2024, DoD notified Congress that it had re-designated DJI on the Section 1260H List for 2024.

DoD's internal report ("DJI Report"), dated December 6, 2024, sets forth the bases in detail for placing DJI on the 1260H List. Administrative Record ("AR") 21-42. DoD explained in the report that the Chinse Communist Party indirectly owns DJI. AR 27-29. The report further explains that DJI functions as a military-civil fusion contributor to the Chinese defense industrial base, *see* § 1260H(d)(1)(B)(i)(II), for three independent reasons: (1) it "knowingly receives assistance from the Government of China . . . through science and technology efforts initiated under the Chinese military industrial planning apparatus," *see* § 1260H(d)(2)(A); (2) it is "affiliated with the Chinese Ministry of Industry and Information Technology, including research partnerships and projects," *see* § 1260H(d)(2)(B); and (3) it "resides in or is affiliated with a military-civil fusion enterprise zone." *See* AR 27, 29-33. As described more fully below, the DJI Report outlines factual bases for placing DJI on the Section 1260H List pursuant to each of these statutory authorities independently. *See id.*[6] Any one of the three factors would be sufficient, but viewed together, they leave no doubt that DJI was properly listed.

## IV.    The Present Case

In October 2024, Plaintiffs initiated this suit challenging DoD's determination that DJI is a Chinese military company under Section 1260H. *See* Compl., ECF No. 1. In accordance with the Court's scheduling order, ECF No. 25, Defendants filed a certified list of the contents of the

---

[6] The 21-page DJI Report contains 21 lines of classified information. The version of the report contained in the administrative record has been redacted accordingly.

administrative record and transmitted the unclassified portions of the record to Plaintiffs on February 24, 2025. *See* Certified List of Administrative Record Contents, ECF No. 26-1 ("Certified List").[7] Plaintiffs amended their complaint on March 3, 2025, ECF No. 27, and moved for summary judgment on March 14, 2025, ECF No. 31 ("Pls.' MSJ").

## STANDARD OF REVIEW

The APA's deferential arbitrary-and-capricious standard presumes an agency's decision to be valid, and a court reviews only whether that decision "was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971). An agency's decision may be deemed arbitrary and capricious only in circumstances where the agency "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency," or its decision "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The Court may not "substitute its judgment for that of the agency"; the agency's decision should be affirmed as long as it is supported by a rational basis. *Id.*

The APA's substantial evidence standard erects a "low bar." *La. Pub. Serv. Comm'n v. Fed. Energy Regul. Comm'n*, 20 F.4th 1, 7 (D.C. Cir. 2021). Substantial evidence "is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pham v. Nat'l Transp. Safety Bd.*, 33 F.4th 576, 581 (D.C. Cir. 2022) (citation omitted). The standard "requires more than a scintilla, but can be satisfied by something less than a preponderance of the evidence." *Bloomberg, L.P. v. SEC*, 45 F.4th 462, 475 (D.C. Cir. 2022) (citation omitted). The agency's factual findings "may be supported

---

[7] The administrative record, which comprises 1552 pages, contains 16 pages of classified information. *See* Certified List at Bates Nos. 274, 1317; *see also* Decl. of C. Scott Coltson ¶ 6, ECF No. 32-1 (attesting that this information constitutes properly classified information).

by substantial evidence even though a plausible alternative interpretation of the evidence would support a contrary view." *Archer W. Contractors, LLC v. U.S. Dep't of Transp.*, 45 F.4th 1, 6 (D.C. Cir. 2022) (citation omitted).

Deference under the APA is further heightened in cases such as this one that involve national security and foreign affairs. *See Islamic Am. Relief Agency v. Gonzales*, 477 F.3d 728, 734 (D.C. Cir. 2007) ("[O]ur review—in an area at the intersection of national security, foreign policy, and administrative law—is extremely deferential."). When "litigation implicates sensitive and weighty interests of national security and foreign affairs," the Supreme Court has instructed courts to grant this heightened deference even when considering constitutional claims. *See Holder v. Humanitarian Law Project*, 561 U.S. 1, 33-34 (2010).[8]

## ARGUMENT

### I.    DoD Applied The Correct Legal Standard

Congress requires the Secretary of Defense to submit "a list of each entity identified . . . to be a Chinese military company" annually "to the Committees on Armed Services of the Senate and the House of Representatives[,]" and to "include in such submission, as applicable, an explanation of any entities deleted from such list[.]" § 1260H(b)(1). In accordance with this mandate, on December 17, 2024, the Deputy Secretary of Defense transmitted to the congressional defense committees a list

---

[8] The "standard of review" section in Plaintiffs' motion incorrectly characterizes *General Chemical Corp. v. United States*, 817 F.2d 844 (D.C. Cir. 1987) (per curiam). Although that case's prefatory summary noted that the specific decision under review had been "internally inconsistent and inadequately explained," *id.* at 846, the opinion did not state that the APA requires absolute consistency in agency explanations. *See id.* at 855 (stating that "[a]ny one of the[] inconsistencies or failures of explanation in the [agency's] analysis of geographic competition might not require remand," but that the "collective impact of these problems" resulted in analysis "below the standard of reasoned decisionmaking"); *see also Battineni v. Mayorkas*, 752 F. Supp. 3d 195, 207 (D.D.C. 2024) ("[The] standard of review under the arbitrary and capricious test is only reasonableness, not perfection." (citation omitted)). Further, *Xiaomi Corp. v. Dep't of Def.*, No. 21-280, 2021 WL 950144, at *4 (D.D.C. Mar. 12, 2021), and *Luokung Tech. Corp. v. Dep't of Def.*, 538 F. Supp. 3d 174 (D.D.C. 2021), did not assess "a prior version of the CMC list," Pls.' MSJ at 15, but instead assessed a different (and now-defunct) statute. *See* FY99 NDAA, Pub. L. No. 105-261, § 1237, as amended (formerly codified at 50 U.S.C. § 1701 note).

identifying the "entities that [DoD] ha[d] determined . . . are 'Chinese military companies'" as well as "six entities" that DoD determined "should be removed from the list." AR 3-6. Following a mandatory 15-day waiting period for de-listing entities that had been previously designated, *see* Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, § 8149, 138 Stat. 460, 519-20, DoD submitted the Section 1260H List to the Federal Register for publication. *See* AR 1. The Federal Register published the List on January 7, 2025. AR 12; *see also* 1 C.F.R. § 17.2 (setting forth schedule for public inspection and publication in Federal Register).

The congressional notification letters dated December 16, 2024 memorialize the Deputy Secretary's listing decision. *See* AR 1. Given that DoD made its listing decision seven days *before* the amendments to Section 1260H were enacted on December 23, 2024, DoD's reliance on the pre-amendment version of the statute was proper. *See Angel-Ramos v. Reno*, 227 F.3d 942, 948 (7th Cir. 2000) (recognizing that "a court or agency 'should apply the law in effect at the time it renders its decision'" (quoting *Landgraf v. USI Film Prods.*, 511 U.S. 244, 273 (1994) and *Bradley v. Sch. Bd. of City of Richmond*, 416 U.S. 696, 711 (1974))).

Plaintiffs' assertion to the contrary is unavailing. They cite no authority for their contention that an agency must apply the law in effect at the time an agency decision is published in the Federal Register as opposed to the time the decision is made. *See* Pls.' MSJ at 16. Nor can they cite such authority, considering that "congressional enactments" generally "will not be construed to have retroactive effect[.]" *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988). Plaintiffs do not attempt to explain how DoD was to apply a law that did not exist at the time it made its listing decision. *See* Pls.' MSJ at 16.

## II.    DoD Considered Submissions From DJI in Its Re-Listing Decision.

The administrative record provided to Plaintiffs contains all "documents that were directly or indirectly considered in connection with DoD's decision to identify [DJI] on the Section 1260H list."

Certification of Administrative Record § 6, ECF No. 26-2. The record includes DJI's July 2023 submission to DoD. *See* AR 1337-52. Moreover, the DJI Report expressly states that in "conducting its analysis" underlying its decision to designate DJI, it "considered all the latest information, *including information provided by DJI.*" AR 27 (emphasis added). Thus, contrary to DJI's contention, Pls.' MSJ at 17-18, DoD considered DJI's July 2023 submission in making all subsequent determinations whether to include DJI on the Section 1260H List. And in making these determinations, DoD tacitly decided that despite the statements in this submission, there is still substantial evidence that DJI is a "Chinese military company."

The fact that DoD did not specifically refer to this submission in the DJI Report does not mean otherwise, contrary to DJI's argument. Under the substantial-evidence standard, there is "no rigid requirement that [an agency decisionmaker] specifically refer to every piece of evidence in [its] decision." *Goodman v. Colvin*, 233 F. Supp. 3d 88, 109 (D.D.C. 2017) (citation omitted). Rather, "[u]nder the APA, the agency 'need only *consider* the evidence;' it need not mention every piece of evidence it considered." *Smith v. Garland*, 103 F.4th 1244, 1253 (7th Cir. 2024) (citation omitted), *cert. denied*, 2025 WL 76486 (U.S. Jan. 13, 2025). Courts applying the APA's deferential review standard will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned" and where "the agency's rationale and its reasonableness can be perceived readily enough." *Xcel Energy Servs. Inc. v. Fed. Energy Regul. Comm'n*, 41 F.4th 548, 557 (D.C. Cir. 2022) (citation omitted).

Under the substantial-evidence standard, it suffices that an agency "expressly state[]" that it "considered" relevant evidence, and that it "implicit[ly] reject[ed]" that evidence in its "choice to give weight to" other evidence sufficient to support its decision. *Krzywicki v. Del Toro*, __ F. Supp. 3d __, 2024 WL 4598338, at *8 (D.D.C. Oct. 29, 2024). Because DoD expressly stated that it considered the information submitted by DJI, *see* AR 27, and it included this material in the administrative record, *see* AR 1337-55, 1358-60, 1367-71, DoD's determination should be upheld. Plaintiffs place mistaken

reliance on inapposite case law, including *Eagle County v. Surface Transportation Board*, 82 F.4th 1152 (D.C. Cir. 2023), *cert. granted sub nom. Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 144 S. Ct. 2680 (2024), to argue that DoD's express statement that it considered the relevant evidence—specifically including the materials at issue—is not sufficient. Because the court in *Eagle County* was analyzing an agency's obligations under the National Environmental Policy Act, 42 U.S.C. §§ 4321 *et seq.* ("NEPA"), the agency was required to "take a 'hard look' at the environmental consequences of [its] actions, and provide for broad dissemination of relevant environmental information." *Eagle Cnty.*, 82 F.4th at 1175 (citation omitted). *Eagle County* is inapposite because NEPA's "hard look" standard does not apply here. The standard that does apply, by contrast, is the APA's deferential standard.

Also inapposite is *Getty v. Federal Savings & Loan Insurance Corp.*, 805 F.2d 1050 (D.C. Cir. 1986). At issue in *Getty* was an agency decision that failed to consider certain factors that a specific statute, 12 U.S.C. § 1730a(m), required the agency to consider. *See Getty*, 805 F.2d at 1051, 1054-57. Conversely, Plaintiffs do not claim here that DoD failed to consider a specific factor that Congress expressly required it to consider in reaching its decision. Moreover, unlike the agency in *Water Quality Insurance Syndicate v. United States*, 225 F. Supp. 3d 41 (D.D.C. 2016), here, DoD has neither "ignore[d] factual matters" nor "fail[ed] to respond adequately" to contrary arguments. *Id.* at 68. As explained above, DoD actually considered the materials submitted by DJI in making its determination. In any event, the agency decision in *Water Quality Insurance Syndicate*—whether the captain of a vessel that caused an oil spill had acted with gross negligence—turned on the weight afforded by the agency to determinations of witness credibility, *see id.* at 68-71, a factor wholly absent from this case.

Regardless, any purported agency error stemming from an alleged failure to consider Plaintiffs' submissions is harmless. "The APA provides that, in reviewing agency action, the court 'shall' take account of 'the rule of prejudicial error,' . . . that is, whether the error caused prejudice." *Nevada v. Dep't of Energy*, 457 F.3d 78, 90 (D.C. Cir. 2006) (quoting 5 U.S.C. § 706). Here, even if the Court were

to find that DoD had not adequately considered Plaintiffs' submission, the error would be harmless because substantial evidence still supports DoD's decision. *See Archer W. Contractors*, 45 F.4th at 7 ("merely show[ing] 'a plausible alternative interpretation of the evidence' that 'would support a contrary view'" does "not eliminate the 'relevant evidence' that would allow 'a reasonable mind' to accept the [agency's] view 'as adequate to support' its factual 'conclusion'" (citations omitted)).

*First*, as explained below, there is substantial evidence showing that the Central Military Commission of the Chinese Communist Party indirectly owns DJI through the State-Owned Assets and Administration Commission of the State Council. *See infra* at IV.A. *Second*, it is undisputed that China had exported DJI products to Ukraine, which DoD cites merely as one piece of evidence underlying its conclusion that DJI "[d]evelops, [m]anufactures, and [s]ells [d]rone and [c]amera [t]echnology." *See* AR 33-34. Because DoD cites other evidence to support this conclusion, and DJI does not dispute that it is "engaged in providing commercial services, manufacturing, producing, or exporting," § 1260H(d)(1)(B)(ii)—*see, e.g.*, Pls.' MSJ at 1, 5 (stating that DJI manufactures commercial drones)—Plaintiffs' contention that they have suspended all sales to business partners in Russia and Ukraine is irrelevant.

## III.    DoD's Decision Is Consistent With Due Process Principles.

Plaintiffs incorrectly argue that DoD violated procedural due process by identifying them on the Section 1260H List. *See* Pls.' MSJ at 18-20. Generally, to state a due process claim, "the plaintiff must show the Government deprived [the plaintiff] of a 'liberty or property interest' to which she had a 'legitimate claim of entitlement,' and that 'the procedures attendant upon that deprivation were constitutionally [in]sufficient.'" *Roberts v. United States*, 741 F.3d 152, 161 (D.C. Cir. 2014) (citation omitted). But Plaintiffs neither show that DoD deprived them of a constitutionally protected liberty or property interest nor that any process was lacking.

Plaintiffs contend that they have suffered reputational harm in the form of unspecified "U.S. and international customers [that] have terminated existing contracts . . . and are refusing to enter into new ones" and allege that "DJI and its employees now suffer frequent and pervasive stigmatization." Pls.' MSJ at 11-12. But reputational harm alone is not sufficient to show a deprivation of a liberty or property interest. *See Paul v. Davis*, 424 U.S. 693, 712 (1976) (harm to reputation alone does not implicate any "liberty" or "property" interests sufficient to invoke due process clause's procedural protection). DJI's placement on the 1260H List did not forbid any potential investor—or any state or local government—from doing business with DJI nor DJI doing business with anyone. "[A] mere unilateral expectation or an abstract need is not a property interest entitled to protection," *UMC Dev. v. Dist. of Columbia*, 401 F. Supp. 3d 140, 151 (D.D.C. 2019) (citation omitted), and Plaintiffs plead no facts sufficient to show that their Section 1260H designation resulted in the termination of any specific existing contract or the loss of new ones. "Businesses generally do not have property interests in their assets or revenues. Those are 'incidents' to ownership—goals that are far from guaranteed, and certainly not guaranteed by the government." *Classic Cab, Inc. v. Dist. of Columbia*, 288 F. Supp. 3d 218, 225 (D.D.C. 2018). Plaintiffs' claim of potential business loss is "too contingent for constitutional protection." *Ralls Corp. v. Comm. on Foreign Inv. in U.S.*, 758 F.3d 296, 316 (D.C. Cir. 2014).

Also, although Plaintiffs claim that some states and local governments "have decided to discontinue their relationships with DJI," Pls.' MSJ at 11, they cite no evidence showing that DJI's Section 1260H designation prompted such action. Instead, Plaintiffs cite only to a news article reporting that because Arkansas has prohibited its government agencies from buying "drones made by any Chinese or Russian company," those agencies will no longer buy drones from DJI, which is "based in China."[9] Nothing in that article represents that Arkansas's action—or the actions of any

---

[9]  Mark Albert, *As states ban Chinese-made drones, officers raise alarm*, WVTM13 (July 25, 2023), https://www.wvtm13.com/article/chinese-drone-bans-in-us/44614233 (last visited Apr. 3, 2025).

other state—were prompted by any action by DoD, as opposed to the publicly available fact that DJI is based in China. Although that article does note that in 2022, DoD "released a statement identifying DJI as a 'Chinese military company' operating in the United States," *id.*, it does not connect DoD's "statement" as the reason for any states' decisions not to use drones from companies based in China. Plaintiffs' strained analogy to the sanctions context is similarly unavailing. *See* Pls.' MSJ at 19 (citing *Nat'l Council of Resistance of Iran ("NCRI") v. U.S. Dep't of State*, 251 F.3d 192, 208-09 (D.C. Cir. 2001)). *NCRI* explained that in addition to "mere stigmatization," the plaintiffs had been "deprived of the previously held right to—for example—hold bank accounts, and to receive material support or resources from anyone within the jurisdiction of the United States." *NCRI*, 251 F.3d at 204. By contrast, here, the only possible harm Plaintiffs have suffered traceable to DoD is to their reputation. No cognizable deprivation has occurred.

Plaintiffs also contend that their designation on the 1260H List will, beginning in 2026, prevent them from contracting with DoD and currently prevents them from contracting with the Department of Homeland Security ("DHS"), Pls.' MSJ at 12, but they do not represent that they have any present intention to enter into such contracts. With respect to DoD, this claim is unripe. "A claim is premature and therefore unripe for judicial review if it depends on 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *Saline Parents v. Garland*, 88 F.4th 298, 306 (D.C. Cir. 2023) (citation omitted), *cert. denied*, 145 S. Ct. 144 (2024). To determine ripeness, the Court evaluates "(1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration." *Id.* (citation omitted). Plaintiffs cannot show now that they will be banned from bidding on DoD contracts in 2026—especially when they disclaim any present intention to do so— but instead ask the Court to impermissibly adjudicate a "hypothetical state of facts." *Id.* at 307 (citation omitted). Because they have no intention to bid on DoD contracts, there is no hardship to Plaintiffs by withholding consideration of this purely hypothetical claim. Similarly, because Plaintiffs do not

have any present intention to bid on any contracts with DHS, they lack standing to premise any claim on their non-existent intention. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (Supreme Court has "repeatedly reiterated that threatened injury must be *certainly impending* to constitute injury in fact, and that allegations of *possible* future injury are not sufficient" (citations and internal punctuation omitted)).[10]

No other caselaw cited by Plaintiffs supports their allegation of a protected property or liberty interest. Because the Court in *Xiaomi* and *Luokung* never reached the plaintiffs' due process claims, its footnoted statements on this topic are pure dicta. *See Xiaomi Corp.*, 2021 WL 950144, at *8 n.8; *Luokung Tech. Corp.*, 538 F. Supp. 3d at 191 n.13. In any event, unlike under the now-defunct statute at issue in those cases, DoD has established an agency reconsideration process where entities have a full and fair opportunity to provide whatever information they wish to DoD in support of requests for de-listing. *See* Notice of Availability of Designation of Chinese Military Companies, 90 Fed. Reg. 1105, 1106 (Jan. 7, 2025) (describing reconsideration process). Plaintiffs' truncated quotation from *Greene v. McElroy*, 360 U.S. 474 (1959), obscures its limited context. The Court there noted only that "where governmental action *seriously injures* an *individual*, and the reasonableness of the action depends on fact findings, the evidence used to prove the Government's case must be disclosed to the *individual* so that he has an opportunity to show that it is untrue." *Id.* at 496 (emphasis added). DJI is a company, not an individual. In addition, because DoD has disclosed to DJI all non-classified information on which it based the designation, *Greene* is inapposite.[11] Justice Gorsuch's "admittedly tentative . . .

---

[10] Plaintiffs also lack standing to assert claims on behalf of "users of DJI's products and the public at large." Pls.' MSJ at 13; *see Hollingsworth v. Perry*, 570 U.S. 693, 708 (2013) ("[I]n the ordinary course, a litigant must assert his or her own legal rights and interests, and cannot rest a claim to relief on the legal rights or interests of third parties." (citation omitted)).

[11] In any event, distinguishing *Greene*, the Supreme Court held shortly afterward that the government may take some decisions—such as summarily revoking an individual's right of access to a job site, even if it causes him or her to lose his job—without procedural due process protections if the law

observations" in *TikTok Inc. v. Garland*, 145 S. Ct. 57, 73 (2025), postulate that Congress should weigh

in on the disclosure of classified evidence, *id.* at 74 (Gorsuch, J., concurring), which Congress has done

with respect to classified material used in Section 1260H determinations. *See* Servicemember Quality

of Life Improvement & National Defense Authorization Act for Fiscal Year 2025, Pub. L. No. 118-

159, § 1346(f), 138 Stat. 1773, 2126 (2024).

In any event, "due process is flexible and calls for such procedural protections as the particular

situation demands." *Ralls Corp.*, 758 F.3d at 317 (quoting *NCRI*, 251 F.3d at 205). Pre-deprivation

notice is not required where "(1) the deprivation was 'necessary to secure an important governmental

interest;' (2) there was a 'special need for very prompt action;' and (3) 'the party initiating the

deprivation was a governmental official responsible for determining, under the standards[] of a

narrowly drawn statute, that it was necessary and justified in the particular instance.'" *Lopez Bello v.*

*Smith*, 651 F. Supp. 3d 20, 39 (D.D.C. 2022) (citation omitted), *aff'd sub nom. Bello v. Gacki*, 94 F.4th

1067 (D.C. Cir. 2024). All three requirements are satisfied here. First, Section 1260H furthers the

compelling government interest of protecting the U.S. military supply chain by preventing infiltration

from foreign actors. Because the United States—including DoD—purchases large quantities of goods

from China, it must take all necessary steps to prevent purchases of equipment (such as drones) from

DoD contractors where such equipment can collect and disseminate data to China and other foreign

adversaries. Second, DoD has a special need for very prompt action to protect the U.S. military supply

chain from infiltration by foreign adversaries. Advance notification of designation would permit

entities to take countermeasures such as spinning off assets to create a new entity or creating new

entities while obscuring their true ownership.[12] In the interim, prior to designation, such entities would

---

specifically authorizes such summary revocation. *See Cafeteria & Restaurant Workers Union v. McElroy*,
367 U.S. 886, 890-94 (1961).

[12] *See, e.g.*, Brandon Vigiliarolo, *US Closes Subsidiary Loophole in Dozens of Chinese Entity List Members*, THE
REGISTER, March 26, 2025, https://www.theregister.com/2025/03/26/us_entity_list_subsidiaries

be fully able to compete for contracts with DoD, DHS, and the Department of Energy ("DOE").
Relatedly, very prompt action is required to ensure that entities cannot spoliate relevant evidence. *See, e.g.,* AR 275-79 (newspaper article examining documents showing that DJI obscured ties to Chinese state funding). Third, the Deputy Secretary of Defense is responsible for approving Section 1260H designations, tacitly determining that such designations are necessary and justified.

In sum, DJI has not identified a deprivation of a protected interest nor any insufficient "procedures attendant upon that deprivation." *Roberts*, 741 F.3d at 162 (citation omitted).[13]

## IV.   Substantial Evidence Supports DoD's Conclusion That DJI Is a "Military-Civil Fusion Contributor to the Chinese Defense Industrial Base."

DoD identified four statutory bases to place DJI on the Section 1260H List, each supported by substantial evidence in the record: DJI (1) is a Chinese military company because it is indirectly owned by the Central Military Commission of the Chinese Communist Party, *see* § 1260H(d)(1)(B)(i)(I); and (2) is a military-civil fusion contributor because DJI (a) knowingly received assistance from the Government of China through science and technology efforts initiated under the Chinese military industrial planning apparatus, *see* § 1260H(d)(2)(A); (b) is affiliated with the Chinese Ministry of Industry and Information Technology, § 1260H(d)(2)(B); and (c) resides in or is affiliated with a military-civil fusion enterprise zone, § 1260H(d)(2)(E). Each rationale in the DJI report appropriately applies the applicable standard according to its plain meaning and provides substantial evidence that DJI meets the standard. Any one of these bases is sufficient to conclude that DoD properly included DJI on the 1260H List.

---

(noting, with respect to Chinese businesses with which the Commerce Department has prohibited American businesses from transacting, "it's a constant game of whack-a-mole as China-based [entities] add subsidiaries that spring up to circumvent bans which some American companies continue to accommodate") (last visited Apr. 3, 2025).

[13] Due process arguments raised in Plaintiffs' motion regarding access to classified information have been addressed in Defendants' briefs opposing Plaintiffs' motion to compel. *See* ECF Nos. 32, 34.

### A. DJI Is Indirectly Owned By The Central Military Commission of the Chinese Communist Party.

Congress requires DoD to place on the Section 1260H List entities that are "directly or indirectly owned" by "an organization subordinate to the Central Military Commission [("the Commission")] of the Chinese Communist Party." § 1260H(d)(1)(B)(i)(I). DoD has determined that DJI is indirectly owned by the Commission.[14] This determination is supported by substantial evidence.

Record evidence compiled by DoD demonstrates that three entities owned and actively managed by the State-Owned Assets Supervision and Administration Commission ("SASAC") have invested in DJI: China Chengtong Holdings Group and its wholly owned subsidiary Chengtong Fund Management Co., Ltd. (collectively "Chengtong"), Guangdong Hengjian Investment Holdings ("Guangdong"), and SDIC United Capital ("SDIC"). AR 28-29, 276, 575. SASAC is a ministerial organization directly subordinate to the State Council[15] that is responsible for supervising and managing China's state-owned enterprises. *See* AR 276, 324-25, 523, 575, 1549-52. The Commission beneficially owns entities owned or managed by SASAC through the National Defense Mobilization Commission ("NDMC"), a joint Commission and State Council organization that coordinates defense-related policy between the Commission and the State Council. AR 28-29, 38 n.41, 428. In addition to its role as a coordinating body, the NDMC oversees a number of defense-related tasks including the aspects of economic activity that relate to the Commission's defense mobilization efforts. AR 428.

---

[14] DoD did not determine that DJI is directly owned by the State-owned Assets Supervision and Administration Commission ("SASAC"). The reference to DJI being directly owned by the SASAC in the Summary Findings section of the report is a scrivener's error—the sentence should have read: "DJI is indirectly owned, controlled, or beneficially owned by the PLA or an organization subordinate to the [Commission] because it is a State-Owned Entity (SOE) *indirectly* owned by the State-owned Assets Supervision and Administration Commission (SASAC) of the State Council and is beneficially owned by the [Commission]." AR 27 (emphasis added).

[15] The State Council is the administrative arm of the Chinese government. AR 27, 312, 324.

Chengtong, which is wholly owned by SASAC, invested in DJI in 2018 through a government fund worth $55.3 billion, although the amount of the investment is unclear. AR 28, 276, 575. As of October 2024, Chengtong remained listed as an investor in DJI. AR 28 & n.53, 591-93. In March 2021, another SASAC-run investment holding company, Guangdong, invested in DJI. AR 29, 276, 576. As of February 2022, SDIC, a state-owned investment holding company approved by the State Council, was also identified as an investor in DJI. AR 29, 276, 576. The terms of both the Guangdong and SDIC investments are unknown. AR 29; *see also* AR 276, 576.

Plaintiffs do not dispute that SASAC owns and manages Chengtong, Guangdong, and SDIC. *See* Pls.' MSJ at 21-26. Nor do they dispute that the three entities are beneficially owned by the Commission through the NDMC. *See id.* Instead, Plaintiffs contend that neither Chengtong, Guangdong, nor SDIC were investors in DJI at the time of DoD's listing decision and argue that even if the three entities did own shares in DJI, their ownership stake is too small to "constitute ownership for purposes of interpreting Section 1260H." *Id.* at 24-25. Plaintiffs' arguments are unavailing.

*First*, Plaintiffs admit that Chengtong has invested in DJI but assert that DoD's reliance on Chengtong's investment was improper because their prior counsel informed DoD in a letter dated September 30, 2024 that, "as of June 2023," Chengtong "ceased to be an investor in DJI." *See* Pls.' MSJ at 23 (citing AR 1368). Plaintiffs similarly rely on their prior counsel's statements in the July 27, 2023 letter requesting reconsideration of DoD's listing decision to support their assertion that Guangdong and SDIC "have never been investors in DJI." Pls.' MSJ at 23 (citing AR 1339). But neither letter cites any evidentiary support for these unsworn statements of Plaintiffs' prior counsel, *see* AR 1339, 1352, 1368, 1371, which are belied by the evidentiary material that *is* in the administrative record. Indeed, record evidence shows that Chengtong continued to be identified as a DJI investor a month after Plaintiffs' prior counsel told DoD that the entity was no longer an investor in DJI. AR 28 & n.53, 591-93. DoD's reliance on record evidence showing Chengtong and the other SASAC-

18

owned and managed entities have invested in DJI—particularly the record evidence that post-dates

prior counsel's letter—is, therefore, reasonable given that the unsworn statements of Plaintiffs' prior

counsel lack any indicia of reliability. *Cf. Kirkland v. McAleenan*, No. 13-194, 2019 WL 7067046, at \*18-

20 (D.D.C. Dec. 23, 2019) (holding that unsworn statements are "beyond the scope of the 'kinds of

evidentiary materials' contemplated by Rule 56" because they lack any "indicia of reliability").

 *Second*, Section 1260H does not define the term "owned" in subsection (d)(1)(B)(i)(I). "When

a statute does not define a term," courts "typically 'give the phrase its ordinary meaning.'" *FCC v.*

*AT&T Inc.*, 562 U.S. 397, 403 (2011) (quoting *Johnson v. United States*, 559 U.S. 133, 138 (2010)).

"[O]wn" means to "have or hold as property: POSSESS." *Own*, Merriam-Webster Collegiate

Dictionary, https://www.merriam-webster.com/dictionary/own; *see also Own*, Black's Law Dictionary

(12th ed. 2024) ("To rightfully have or possess as property; to have legal title to."); *cf. Ownership*, Black's

Law Dictionary (12th ed. 2024) ("The bundle of rights allowing one to use, manage, and enjoy property

. . . . Ownership implies the right to possess a thing regardless of any actual or constructive control.").

Thus, in the context of Section 1260H, "owned" means that the "People's Liberation Army or any

other organization subordinate to the Central Military Commission" has or holds as property a

company or has or holds a property interest in a company. § 1260H(d)(1)(B)(i)(I).

 Here, three organizations subordinate to the Commission have or hold a property interest in

DJI. Therefore, under the plain meaning definition of the term "own" these organizations indirectly

own DJI, which is sufficient for DoD to make a finding under Section 1260H(d)(1)(B)(i)(I).

 That DoD did not explicitly state that it was applying the ordinary meaning of the term

"owned" in the report setting forth its rationale for designating DJI as a Chinese military company is

not, contrary to Plaintiffs' contention, evidence of a "serious gap in DoD's reasoning." *See* Pls.' MSJ

at 24. When a statute does not define a term, it is reasonable for an agency, much like the courts, to

"assume" that "Congress intended to give the term its ordinary meaning[,]" *Doe v. Rogers*, 139 F. Supp.

3d 120, 137 (D.D.C. 2015) (quoting *Aid Ass'n for Lutherans v. U.S. Postal Serv.*, 321 F.3d 1166, 1176 (D.C. Cir. 2003)), and to apply that meaning during the decisionmaking process.

The Court should reject Plaintiffs' argument that application of the plain meaning of the term requires the delineation of a bright "line for establishing ownership[.]" Pls.' MSJ at 24. Plaintiffs urge the Court to adopt the 50 Percent Rule promulgated by the Department of the Treasury, Office of Foreign Asset Control ("OFAC") because "anything less" than "a 50% stake" would be inconsistent with the plain meaning of the term "own." *Id.* Alternatively, Plaintiffs argue that "under no circumstances could a stake of less than 10% constitute ownership for purposes of interpreting Section 1260H" because "Congress . . . provided that anything less" does not amount to a "'substantial interest' in a business" when the Committee on Foreign Investment reviews transactions involving investments by foreign entities. *Id.* at 24-25 (citing 50 U.S.C. § 4565).

Nothing in Section 1260H, however, "compels [DoD] to quantify a uniform amount[,]" *Catawba Cnty. v. EPA*, 571 F.3d 20, 39 (D.C. Cir. 2009), of investment to constitute ownership of an entity. And for good reason. "[N]ational security and foreign policy concerns arise in connection with efforts to confront evolving threats in an area where information can be difficult to obtain and the impact of certain conduct difficult to assess." *TikTok Inc.*, 145 S. Ct. at 70 (citation omitted). In the context of implementing Section 1260H, a complete list of investors and the terms of their investments are not always readily available. DJI, for example, is not publicly traded and thus not obligated to make such information public. AR 276.

Plaintiffs' analogy to OFAC's 50 Percent Rule and Congress's decision that a foreign entity does not have a "substantial interest" in a company if its ownership stake is less than 10 percent is thus misplaced. Congress did not direct OFAC to delineate a bright line rule for ownership. The 50 Percent Rule is merely "a guidance tool" established by OFAC "for assisting the public to identify designated entities regardless of whether the entity itself" has been identified as a sanctioned entity.

*United States v. Three Sums Totaling $241,386.58 in Seized U.S. Currency*, Civ. A. No. 18-750, 2021 WL 2255174, at *5 n.5 (D.D.C. June 3, 2021) (citation omitted). Further, although Congress defined "substantial interest" for purposes of the Committee on Foreign Investment's review of foreign transactions, Congress also required the parties to a covered transaction to submit a declaration identifying the percentage of voting and economic interest acquired and the resulting percentage of interest by the foreign entity. *See* 50 U.S.C. § 4565(b)(1)(C)(v)(IV)(bb)(AA); 31 C.F.R. § 800.404(c)(2)(ii)-(iii). Congress did not require entities to provide similar information to DoD for purposes of Section 1260H. *See generally* § 1260H.

In addition, the FY2025 NDAA amendments to Section 1260H broadened the definition of a "Chinese military company" by inserting a new subsection (C), which provides that entities "own[ing] in the aggregate, directly or indirectly, 50 percent or more of any entity or entities" that are, among other things, indirectly owned by the PLA or any other organization subordinate to the Commission also constitute a "Chinese military company." Pub. L. No. 118-159, § 1346. While Congress expanded the definition of "Chinese military" company in subsection (B) to include entities that are "directly or indirectly . . . affiliated with" the PLA or any other organization subordinate to the Commission or several other organizations including SASAC, it did not impose a uniform quantity of ownership, control, or affiliation that must be present for an entity to constitute a "Chinese military company." *See id.* "Congress says what it means and means what it says[;]" it "does not hide elephants in mouseholes." *Banks v. Booth*, 3 F.4th 445, 449 (D.C. Cir. 2021). Congress could have established the bright line Plaintiffs urge this Court to adopt when it amended Section 1260H but chose not to do so. Although the amendments were not in place at the time of DoD's decision, they demonstrate Congress's intent that the term "own" not be defined by a bright line rule quantifying the ownership stake required to fall within the scope of the statute. *See Jama v. Immigr. & Customs Enf't*, 543 U.S. 335, 341 (2005) ("We do not lightly assume that Congress has omitted from its adopted text requirements

that it nonetheless intends to apply, and our reluctance is even greater when Congress has shown elsewhere in the same statute that it knows how to make such a requirement manifest.").[16]

DoD has thus provided a rational connection between the facts supported by substantial evidence in the record and its determination that the Commission indirectly owns DJI.

**B.    DoD Has Provided Substantial Evidence to Support Its Finding That DJI Is a Military-Civil Fusion Contributor to the Chinese Defense Industrial Base.**

**1.    DoD's Finding That DJI Is a "Military-Civil Fusion Contributor to the Chinese Defense Industrial Base" Falls Within Its Statutory Authority.**

Section 1260H requires DoD to identify each entity determined to be a "Chinese military company," § 1260H(a). In defining "Chinese military company," Congress requires DoD to place on the Section 1260H List entities that are, *inter alia*, "identified as a military-civil fusion contributor to the Chinese defense industrial base." § 1260H(d)(1)(B)(i)(II). Because Congress chose not to define all words in this statutory phrase, each one bears its plain meaning.[17] "In statutory interpretation disputes, a court's proper starting point lies in a careful examination of the ordinary meaning and structure of the law itself." *Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427, 436 (2019). "Moreover, where a statute's terms are undefined, [the court's] interpretation is guided by the terms' 'regular

---

[16] Plaintiffs' argument that interpreting Section 1260H to not require a quantifiable ownership stake would lead to "absurd results[,]" such as the designation of Morgan Stanley as a Chinese military company, Pls.' MSJ at 25, is also unavailing. The Supreme Court has recognized that an agency "need not address all aspects of a problem in one fell swoop." *TikTok*, 145 S. Ct. at 70 (citation omitted).

[17] Plaintiffs' contrary argument that "Chinese defense industrial base" is a term of art, Pls.' MSJ at 27-28, is unpersuasive. The two examples provided by Plaintiffs define instead the term "*United States* defense industrial base," not "Chinese defense industrial base." *Id.* (quoting 50 U.S.C. § 4815(d)(3)) (emphasis added). The difference is important because Plaintiffs provide no evidence that the two terms are interchangeable. In any event, these two different terms cannot be transposed because of the significantly different relationship between the Chinese government and its defense industrial base, on the one hand, and the United States and its defense industry. "Congress is presumed to use words to have their ordinary meaning absent indication to the contrary," *In re Grand Jury Investigation*, 916 F.3d 1047, 1055 (D.C. Cir. 2019), and Plaintiffs fail to overcome this presumption.

usage.'" *Bd. of Cnty. Comm'rs of Kay Cnty., Okla. v. Fed. Hous. Fin. Agency*, 754 F.3d 1025, 1028-29 (D.C. Cir. 2014) (citation omitted).

      "Contributor" means "someone or something that contributes something or that contributes to something." *Contributor*, Merriam-Webster's Collegiate Dictionary, merriam-webster.com/ dictionary/contributor; *see also Holloran v. Duncan*, 92 F. Supp. 3d 774, 790 (W.D. Tenn. 2015) ("'Contribute to' means to have a share in bringing about a result." (citation omitted)). The word "defense," in context, refers to "[a] country's military establishment." *Defense*, Black's Law Dictionary (12th ed. 2024) (definition 6); *see also Defense*, Am. Heritage Dictionary (5th ed. 2022), https://ahdictionary.com/word/search.html?q=defense (defining "defense" as "[t]he provision of personnel and resources for military purposes") (definition 8); Merriam-Webster's Collegiate Dictionary, merriam-webster.com/dictionary/defense (defining "defense" as "the military and industrial aggregate that authorizes and supervises arms production") (definition 5). "[I]ndustrial" means "[o]f, relating to, or resulting from the manufacturing industry" or "[e]mployed, required, or used in the manufacturing industry." *Industrial*, Am. Heritage Dictionary (5th ed. 2022), https://ahdictionary.com/word/search.html?q=industrial (definitions 1 and 3); *see also Industrial*, Merriam-Webster's Collegiate Dictionary, merriam-webster.com/dictionary/industrial (defining "industrial" as "of or relating to industry," "engaged in industry," and "used for or developed for use in industry") (definitions 1, 2, and 4). Finally, in context, "base" refers to "a basic or underlying element; infrastructure." *Base*, Am. Heritage Dictionary (5th ed. 2022), https://ahdictionary.com/ word/search.html?q=base (definition 3.b); *see also Base*, Merriam-Webster's Collegiate Dictionary, merriam-webster.com/base (defining "base" as "a first or bottom layer of something on which other elements are added" or "the fundamental part of something: GROUNDWORK, BASIS") (definitions 2.c and 3.a).

Thus, in Section 1260H, a "military-civil fusion contributor to the Chinese defense industrial base" means an entity whose contribution to China's policy of military-civil fusion relates to the basic or underlying elements of China's military-industrial complex. § 1260H(d)(1)(B)(i)(II). As explained in Defendants' classified supplement, substantial evidence supports DoD's conclusion that DJI contributes to China's policy of military-civil fusion in relation to China's defense industrial base.

DJI also errs in contending that it cannot be a military-civil fusion contributor to the Chinese defense industrial base because DoD has found that it "develops and manufactures drone and camera technology for commercial and recreational use." AR 24; *see* Pls.' MSJ at 28. By its nature, DJI's drone and camera technology has substantial dual-use applications in military and civilian settings. For the same reason, DJI misses the mark in arguing that it has "strict policies against doing business with entities that intend to use DJI products for combat." *Id.* As DJI has conceded, it is "aware some of its drones are sent to Russia and Ukraine after they're purchased in other countries" and "it opposes this practice but has no way of stopping it." AR 264. Plaintiffs' arguments that DoD is logically foreclosed from showing that DJI is a military-civil contributor to the Chinese defense industrial base thus lack merit.

  **2. DoD Reasonably Determined That DJI Knowingly Received Science and Technology-Related Assistance from the Government of China.**

Congress requires DoD to place on the Section 1260H List entities that are "identified as a military-civil fusion contributor to the Chinese defense industrial base," which includes "[e]ntities knowingly receiving assistance from the Government of China or the Chinese Communist Party through science and technology efforts initiated under the Chinese military industrial planning apparatus." § 1260H(d)(1)(B)(i)(II), (d)(2)(A). DoD has determined that DJI knowingly received science and technology-related assistance from the Government of China, and that this assistance was initiated under China's military industrial planning apparatus. AR 29-30. This finding thus falls within the Department's statutory authority, and as shown below, it is supported by substantial evidence.

Because Congress chose not to define the statutory term "initiated under the Chinese military industrial planning apparatus," the text bears its plain meaning. § 1260H(d)(2)(A). "[P]lanning" is "the act or process of making or carrying out plans[;] *specifically*: the establishment of goals, policies, and procedures for a social or economic unit." *Planning*, Merriam-Webster's Collegiate Dictionary, merriam-webster.com/planning. "Apparatus" means "[t]he totality of means by which a designated function is performed or a specific task executed, as in a system of government." *Apparatus*, Am. Heritage Dictionary (5th ed. 2022), https://ahdictionary.com/word/search.html?q=apparatus (definition 2.a). Thus, in Section 1260H, assistance that is "initiated under the Chinese military industrial planning apparatus" means that it has been provided in accordance with the totality of means by which China carries out its goals, policies, and procedures for the use of manufactured products that help support its military establishment.

The Department has also connected the relevant facts it has found to its determination that DJI knowingly received science and technology-related assistance from the Government of China, and that this assistance was initiated under China's military industrial planning apparatus. *Contra* Pls.' MSJ at 28-32. DoD has identified two grounds for its determination, one of which is discussed in the classified annex to this memorandum. The other ground is that China's National Development and Reform Commission ("NDRC") recently recognized DJI as a National Enterprise Technology Center ("NETC" or "National Center"). AR 29-30, 603-11. Recognition as a National Center is a "symbol of industry leadership and strength." AR 604. Such recognition carries with it "many policy benefits, including free cash subsidies of up to 5 million to 15 million yuan," "special financial support . . . from the Ministry of Science and Technology,[18] the National Development and Reform Commission, and state-owned capital industry upgrading funds," and "a large number of tax benefits." AR 604.

---

[18] The Ministry of Science and Technology is a leading organization for the development of military-civil fusion in the domain of science and technology. AR 417.

The NDRC functions as an important organ of China's military industrial planning apparatus. AR 612; *see also* AR 716 ("The overall management and implementation of [China's Military-Civil Fusion] Development Strategy involves the most powerful organs in the party-state," including "the State Council (notably the National Development and Reform Commission)"). It is subordinate to China's State Council *see* AR 402, and is responsible for "managing the country's defense mobilization efforts." AR 612. China's "national defense mobilization system is a complex bureaucracy of military and civilian government coordinating bodies under [Chinese Communist Party] leadership." AR 614. National defense mobilization "refers to the conversion of political, economic, technological, cultural, social, and other resources from a peacetime status to a war footing in support of national defense." AR 618; *see also* AR 613 ("National defense mobilization rallies national labor, economic resources, and other elements of comprehensive national power in response to war and non-war emergencies."). National defense mobilization "is an outcome and component of [China's] military-civil fusion . . . strategy." AR 618. "Fundamentally," China's national defense mobilization system "exists so that authorities are able to draw on [China's] vast economic base to manage a conflict or emergency when necessary resources and capabilities are not available in military stockpiles or national strategic reserves." AR 618.

The NDRC "works with relevant authorities to formulate strategies to promote the coordinated development of economic and national defense construction" and "undertakes specific work related to the National Defense Mobilization Commission." AR 612. "For example, in the event of a military operation, it is necessary to get manpower to the battlefield, which requires the coordination of the production of materials by the NDRC and other related operations." AR 612. The NDRC's Economic and Defense Coordinated Department "works closely with [China's Central Military Commission] Strategic Planning Office's Military-Civil Fusion Bureau to study and formulate plans and policies to coordinate military and economic activities." AR 383. It is a leading organization

for the development of military-civil fusion in the domain of science and technology. AR 417. The NDRC connects to China's Central Military Commission through the National Defense Mobilization Commission, the Transportation Readiness Office, the People's Armed Forces Mobilization Office, the Civil Air Defense Office, the National Defense Education Office, and the General Office. AR 622, 636.

Plaintiffs thus err in contending that the NDRC is not an organ of the Chinese military industrial planning apparatus. Pls.' MSJ at 30. And by showing that DJI is receiving massive financial assistance from a vital component of that apparatus—one which is responsible for managing China's conversion of political, economic, and technological resources to a war footing in support of national defense—DoD has shown that this assistance was initiated under China's military industrial planning apparatus. Contrary to Plaintiffs' belief, nothing in Section 1260H imposes the additional obligation of demonstrating that the specific program under which this assistance was provided (here, the National Center program) constitutes part of China's military industrial planning apparatus.[19] Under the statute's plain language, it suffices for DoD to show that an entity received assistance initiated under that apparatus, as it has done here by demonstrating that the assistance was provided by a leading organization responsible for coordinating China's development of military-civil fusion in the domain of science and technology, and for converting China's economic resources to a war-based footing in support of the nation's military defense.

And because DoD's finding that DJI received financial assistance from the NDRC is only one of two bases for its determination that DJI received assistance from the Chinese government initiated under the Chinese military industrial planning apparatus, Plaintiffs miss the mark in pointing out that other entities (such as Volkswagen and Mitsubishi) have also received recognition as an NETC. Pls.'

---

[19] For the same reason, it is irrelevant that the administrative measures or guidelines pertaining to that program do not specifically include the words "military" or "national defense." Pls.' MSJ at 31.

MSJ at 30. *See also TikTok Inc. v. Garland*, 122 F.4th 930, 958 (D.C. Cir. 2024) (rejecting argument that Congress legislated underinclusively in designating specific data-collecting entity as national security threat, despite the fact that other Chinese companies also collected data, where entity did not "identify any company operating a comparable platform in the United States with equivalent connections to the PRC[; n]or would it be dispositive if TikTok had done so because the political branches are free to 'focus on their most pressing concerns'" (citation omitted)), *aff'd*, 145 S. Ct. 57 (2025); *TikTok Inc.*, 145 S. Ct. at 70 ("[T]he Government 'need not address all aspects of a problem in one fell swoop.'" (citation omitted)).

Plaintiffs also misplace their reliance on *Xiaomi Corp. v. Department of Defense*, 2021 WL 950144 (D.D.C. Mar. 12, 2021), which is inapposite. The Court in *Xiaomi* was not determining whether an entity designated by DoD was "receiving assistance from the Government of China . . . initiated under the Chinese military industrial planning apparatus." § 1260H(d)(2)(A). Instead, applying a now-defunct statute, the Court was analyzing whether that entity was "owned or controlled by, or affiliated with, the People's Liberation Army or a ministry of the government of [China] or . . . is owned or controlled by an entity affiliated with the defense industrial base of [China]." *Xiaomi Corp.*, 2021 WL 950144, at *1 (quoting FY99 NDAA, Pub. L. No. 105-261, § 1237(a), (b)). The portion of *Xiaomi* cited by Plaintiffs involved a different inquiry made under a different statute, which is not relevant here.

### 3. Substantial Evidence Supports the Finding That DJI Is "Affiliated With" China's Ministry of Industry and Information Technology.

DoD determined that DJI is a military-civil fusion contributor to the Chinese defense industrial base, as defined in Section 1260H, because it is "affiliated with the Chinese Ministry of Industry and Information Technology [("MIIT")], including research partnerships and projects." § 1260H(d)(2)(B). AR 30-31. DoD has supported this conclusion with substantial evidence.

At the time of DJI's designation, Section 1260H did not define the phrase "affiliated with" in subsection (d)(2)(B).[20] A broad definition of that term is warranted given that the term's ordinary definition refers to associations "on the basis of a common purpose or of shared characteristics." *Affiliated*, Oxford English Dictionary, https://www.oed.com/dictionary/ affiliated_adj?tab=meaning_and_use#9323083 (affiliated (adj.)); *see also Affiliated*, Merriam-Webster's Collegiate Dictionary, https://www.merriam-webster.com/dictionary/affiliated ("closely associated with another typically in a dependent or subordinate position").

The administrative record contains sufficient evidence to support DoD's factual determination that DJI is an entity "affiliated with [MIIT], including research partnerships and projects." § 1260H(d)(2)(B). Record evidence shows that MIIT: (1) tasked DJI to serve as a "main drafting unit" for a national standard related to drone safety and (2) utilized a DJI department lead to serve as an MIIT Subproject Leader. AR 30-31.

*First*, DJI's designation by MIIT as a "main drafting unit" for a national standard over which MIIT maintains jurisdiction shows that DJI shares a common purpose and shared characteristics with MIIT. AR 30-31. China has taken a "strategic approach toward technical standards," AR 911, and "views standardization as a way to strengthen its research and development . . . ecosystem by elevating whole-sector capacities." AR 912. As outlined in China's "China Standards 2035" plan, standards formulation is part of a national strategy "aiming to create a blueprint for the Chinese government and leading tech companies to set global standards for emerging technologies," AR 911, including drone technology. *See also* AR 922 (plan includes "lead[ing] the development of emerging industries").

_____

[20] The FY2025 National Defense Authorization Act, signed by the President on December 23, 2024, modifies the statutory text of Section 1260H to include, among other things, a definition for the term "affiliated with" (*i.e.*, "in close formal or informal association"). Pub. L. No. 118-159, § 1346 (2024). Although this definition was not in place at the time DoD designated DJI, it demonstrates Congress's intent that the term bears its plain meaning.

"The China Standards 2035 strategy empowers Chinese enterprises to participate in standardization, with the incentive being that they can benefit from the economic gains that come with licenses and royalties." AR 912. China's project of "help[ing] the domestic [drone] industry occupy the commanding heights of technology," *i.e.*, increasing the industry's global dominance, includes "[o]rganiz[ing] and carry[ing] out the development of relevant national standards for the [drone] industry, and promot[ing] the formulation of international standards for the classification . . . of civil unmanned aircraft systems." AR 922.

As part of this project, MIIT maintains jurisdiction over the National Technical Committee for Aircraft Standardization, which issued the national standard entitled "Safety requirements for civil unmanned aircraft systems." AR 906. DJI served as a main drafting unit for this mandatory national standard, AR 905, which establishes safety requirements for civil unmanned aircraft products. AR 900. The "main drafting unit of a national standard" is an entity "such as a research institution, company, or association" that typically receives subsidies from Chinese provincial or municipal governments in the amount of 200,000-500,000 yuan. AR 898.

*Second*, record evidence shows that DJI allowed an important department head to work on a research project with MIIT. AR 31. DJI employs Mr. Zhang Yuxin as its functional safety department lead. AR 934. As an associate professor at China's Jilin University State Key Laboratory of Automotive Simulation, he served as a Subproject Leader for an MIIT research project entitled "2020 Industrial Technology Foundation Public Service Platform Project, Department of In-vehicle Intelligent Computing System simulation test verification service platform." AR 1096.[21] The specific subtopic for this MIIT project is "Construction of expected functional safety scenarios and safety quantitative evaluation of autonomous driving systems." AR 1096. Moreover, China's Ministry of Science and

---

[21] The relevant portion of this AR document (AR 1094-98) is in untranslated Mandarin. A machine-translated version of the document is attached as Ex. 2.

Technology—which is organized directly by China's State Council—oversees the university laboratory at which Mr. Zhang works. AR 1092. DoD has thus provided evidence of a specific "research . . . project[]," further demonstrating that DJI is "affiliated with" MIIT. § 1260H(d)(2)(B).

Serving as a main drafting unit of a national standardization plan under MIIT's jurisdiction intended to promote the global dominance of China's domestic drone industry, and acting in a leading role in a research project with MIIT both show that DJI is closely affiliated with MIIT in a subordinate position and that they share a common purpose. Plaintiffs' attempts to minimize the weight of this evidence are not persuasive. Pls.' MSJ at 32-36. It is immaterial that the Safety Requirements for Civil Unmanned Aircraft Systems standard establishes a national standard for Chinese civilian drone manufacturing, rather than for specifically military drones. Section 1260H(d)(2)(b) requires that an entity be "affiliated with" MIIT, not that the entity be affiliated with MIIT solely in relation to products specifically designed for solely military uses. Moreover, the guiding aim of China's military-civil fusion project is to strengthen key domestic industries that may service the civilian sector but can be harnessed by China's military apparatus to fulfill crucial military production needs. *See, e.g.*, AR 618 (explaining that national defense mobilization, which "is an outcome and component of [China's] military-civil fusion . . . strategy," fundamentally exists "so that authorities are able to draw on [China's] vast economic base to manage a conflict or emergency when necessary resources and capabilities are not available in military stockpiles or national strategic reserves"). Plaintiffs further observe that other entities also listed as drafters of the national drone safety standard were not included on the Section 1260H list. Pls.' MSJ at 34-35. But this observation is largely beside the point. DoD's factual determination that DJI is affiliated with MIIT is not based on this single piece of evidence, taken in isolation. Rather, it is the combined weight of the totality of the record evidence for this finding, instead of any single item, that supports DoD's factual determination. Additionally, DJI has not

31

explained why the other entities that it lists as plan drafters are similarly situated with respect to all of the other factors that support DoD's factual finding that DJI is affiliated with MIIT.

Plaintiffs' attempts to downplay the weight of the evidence that DJI's department head worked on a research project with MIIT are similarly unpersuasive. Pls.' MSJ at 35-36. Taken together with the other evidence DoD has cited, the fact that an important member of DJI's management team served on an MIIT-sponsored research project shows that DJI is closely associated with MIIT in a dependent or subordinate position. And in including "research . . . projects" as a specific example of a way in which an entity can be shown to be "affiliated with" MIIT, § 1260H(d)(2)(B), Congress did not require DoD to make any additional showing that the research project directly relates to military or defense applications, as Plaintiffs contend. Finally, the recency of DoD's evidence supporting this finding—consisting of DJI's participation as a main drafting unit of a standard released in 2023 with a 2024 implementation date, *see* AR 906, and subproject leader participation between 2020 and 2022— suffices to demonstrate that DJI is presently "affiliated with" MIIT. The record evidence compiled by DoD, taken as a whole, is more than sufficient to allow a reasonable factfinder to conclude that DJI is associated with MIIT in a subordinate position on the basis of a common purpose or shared characteristics.

### 4.    DoD's Finding That DJI Resides in or Is Affiliated with a Military-Civil Fusion Enterprise Zone Is Supported by Substantial Evidence.

Congress requires DoD to place on the Section 1260H List entities "residing in or affiliated with a military-civil fusion enterprise zone or receiving assistance from the Government of China through such" a zone. § 1260H(d)(2)(E). DoD's determination that DJI constitutes such an entity is supported by substantial evidence in the administrative record.

Because Congress did not define the term "military-civil fusion enterprise zone," its terms bear their plain meaning. *See AT&T Inc.*, 562 U.S. at 403. "Enterprise" means a "unit of economic organization or activity[,] *especially*: a business organization." *Enterprise*, Merriam-Webster's Collegiate

Dictionary https://www.merriam-webster.com/dictionary/enterprise (definition 2.a.). And a "zone" is a "section of an area or territory established for a specific purpose, as a section of a city restricted to a particular type of building, enterprise, or activity," *Zone*, Am. Heritage Dictionary (5th ed. 2022), https://ahdictionary.com/word/search.html?q=zone (definition 1.b). Hence, a "military-civil fusion enterprise zone" is a section of territory established by the Chinese government for the purpose of advancing its policy of military-civil fusion through economic activity.

The Xi'an High-Tech Industrial Development Zone, which is also referred to as the Xi'an High-Tech Zone, *see* Pls.' MSJ at 37, qualifies as a "military-civil fusion enterprise zone" because the "zone takes, as its main direction, absorbing high-quality resources" from society as a whole "to participate in national defense construction, guiding civilian technology to expand into the military filed[.]" AR 1210 n.23 (citation omitted). In 2016, the Xi'an High-Tech Industrial Development Zone Management Committee signed a "Memorandum of Understanding on Jointly Promoting the Standardization Strategy of Civil-Military Integration Industry" with Xi'an Quality Supervision Bureau and several other entities for the purpose of "jointly explor[ing] the establishment of a standardized regulatory system, management system, technical standard system, work system and standardized service guarantee system for military-civilian integration," including the "two-way transfer of military and civilian technology." AR 1154-55.

DoD's determination that DJI resides in or is affiliated with the Xi'an High-Tech Industrial Development Zone is supported by substantial evidence. DJI held a signing ceremony in January 2019 to cement its plans to construct a thousand-person innovation research and development and a global technical support center in the Xi'an High-Tech Industrial Development Zone. AR 1104, 1108-09, 1118. The center is slated to "carry out research and development in multiple core areas such as precision manufacturing, intelligent systems[,] and unmanned aerial vehicles[.]" AR 1104, 1109, 1118.

Plaintiffs thus err in arguing that DoD's "claims are both wrong and irrelevant and therefore" do not provide a rational basis for its determination. Pls.' MSJ at 37-38. Defendants acknowledge that much of their analysis related to this finding focuses on the Xi'an Economic and Technological Development Zone. *See id.*; AR 32-33. But regardless of whether the Xi'an Economic and Technological Development Zone is also known as or is otherwise related to the Xi'an High Tech Industrial Development Zone, the record evidence discussed above shows that the Xi'an High-Tech Industrial Development Zone is itself a military-civil fusion enterprise zone. *See* AR 1154-55, 1210. That DJI's new headquarters, DJI Sky City Innovation Hub, is in Shenzhen as opposed to Xi'an is immaterial. Section 1260H merely requires that an entity be "affiliated with" a military-civil fusion enterprise zone. § 1260H(d)(2)(E). DJI's plan to construct a thousand-person research and development facility as well as a global technical support center in the Xi'an High-Tech Industrial Development Zone shows that the entity is affiliated with (*i.e.*, in close formal or informal association with) the military-civil fusion enterprise zone. *See supra* at IV.B.3.

Finally, Plaintiffs provide no support for their statement that they did not accept the offer by the Qujing City People's Government to participate in its municipal development plan to promote military-civilian integration through modern equipment manufacturing, *see* Pls.' MSJ at 38; *see also* AR 1280 (listing Shenzhen DJI Innovations Technology Co., Ltd. among the "[t]arget companies" for the "Aviation UAV Industry"), 1371 (letter from DJI's prior counsel addressing DoD's military-civil fusion enterprise zone analysis). DoD's determination that DJI resides in or is affiliated with a military-civil fusion enterprise zone is thus supported by sufficient evidence in the record.

## V.    DoD's Decision to Re-List Plaintiffs Did Not Exceed Its Statutory Authority

For the reasons discussed above, DoD's decision to re-list Plaintiffs on the most recent

Section 1260H List is not arbitrary and capricious under Section 706(2)(C) of the APA. *See supra* at

IV. DoD's decision, therefore, did not exceed its statutory authority. [22]

## VI.    Any Relief Should Be Limited To Remand Without Vacatur

In the event the Court is inclined to grant relief to Plaintiffs, remand without vacatur would

be the appropriate remedy. It is well-settled that "[i]f the record before the agency does not support

the agency action [or] if the agency has not considered all relevant factors, . . . the proper course,

except in rare circumstances, is to remand to the agency for additional investigation or explanation."

*Erwin v. FAA*, 23 F.4th 999, 1007 (D.C. Cir. 2022) (citation omitted). Courts in this Circuit thus have

discretion "to leave agency action in place while the decision is remanded for further explanation."

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 985 F.3d 1032, 1051 (D.C. Cir. 2021). Two factors

guide this discretion: "the seriousness of the action's deficiencies" and "the likely disruptive

consequences of vacatur." *Am. Great Lakes Ports Ass'n v. Schultz*, 962 F.3d 510, 518 (D.C. Cir. 2020)

(citations and internal punctuation omitted). "The 'seriousness' of a deficiency . . . is determined at

least in part by whether there is a 'a significant possibility that the [agency] may find an adequate

explanation for its actions' on remand." *Standing Rock*, 985 F.3d at 1051 (citation omitted).

Here, both factors weigh in favor of remand without vacatur if the Court were to decide that

DoD erred by failing to consider the July 2023 letter submitted by Plaintiffs' prior counsel, *see* Pls.'

MSJ at 17-18; AR 1337-52, or the facts contained in Plaintiffs' memorandum in support of their

---

[22] Lastly, information contained in the background section of the DJI Report is not essential to DoD's Section 1260H determination. Plaintiffs' contention that certain facts presented in this section are incorrect is thus immaterial. *See* Pls.' MSJ at 38-39. Similarly immaterial is Plaintiffs' allegation that it has suspended all drone sales to buyers in Russia and Ukraine. *See id.* at 39-40. As explained above, *see supra* at II, DoD made its finding regarding DJI sales to these countries as one piece of evidence for a required element under Section 1260H that is not contested here.

motion for summary judgment that are not in the administrative record, *see, e.g.*, Pls.' MSJ at 30 & n.9, 35 n.10, 37, 38 nn.11-12. First, because the alleged error would simply reflect a deficiency in explanation, there would be a substantial chance that DoD could remedy the alleged error by providing additional explanation why the information in the July 27, 2023 letter submitted by Plaintiffs' prior counsel or the facts identified in Plaintiffs' memorandum do not warrant de-listing DJI. *Cf. U.S. Postal Serv. v. Postal Regul. Comm'n*, 785 F.3d 740, 756 (D.C. Cir. 2015) (remanding agency decision for clarification and reconsideration). Second, the serious national security concerns underlying Congress's establishment of the Section 1260H List and its authorization that the List may be based on classified information[23] evidence the dangerous consequences of erroneously de-listing an entity DoD determined to be a Chinese military company and a military-civil fusion contributor. *Cf. FBME Bank Ltd. v. Lew*, 209 F. Supp. 3d 299, 342-43 (D.D.C. 2016) (remanding rule for further explanation because, among other things, "the national-security interests underlying th[e] rulemaking . . . ma[de] the Court especially hesitant to vacate").

Contrary to Plaintiffs' assertion, DoD's decision to re-list DJI on the Section 1260H List after receiving the letter dated July 27, 2023 from Plaintiffs' prior counsel does not "qualif[y] as agency action 'unlawfully withheld or unreasonably delayed'" under Section 706(1) of the APA, Pls.' MSJ at 41 (quoting 5 U.S.C. § 706(1)). "[A] claim under § 706(1) can proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take.*" *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004). "[T]he mandatoriness requirement means that courts cannot compel agencies to take action *beyond* what is legally required of them." *Ctr. for Biological Diversity v. Zinke*, 260 F. Supp. 3d 11, 20 (D.D.C. 2017). Section 1260H requires DoD to "make additions or deletions to the most recent list . . . based on the latest information available." § 1260H(b)(3). The statute does

---

[23] *See* § 1260H(b)(1) (directing the Secretary to submit a list of each entity determined to be a Chinese military company in "classified and unclassified forms").

not, however, mandate what that determination should be. *See generally* § 1260H. As discussed above, *see supra* at II, DoD considered the July 27, 2023 letter from Plaintiffs' prior counsel when making its re-listing determination. That is all Section 1260H(a) requires.

In any event, if the Court were to conclude that DoD did not adequately consider or explain its decision to include Plaintiffs on the Section 1260H List and that any concomitant error was not harmless, the appropriate remedy would be remand without vacatur.

## **CONCLUSION**

For the foregoing reasons, the Court should deny Plaintiffs' Motion for Summary Judgment and grant Defendants' Cross-Motion for Summary Judgment.

Dated: April 4, 2025                     Respectfully submitted,


                                         YAAKOV M. ROTH
                                         Acting Assistant Attorney General

                                         LAUREN A. WETZLER
                                         Deputy Director, Federal Programs Branch

                                         */s/ Daniel Riess*
                                         DANIEL RIESS (TX Bar No. 24037359)
                                         KRISTINA WOLFE (VA Bar No. 71570)
                                         Trial Attorneys
                                         United States Department of Justice
                                         Civil Division, Federal Programs Branch
                                         1100 L St. NW
                                         Washington, D.C. 20005
                                         Tel: (202) 353-3098
                                         E-mail: daniel.riess@usdoj.gov
                                         *Attorneys for Defendants*