## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SZ DJI TECHNOLOGY CO., LTD., *et al.*,<br><br>    Plaintiffs,<br><br>  v.<br><br>U.S. DEPARTMENT OF DEFENSE, *et al.,*<br><br>    Defendants. | No. 1:24-cv-02970-PLF |

## PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANTS' CROSS-MOTION FOR <u>SUMMARY JUDGMENT</u>

# TABLE OF CONTENTS

PRELIMINARY STATEMENT .................................................................................................... 1

ARGUMENT .................................................................................................................................. 5

I.      DOD APPLIED THE INCORRECT LEGAL STANDARD ................................................ 5

II.     DOD IGNORED CONTRADICTORY RECORD EVIDENCE .......................................... 6

III.    DOD'S ACTION VIOLATED PROCEDURAL DUE PROCESS .................................... 9

        A.      DJI Has Demonstrated A Protected Interest ................................................... 9

        B.      Pre-Deprivation Notice Was Required, And National Security Arguments
                Do Not Excuse DoD's Failure to Provide It ........................................... 11

IV.     DOD FAILS TO PROVIDE A RATIONAL CONNECTION BETWEEN FACTS
        SUPPORTED BY SUBSTANTIAL EVIDENCE AND ITS DECISION TO LIST
        DJI AS A CMC ........................................................................................................... 13

        A.      DJI Is Not Owned By The SASAC ............................................................... 13

        B.      DJI Is Not A Military-Civil Fusion Contributor To The Chinese Defense
                Industrial Base ............................................................................................ 17

                1.      DJI Does Not Contribute To The Chinese Defense Industrial Base ......... 17

                2.      DJI Does Not Receive Assistance From The Government Of China
                        Through Efforts Initiated Under The Chinese Military Planning
                        Apparatus ................................................................................................. 20

                3.      DJI Is Not Affiliated With The MIIT ......................................................... 23

                4.      DJI Does Not Reside In And Is Not Affiliated With A Military-
                        Civil Fusion Enterprise Zone ................................................................... 26

V.      VACATUR, NOT REMAND WITHOUT VACATUR, IS THE APPROPRIATE
        REMEDY ..................................................................................................................... 29

CONCLUSION ............................................................................................................................ 31

# TABLE OF AUTHORITIES

**Page**

## <u>Cases</u>

*Allied–Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*,
988 F.2d 146 (D.C. Cir. 1993) ................................................................29

*Angel-Ramos v. Reno*,
227 F.3d 942 (7th Cir. 2000) ................................................................6

*Baltimore Gas & Elec. Co. v. FERC*,
954 F.3d 279 (D.C. Cir. 2020) ................................................................3, 16

*Bowen v. Georgetown Univ. Hosp.*,
488 U.S. 204 (1988) ................................................................6

*Chambers v. D.C.*,
35 F.4th 870 (D.C. Cir. 2022) ................................................................18

*Dakota Rural Action v. United States Dep't of Agric.*,
668 F. Supp. 3d 1 (D.D.C. 2023), *appeal voluntarily dismissed*, No. 23-5158,
2023 WL 5421842 (D.C. Cir. Aug. 21, 2023) ................................................................8

*Dynalantic Corp. v. Dep't of Def.*,
115 F.3d 1012 (D.C. Cir. 1997) ................................................................10

*Eagle County v. Surface Transportation Board*,
82 F.4th 1152 (D.C. Cir. 2023) ................................................................8

*Fred Meyer Stores, Inc. v. NLRB*,
865 F.3d 630 (D.C. Cir. 2017) ................................................................7

*Gen. Elec. Co. v. Jackson*,
610 F.3d 110 (D.C. Cir. 2010) ................................................................10

*Genus Med. Techs. LLC v. United States Food & Drug Admin.*,
994 F.3d 631 (D.C. Cir. 2021) ................................................................19

*Goodman v. Colvin*,
233 F. Supp. 3d 88 (D.D.C. 2017) ................................................................7

*Greene v. McElroy*,
360 U.S. 474 (1959) ................................................................12

*GSS Group Ltd v. Nat'l Port Authority*,
680 F.3d 805 (D.C. Cir. 2012) ................................................................12

*Haw. Longline Ass'n v. Nat'l Marine Fisheries Serv.*,
288 F.Supp.2d 7 (D.D.C. 2003) ................................................................29

*Humane Soc'y of the U.S. v. USDA*,
41 F.4th 564 (D.C. Cir. 2022) ................................................................5

*Muwekma Ohlone Tribe v. Salazar*,
    708 F.3d 209 (D.C. Cir. 2013) ........................................................................................16

*NCRI v. U.S. Dep't of State*,
    251 F.3d 192 (D.C. Cir. 2001) ........................................................................................11

*NRDC v. EPA*,
    559 F.3d 561 (D.C. Cir. 2009) ..........................................................................................5

*Paul v. Davis*,
    424 U.S. 693 (1976) .......................................................................................................10

*Petroleum Commc'ns, Inc. v. FCC*,
    22 F.3d 1164 (D.C. Cir. 1994) ....................................................................................3, 16

*Radio–Television News Dirs. Ass'n v. FCC*,
    184 F.3d 872 (D.C. Cir. 1999) ...................................................................................29, 30

*Smith v. Garland*,
    103 F.4th 1244 (7th Cir. 2024) .........................................................................................7

*TikTok Inc. v. Garland*,
    145 S. Ct. 57 (2025) .......................................................................................................16

*United Steel v. Mine Safety & Health Admin.*,
    925 F.3d 1279 (D.C. Cir. 2019) ......................................................................................29

*Williams-Yulee v. Fla. Bar*,
    575 U.S. 433 (2015) .......................................................................................................16

*Wisc. Dep't of Revenue v. William Wrigley, Jr., Co.*,
    505 U.S. 214 (1992) .......................................................................................................18

*Xiaomi Corp. v. DoD*,
    2021 WL 950144 (D.D.C. Mar. 12, 2021) .................................................................13, 22

## Statutes

5 U.S.C. § 706(2)(A) .............................................................................................................29

Pub. L. No. 116-283, § 1260H, 134 Stat. 3388 (2021), as amended by Pub. L. No.
    118-159, § 1346, 138 Stat. 1773 (2024) ................................................................ *passim*

Pub. L. No. 116-92, § 848, 133 Stat. 1198, 1508 (Dec. 20, 2019) ...................................11

Pub. L. No. 117-263, sec. 817, § 848(e)(3)(A), 136 Stat. 2395, 2708 (Dec. 23,
    2022) .................................................................................................................................11

Pub. L. No. 118-31, § 805(a)(1)(B), 137 Stat. 136, 315 (Dec. 22, 2023) .......................10

## PRELIMINARY STATEMENT

DoD's decision to list DJI as a CMC under Section 1260H is unsupported, unreasonable, and harmful to DJI and its business, including to its U.S. employees. Pub. L. No. 116-283, § 1260H, 134 Stat. 3388 (2021), as amended by Pub. L. No. 118-159, § 1346, 138 Stat. 1773 (2024). For more than two years, DJI has repeatedly sought to engage with DoD to explain why it is not a CMC. DoD rejected DJI's requests and refused to consider the deficiencies in its evidence and analysis. The arguments that DoD advances in its opposition to DJI's motion for summary judgment and cross-motion for summary judgment only further illuminate the flaws in its analysis, the carelessness of its treatment of the factual record, and, ultimately, the arbitrariness of its decision to designate DJI as a CMC.

In the unclassified portions of DoD's 2024 Report, the agency offers four factual bases for its decision to list DJI as a CMC, none of them supported by the record or consistent with a rational analysis:

1. Based solely on a stale report on an S&P Global website indicating that three funds ultimately controlled by the State-Owned Assets Supervision and Administration Commission of the State Council (SASAC) hold unspecified investments in DJI, DoD claims that SASAC itself "owns" DJI. In fact, as discussed in DJI's motion (and as DJI informed DoD before it reached its listing decision), those funds are not current investors in DJI, and, historically, only one of the three funds ever held a (minimal) stake in DJI. Indeed, DJI is privately owned, with four individuals—the company's founder and early-stage investors—holding 99.3% of the company's voting rights and approximately 88.0% of its shares.[1]

2. DoD argues that DJI is affiliated with the Chinese Ministry of Industry and Information Technology (MIIT) because (a) from 2020 to 2022, DJI contracted with a university professor who was also independently involved in a separate MIIT project on behalf of his university, and (b) in 2023, DJI drafted a single, *civilian* safety standard, similar to standards drafted for the MIIT on a regular basis by a multitude of non-CMCs, including

---

[1]  In addition, DoD relied in the 2024 Report (and continues to rely on) the version of 1260H that was in effect prior to the December 2024 amendments, but even direct ownership by SASAC was not, on its own, sufficient to sustain CMC designation under that law absent a finding that SASAC was subordinate to the Chinese Military Commission of the Chinese Communist Party, which it is not and which, in any event, the 2024 Report fails to establish.

many non-Chinese companies.  These facts fall well short of establishing the "close" association required for listing under the statute.

3. DoD argues that DJI is receiving assistance through efforts initiated under an organ of the Chinese military planning apparatus because in 2021 it was recognized as a National Enterprise Technology Center (NETC) for being an industry leader.  NETC recognition, however, is not an effort initiated under the Chinese military planning apparatus, as evidenced by, among other things, the fact that numerous major non-Chinese corporations that are plainly not CMCs have received NETC recognition.  DoD also failed to identify any assistance that DJI is currently receiving based on its 2021 NETC recognition.

4. DoD argues that DJI is affiliated with a military-civil fusion zone because (a) in 2019 DJI was planning to build an innovation and support center in the Xi'an Economic and Technological Development Zone and (b) the Qujing City People's Government in 2017 wanted DJI to help it to promote military-civil fusion efforts.  This section of DoD's report is undermined by errors already conceded by DoD, which shows that DJI does not reside in a military-civil fusion zone.  In addition, the record includes no evidence or even any claim that the 2019 plan referenced in the Report was ever implemented or that DJI accepted Qujing's 2017 proposal.

Notably, none of the "facts" that DoD cites establishes or even suggests that DJI associated with or helped the Chinese military in any respect.  Indeed, DoD cannot escape its own assertions in the Report that DJI merely makes "commercial and recreational"—not military—drones (in fact DJI prohibits their military use) and sells them on the open, consumer market.  Those facts establish that DJI *does not* contribute to the Chinese defense industrial base at all, much less in a material or non-*de minimis* way, as required by the second prong of Section 1260H.

DoD's mischaracterization of the applicable statutory framework similarly underscores the arbitrariness and incoherence of its decision to list DJI as a CMC.  In its unsuccessful effort to justify its listing of DJI, DoD resorts to overly expansive definitions of Section 1260H's terms that are divorced from the context of the statutory scheme, which calls for the identification of Chinese *military* companies.  For example, DoD argues that any investment (no matter how small), any contribution (no matter how insignificant), and any relationship (no matter how tenuous) satisfy

Section 1260H's requirements of "ownership," "contribution," or "affiliation." In that and many other respects, DoD simply gets the law wrong.

Moreover, DoD's resort to maximally expansive definitions in an effort to bring DJI within reach of the statute runs into and aggravates the problem of treating similarly situated companies differently, an essential indicator of the arbitrariness of DoD's decision to list DJI. *Petroleum Commc'ns, Inc. v. FCC*, 22 F.3d 1164, 1172 (D.C. Cir. 1994) ("We have long held that an agency must provide adequate explanation before it treats similarly situated parties differently."); *Baltimore Gas & Elec. Co. v. FERC*, 954 F.3d 279, 283 (D.C. Cir. 2020) ("On arbitrary and capricious review, FERC bears the burden "to provide some reasonable justification for any adverse treatment relative to similarly situated competitors."). A host of companies that are obviously not CMCs and have consequently and correctly not been listed as such share the very traits that DoD relies on in support of its decision to list DJI. To name just a few:

- **Nokia Bell:**
  - Has China Huaxin Post and Telecom Technologies Co., Ltd. ("China Huaxin"), a Chinese state-owned enterprise, as a major shareholder of a Nokia Bell subsidiary, and SASAC is the ultimate controlling entity of China Huaxin, *see* Shanghai Nokia Bell Co., Ltd., Qichacha, https://tinyurl.com/37mwcd9t (last visited Apr. 18, 2025) (attached as Ex. 1 for convenience);
  - Has participated in drafting 514 MIIT standards, *see* Amended Complaint, ECF 27 ("Compl.") ¶ 121;
  - Was recognized as an NETC, *see* Compl. ¶ 113;
  - Had a branch in the Xi'an High-Tech Zone (defined below and not the same as the Xi'an Economic and Technological Development Zone), *see* Shanghai Nokia Bell Co., Ltd. Shaanxi Branch, Qichacha, https://tinyurl.com/28z5szcd (last visited Apr. 18, 2025) (attached as Ex. 2 for convenience); and
  - Has operations in Ukraine even after the Russia-Ukraine conflict, *see* Nokia, *Nokia's statement on Ukraine* (updated Mar. 3, 2022), https://tinyurl.com/fujdk2n6.

- **Whirlpool:**
  - Has as one of its shareholder Hefei State-owned Asset Holding Co., Ltd, which is ultimately controlled by Hefei Municipal People's Government SASAC, *see*

Whirlpool (China) Co., Ltd., Qichacha, https://tinyurl.com/5amu7py9 (last visited Apr. 18, 2025) (attached as Ex. 3 for convenience);

o  Has participated in drafting MIIT standards, *see* MIIT, Standard No. QB/T 4981-2016, *Xiyiji Zhiliu Bianpin Qudong Zhuangzhi Jishu Guifan* [Technical specification of DC inverter driver for washing machines], https://tinyurl.com/3xp43t4y (last visited Apr. 17, 2025); and

o  Was recognized as an NETC, *see* Compl. ¶ 113.

- **Volkswagen:**

o  Has a subsidiary, SAIC Volkswagen, that is ultimately controlled by Shanghai SASAC, *see* SAIC Volkswagen Automotive Co., Ltd., Qichacha, https://tinyurl.com/3kbkpnz2 (last visited Apr. 18, 2025) (attached as Ex. 4 for convenience);

o  Has participated in the drafting of at least 37 MIIT standards, Compl. ¶ 121;

o  Was recognized as an NETC, Compl. ¶ 113; and

o  Has an entity in the Xi'an High-Tech Zone, *see* Shaanxi Sales and Service Center of Shanghai SAIC Volkswagen Automotive Sales Co., Ltd., Qichacha, https://tinyurl.com/yx45hffp (last visited Apr. 18, 2025) (attached as Ex. 5 for convenience).

- **Nissan:**

o  Has a subsidiary, Dongfeng Nissan, that is a subsidiary of Dongfeng Motor Corporation, which is an SOE, *see* Dongfeng Nissan Passenger Vehicle Co., Ltd., Qichacha, https://tinyurl.com/msyzvtwv (last visited Apr. 18, 2025) (attached as Ex. 6 for convenience);

o  Has participated in drafting 8 MIIT standards, MIIT, https://tinyurl.com/3y4rhhft (last visited Apr. 17, 2025) (search results for 日产 [Nissan] using the last field, *Qiantou danwei* [Lead Unit]);

o  Is MIIT's "first partner in the field of electric vehicles," CHENGDU BUSINESS DAILY, *Richan qianding xieyi cheng gongxinbu shou ge diandongche lingyu hezuo huoban*, [Nissan signs agreement to become the first electric vehicle partner of the MIIT], (Jun. 15, 2009), https://tinyurl.com/4t53b9kz; and

o  Was recognized as an NETC, Compl. ¶ 113.

DoD responds to this systemic problem with its decision by referencing the principle that Congress need not tackle every concern at once in a given piece of legislation. That basic principle of legislative discretion, however, does not open the door to boundless agency discretion. To the contrary, and as DoD admits, Congress has directed DoD to list *all* CMCs—not just the companies DoD disfavors—meaning that if other companies meet the same criteria that DoD has applied to

DJI, they, too, should be listed as CMCs. That the companies listed above (and many others similarly situated) have not been so classified suggests that DoD's decision to list DJI was not, in fact, the result of neutral application of the standards on which it claims to rely.

Those and several other legal and factual errors in DoD's decision-making—including DoD's reliance on the wrong law, failure to consider material evidence before it, and violation of DJI's due-process rights—lead to the inescapable conclusion that DoD's decision to list DJI was arbitrary and capricious and, consequently, should be set aside.

## ARGUMENT

### I.    DOD APPLIED THE INCORRECT LEGAL STANDARD

DoD asserts that it applied the correct legal standard in relying on the pre-amendment version of Section 1260H because its *internal* December 17, 2024 submission to Congress was the operative date of its decision and Section 1260H was not amended until December 23, 2024. ECF 36 ("Opp."), at 7-8. That argument misunderstands the timing of its final agency action.

Section 1260H—including its pre-amendment version—requires that "[c]oncurrent with the submission" of the CMC list to Congress, the Secretary of Defense "shall publish the unclassified portion of such list in the Federal Register." Section 1260H(b)(2). This publication is not a mere formality; it is the moment at which the agency's action becomes final and enforceable. *See NRDC v. EPA*, 559 F.3d 561, 565 (D.C. Cir. 2009) (a rule has "no legal consequences" until published); *cf. Humane Soc'y of the U.S. v. USDA*, 41 F.4th 564, 574 (D.C. Cir. 2022) ("[A] rule made available for *public* inspection prescribes law with legal consequences for regulated parties." (emphasis added)). Indeed, Congress's use of the word "concurrent" underscores its expectation that the submission of the CMC list to Congress and its publication to the public occur at the same time (which, contrary to DoD's assertion, is not nullified by a

mandatory waiting period for *de*-listing entities). That avoids any ambiguity and ensures that the operative timing of a listing decision is its publication.

DoD's listing of DJI became legally operative and final only when DoD published the listing in the Federal Register on January 7, 2025, and the law in effect on that date—*i.e.*, the amended version of Section 1260H—therefore governs. That is why DJI could not conceivably have challenged DoD's internal and non-final agency action that occurred on December 17, 2024, when it submitted a *non-public* list of CMCs to various congressional committees. Rather, DJI can only, and does only, challenge its unlawful inclusion on the CMC list that DoD published on January 7, 2025, because that is the only final agency action at issue. Similarly, those entities that were removed from the latest CMC list surely cannot be understood to have been removed at any time before January 7, 2025.

The cases DoD cites are inapposite. *Angel-Ramos v. Reno*, 227 F.3d 942 (7th Cir. 2000), involved review of an internal administrative decision by the Board of Immigration Appeals, not the unlawful publication of a list. Similarly, *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204 (1988), merely reaffirmed the general presumption against retroactive application of statutes. DJI, however, does not seek retroactive application of a law here—the statutory amendment to Section 1260H was fully in effect at the time DoD took the final agency action that DJI is challenging.

DoD's failure to apply the amended version of Section 1260H in effect at the time it published the latest CMC list (the only one with current legal effect) is by definition arbitrary and capricious decision-making that the Court should set aside.

## II.    DOD IGNORED CONTRADICTORY RECORD EVIDENCE

DoD contends that it satisfied its obligation to consider DJI's July 2023 delisting petition because the administrative record includes the petition and the 2024 Report generically states that DoD considered "information provided by DJI." Opp. 9. As DJI explained, however, that bare

assertion falls short of the APA's requirements.  ECF 31 ("Mot."), at 17.  Instead, an agency must "reasonably reflect upon the information contained in the record and grapple with contrary evidence." *Fred Meyer Stores, Inc. v. NLRB*, 865 F.3d 630, 638 (D.C. Cir. 2017).  Here, in keeping with its general pattern of not showing sufficient care about the accuracy or completeness of its record, DoD failed to explain why it discounted or rejected DJI's submission, or how it reconciled the evidence in DJI's submission with its determination.

DoD misapplies *Goodman v. Colvin,* 233 F. Supp. 3d 88 (D.D.C. 2017), and *Smith v. Garland*, 103 F.4th 1244 (7th Cir. 2024), in attempting to rebut DJI's argument.  Opp. 9.  Those cases confirm the uncontroversial proposition that an agency need not mention every single piece of evidence in the record, but they do not authorize agencies to disregard core submissions from a regulated party without meaningful analysis—particularly where, as here, the agency's final determination rests on contested factual premises, such as ownership ties, that DJI directly challenged.  In *Smith*, for instance, the agency "specifically mention[ed] four of the eight items [plaintiff] alleges they ignored," which demonstrated actual engagement with the record.  103 F.4th at 1253.  Likewise, in *Goodman*, the court upheld the agency's decision because it was supported by detailed medical assessments, and the plaintiff simply disagreed with the weight assigned to certain reports.  233 F. Supp. 3d at 109.  In this case, by contrast, DoD failed to address any part of DJI's submission, which offered detailed factual rebuttals to the agency's basis for designation.  This was not a failure to cite incidental material; it was a wholesale failure to consider the contrary record evidence before the agency.

DoD's invocation of harmless error is similarly unavailing.  Opp. 10.  The APA's rule of prejudicial error does not excuse agencies from meaningfully engaging with important evidence.  It is a narrow doctrine that applies only when the agency's error clearly had no bearing

on the outcome, not a license to retroactively justify arbitrary or incomplete decision-making. *Dakota Rural Action v. United States Dep't of Agric.,* 668 F. Supp. 3d 1, 8 (D.D.C. 2023), *appeal voluntarily dismissed,* 2023 WL 5421842 (D.C. Cir. Aug. 21, 2023) ("[A] reviewing court may not accept" "post-hoc rationalizations . . . to determine the scope of procedural error."). The mistakes and failures of analysis at issue here were not harmless; to the contrary, DoD failed to address aspects of DJI's submission that directly rebutted the core factual premises underpinning DoD's listing decision. That omission prevented full consideration of relevant record evidence and deprived DJI of a reasoned explanation for DoD's decision. Because this failure undermines both the integrity of the decision and meaningful judicial review, it was prejudicial and cannot be brushed aside under the APA.

DoD's arguments that the harmless error standard is met miss the point. Opp 11. Contrary to DoD's claim, there is not substantial evidence that the SASAC owns DJI, and DoD only reached that incorrect conclusion by ignoring DJI's delisting petition explaining that the SASAC does *not* own DJI. Similarly, it is in fact disputed that China has exported DJI drones to Ukraine. Mot. 39-40.

Finally, DoD's attempt to distinguish *Eagle County v. Surface Transportation Board*, 82 F.4th 1152 (D.C. Cir. 2023), and other cases on the basis that they involved NEPA or other statutes does not justify DoD's failure to address any part of DJI's submission. While the statutory framework may differ, the APA's core requirement that an agency engage with contrary evidence and explain its reasoning applies across contexts and *in addition* to other statutes in those very cases. An agency cannot discharge its duty to consider the record and engage in reasoned decision-making by means of a boilerplate, conclusory statement that it "considered all information"

without demonstrating how that information factored into its analysis and why the agency reached its ultimate decision in spite of evidence to the contrary.

## III.    DOD'S ACTION VIOLATED PROCEDURAL DUE PROCESS

DoD's argument that DJI was afforded sufficient process ignores the fundamental requirements of due process and the actual record here.  DJI's designation as a "Chinese military company" under Section 1260H stigmatizes the company, disrupts its business relationships, and imposes concrete economic harm—all of which occurred without DJI receiving notice, an opportunity to be heard, or a reasoned explanation for the ultimate decision.

### A.    DJI Has Demonstrated A Protected Interest

Contrary to DoD's claim that DJI faces only "reputational harm," the record demonstrates significant economic and other tangible injuries stemming from its CMC designation, including that customers have canceled existing contracts or declined new engagements.  For instance, in November 2022—just one month after DJI was first designated as a CMC—one of DJI's largest U.S. contractors informed DJI that it could no longer purchase from DJI due to "the latest federal announcement."  *See* Ex. 7 (Email dated Nov. 4, 2022 from Benchmark Supply to DJI, with subject "Large contractor").  Another major client soon closed "all business with DJI" because of the "tightening of US government policies."  *See* Ex.  8 (Email Apr. 23, 2023, from ONSEMI to DJI forwarding internal commentary, with subject "DJI business issue !!!").  Notably, on the very day DoD first included DJI on the CMC list, a prospective hire withdrew her application, citing concerns over "the US government sanctions on DJI."  *See* Ex. 9 (Email dated Oct. 5, 2022 from M. Check to DJI, with subject "Manager for U.S. Government Relations with DJI").

DoD's claim that state actions cannot be traced to the CMC designation asks this Court to ignore the obvious.  Legislative materials and the news article DJI cited confirm that DJI's CMC label influenced lawmakers' decisions.  Indeed, that article specifically notes that "the [DoD's]

statement identifying DJI as a 'Chinese military company' operating in the United States" spurred

state-level bans.  *See* Mark Albert, *As states ban Chinese-made drones, officers raise alarm*,

WVTM13 (Jul. 25, 2023), https://tinyurl.com/se554n3t.  DoD's suggestion that these bans arose

for unrelated reasons defies the plain, publicly available record.

Moreover, it is undisputed that due process protections apply when reputational harm is

coupled with a tangible alteration of legal status or rights—a "stigma-plus" injury.  *See Paul v.*

*Davis*, 424 U.S. 693, 708-09 (1976); *Gen. Elec. Co. v. Jackson*, 610 F.3d 110, 121 (D.C. Cir. 2010).

As the D.C. Circuit has explained, the stigma-plus rule is satisfied "where plaintiffs show, in

addition to reputational harm, that (1) the government has deprived them of some benefit to which

they have a legal right ... or (2) the government-imposed stigma is so severe that it broadly

precludes plaintiffs from pursuing a chosen trade or business."  *Gen. Elec.*, 610 F.3d at 121

(internal quotations and citations omitted).  DJI's forced exit from critical governmental and

private markets easily meets this standard.  Moreover, the injury extends beyond prospective

contracts.  The FY 2024 NDAA categorically prohibits DoD from using or procuring products or

services of CMCs.  Pub. L. No. 118-31, § 805(a)(1)(B), 137 Stat. 136, 315 (Dec. 22, 2023).  This

prohibition deters both existing and potential partners—essentially any partner that relies on

federal work—from engaging with DJI, thereby inflicting direct and foreseeable economic harm

on DJI and its U.S. customer base.  DJI need not identify a specific DoD or DHS contract that it

might have bid on; the sweeping statutory exclusion itself creates an immediate legal disability

with concrete ramifications, regardless of any current intent to bid.  *Dynalantic Corp. v. Dep't of*

*Def.*, 115 F.3d 1012, 1016 (D.C. Cir. 1997) (holding that a contractor did not need to demonstrate

that it actually would have won a particular contract; instead, the injury was "its lack of opportunity

to compete for Defense Department contracts").

**B.    Pre-Deprivation Notice Was Required, And National Security Arguments Do Not Excuse DoD's Failure to Provide It**

The D.C. Circuit has long held that due process includes a right to pre-deprivation notice and an opportunity to rebut the allegations whenever feasible.  *See NCRI v. U.S. Dep't of State*, 251 F.3d 192, 206-07 (D.C. Cir. 2001).  DoD seeks to bypass these protections by invoking generalized national security concerns, but that argument does not withstand scrutiny.

First, any claim of urgent national security concern is belied by the longstanding restrictions already in place.  The government banned DJI drones from Army use in 2017 and prohibited them across all DoD systems in 2018.  *See* U.S. Dep't of the Army, Memorandum, *Discontinue Use of Dajiang Innovation (DJI) Corporation Unmanned Aircraft Systems* (Aug. 2, 2017), https://tinyurl.com/u65z7nw2 (instructing all Army units to cease using DJI drones); *see also* DoD, *Department Statement on DJI Systems* (Jul. 23, 2021), https://tinyurl.com/tkjaz5zf ("In 2018, DoD issued a ban on the purchase and use of all commercial off-the-shelf drones, regardless of manufacturer … .").  Moreover, Section 848 of the 2020 NDAA, Pub. L. No. 116-92, § 848, 133 Stat. 1198, 1508 (Dec. 20, 2019), prohibits DoD from operating or renewing contracts for Chinese-made unmanned aircraft systems.  These pre-existing restrictions undercut any notion that DJI's designation in 2022—or its re-listing in 2024 and 2025—was urgently needed to protect the DoD supply chain and "prevent purchase of" DoD products.  Opp. 15.

Second, DoD speculates that providing notice in advance might allow DJI to "take countermeasures such as spinning off assets" or "obscuring [] ownership." Opp. 15.  That rationale is unpersuasive.  DJI has already been designated multiple times—first in 2022, again in 2024 and 2025, and by statute in Section 817 of the 2023 NDAA (Pub. L. No. 117-263, sec. 817, § 848(e)(3)(A), 136 Stat. 2395, 2708 (Dec. 23, 2022)).  There is no evidence that DJI took evasive action in response to those prior listings, nor has DoD alleged any attempt to restructure or obscure

ownership. These facts undermine any claim that surprise re-designation was necessary to prevent circumvention. By failing to provide any pre-deprivation notice or hearing, DoD violated the fundamental due process principles the D.C. Circuit has repeatedly affirmed.

Likewise, *Greene v. McElroy*, 360 U.S. 474 (1959), does not cease to apply merely because DJI is a corporation. Opp. 14. *Greene* recognized the principle that "where governmental action seriously injures an individual, and the reasonableness of the action depends on fact findings, the evidence used to prove the Government's case must be disclosed" so the affected party can rebut it. *Greene*, 360 U.S. at 496. Nothing in *Greene* suggests that this duty to disclose and allow rebuttal ends when the subject of government action is a corporate entity rather than a natural person. Indeed, the decision referenced administrative rulings involving organizations. *Id*. at 497. Consistent with this approach, courts have long treated corporations as "persons" for due process purposes—especially when significant economic and reputational consequences are at stake. *See e.g., GSS Group Ltd v. Nat'l Port Authority,* 680 F.3d 805, 813-14 (D.C. Cir. 2012) (recognizing due process protections for Liberian government-owned corporation in arbitration dispute involving over $44 million in damages). At core, DoD never gave DJI pre-deprivation notice or a chance to address the alleged facts before publishing the designation in the Federal Register. Instead, the agency relied on undisclosed or mischaracterized information and refused to share any evidence until after finalizing its decision.

In short, DoD's failure to provide even minimal due process violates the Fifth Amendment. No significant government interest justifies discarding fundamental fairness, especially given DoD's own pre-existing drone bans addressing any purported security concerns. The Court should accordingly hold DoD's designation unlawful and set it aside.

IV.    **DOD FAILS TO PROVIDE A RATIONAL CONNECTION BETWEEN FACTS SUPPORTED BY SUBSTANTIAL EVIDENCE AND ITS DECISION TO LIST DJI AS A CMC**

A.    **DJI Is Not Owned By The SASAC**

DoD states that the references in the Report to DJI being "directly" owned by the SASAC was a "scrivener's error." Opp. 17 n.14. DJI appreciates the concession and acknowledges that the admission does not technically foreclose DoD's argument that the SASAC "indirectly" owns DJI. Nonetheless, this admission of a substantial flaw in the Report highlights DoD's general carelessness in listing DJI. DoD describes the mistake as a scrivener's error, but the statement that DJI was "directly" owned by the SASAC was not a one off—it was *the* reason that DoD provided for listing DJI based on its ownership in *both* the summary of findings and in the conclusion of the report. The prevalence of the allegation is why DJI devoted significant space rebutting it in its motion for summary judgment. *See* Mot. 21-23. Indeed, the Report includes more references to DJI's purported direct ownership by the SASAC than to the alleged indirect ownership DoD relies on in its responsive briefing. Such substantial errors "do not inspire confidence in the fastidiousness of the agency's decision-making process." *Xiaomi Corp. v. DoD*, 2021 WL 950144, at *5 (D.D.C. Mar. 12, 2021).

Moreover, DoD's remaining conclusion that DJI is indirectly owned by the SASAC finds no support in the record and ignores DJI's actual ownership structure. In response to DJI's comprehensive explanation of its ownership structure and showing that no SASAC fund has any interest in DJI, DoD simply refers back to a single S&P Global website. Opp. 18-19. It does not provide any reason for relying on that website as opposed to DJI's explanation of its ownership, though there is good reason for DoD <u>not</u> to take the S&P Global website as providing reliable statements of fact. Indeed, that website's own disclosure states that the information provided constitutes mere "statements of opinion … and not statements of fact" and disclaims all warranties

regarding accuracy. S&P Global, *Website Disclosures: S&P Global Market Intelligence*, https://tinyurl.com/54fnp4yw (last visited Apr. 17, 2025). Moreover, DJI is a privately-owned company that does not publicly announce a list of shareholders or investors for the S&P Global website to rely on, and SDIC's own public website directly contradicts the S&P report and notes that SDIC has exited from DJI. SDIC Gaoxin, *Dajian Chaungxin* [DJI], (Dec. 16, 2017), https://tinyurl.com/474nujdm.

DoD also now claims to fault the ownership statement that DJI submitted to DoD for being unsworn, Opp. 18, but DoD did not provide that—or any—reason in the Report for ignoring DoD's ownership statement, and DoD never afforded DJI any reason or ability to provide sworn statements regarding its ownership structure prior to its listing. In fact, now that DJI has received the opportunity to present that evidence to DoD, it has done so: On April 2, 2025, DJI submitted a reconsideration petition to DoD that included a sworn declaration explaining that the three funds in question are not investors in DJI.[2]

Even if the three SASAC funds referenced in the Report did have some undefined interest in DJI (they do not), DoD provides no reasonable explanation for how that interest could support a finding that SASAC owns DJI. DoD takes the implausible position that *any* ownership stake is sufficient to render an entity "owned by" the stakeholder. Opp. 20-21. For the reasons stated in DJI's motion for summary judgment, that is not what "owned by" means, and DoD's own definitions of "owned by" make this clear. The SASAC's purported tiny minority stake (far less than 10% of total ownership, and less than 1% of the voting shares) in DJI surely cannot support

---

[2]  DJI understands that this evidence, attached as Ex. 10, is outside the administrative record. If the Court decides not to consider it for that reason, it is all the more proof that DJI has not been afforded due process because DoD never informed DJI that DoD was rejecting its ownership statement because it was unsworn, and DJI therefore never was afforded the chance to remedy that issue prior to being listed as a CMC.

a conclusion that the SASAC "ha[s] or hold[s DJI] as property," "possess[es DJI] as property," "ha[s] legal title to [DJI]," or has the "bundle of rights allowing [it] to use, manage, and enjoy [DJI]." Opp. 19 (quotations omitted). DoD even engages in some sleight of hand in its citations to the language of Section 1260H, arguing that 1260H's requirements are met if the SASAC "has or holds *a property interest in* a company," Opp. 19 (emphasis added), when that language does not appear in Section 1260H. Instead, Section 1260H says that a CMC is "an entity" that is "owned by" the SASAC. It is thus irrelevant whether the SASAC simply holds any "interest in" a company. Under Section 1260H, the SASAC must "own[]" the entity itself, and DoD provides no plausible argument that the SASAC "owns" DJI.

As to the OFAC 50% rule and CFIUS 10% rule, DoD points out a number of differences between Section 1260H and the frameworks under which those rules apply, Opp 20-21, but DJI never suggested that the various statutory frameworks were the same. DJI's point was that those definitions of "ownership" and "substantial interest" by other arms of the government help inform the plain meaning of "owned by" as the phrase is used in any statute, and reflect the common sense understanding that no stake under 50%, and certainly no stake under 10%, can constitute an "ownership" stake under that phrase's plain meaning.

For similar reasons, DoD's focus on the 50% line that Congress spelled out in another portion of the amended Section 1260H does not show that *any* stake is sufficient to constitute ownership. Opp. 21. If anything, it shows that Congress agrees with the common understanding that one entity owns another entity if it holds more than a 50% stake in that entity. In this context, DoD's reliance on the proposition that Congress "does not hide elephants in mouseholes" is illogical. Opp 21. It is DoD that seeks to find an elephantine power in the mousehole of 1260H(g)

to list as a CMC any company in which the SASAC (among many other investors, including private citizens) has *any* interest at all.

Last, DoD does not dispute that it has treated similarly situated parties differently by listing DJI as a CMC but not listing other entities in which the SASAC has some interest. Instead, DoD wrongly asserts that it did not have to list all companies in which the SASAC has an interest because "[t]he Supreme Court has recognized that an agency 'need not address all aspects of a problem in one fell swoop.'" Opp. 22 (quoting *TikTok Inc. v. Garland*, 145 S. Ct. 57, 70 (2025) (citation omitted)). That statement in the Supreme Court's recent *TikTok* decision acknowledges that *Congress* need not fix all issues at once when it passes a statute. For instance, Congress can prohibit some but not all kinds of unprotected speech in service of a stated goal. *See Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 449 (2015). That proposition, however, does not apply to an *agency's* burden under the APA to treat similarly situated parties in the same way; treating similarly situated parties or situations differently is the *definition* of arbitrariness and caprice. *Petroleum Commc'ns*, 22 F.3d at 1172; *Baltimore Gas & Elec.*, 954 F.3d at 283 (observing that an agency "bears the burden 'to provide some reasonable justification for any adverse treatment relative to similarly situated competitors.'" (quotation omitted)); *Muwekma Ohlone Tribe v. Salazar*, 708 F.3d 209, 216 (D.C. Cir. 2013) (observing that agency action is arbitrary and capricious if "the agency offers insufficient reasons for treating similar situations differently").

DoD concedes, as it must, that Section 1260H "*requires* DoD to place on the Section 1260H List entities" that qualify as CMCs, as defined by statute. Opp. 17 (emphasis added). If, as DoD argues, DJI is "owned" by SASAC, then *all* companies in which the SASAC or any other relevant body referenced in Section 1260H(g) has *any* interest qualify as CMCs and must also be listed. DoD's reading of the statute therefore would require the listing of Morgan Stanley, among

a number of other companies, even though it is obvious that Morgan Stanley is not a CMC. Mot. 25. The absurd results that would arise from DoD's proposed reading of the statute suggest that DoD has proposed a definition meant to apply to DJI alone, which the APA forbids.

    **B.    DJI Is Not A Military-Civil Fusion Contributor To The Chinese Defense Industrial Base**

        **1.    DJI Does Not Contribute To The Chinese Defense Industrial Base**

As a matter of basic statutory construction, in order for DJI to qualify as a military-civil fusion *contributor* to the Chinese defense industrial base pursuant to Section 1260H(g)(2)(b)(i)(II), the record must support a finding that DJI in fact *contributes* to the Chinese industrial base, and that it does so in a material, non-incidental way. The record does not support such a finding.

*First*, DoD has not made the requisite showing that DJI makes *any* contribution, much less a material one, to the defense industrial base because (1) DJI merely puts its products on the open market, which is not a "contribution" to the military, and (2) even if open market sales might in some context qualify as a "contribution" to the military, the products being sold in such a context would have to be for military or dual use, which DJI's drones are not.[3] DJI's sale of its drones on the open consumer market—which is undisputedly DJI's practice—would not constitute a contribution to the Chinese military even if the military was eventually a purchaser of DJI drones any more than open market sales of trucks or paper towels or bottles of water to the military would constitute a contribution. For that reason alone, the record does not support a finding that DJI is a

---

[3] DoD admits that the only evidence supporting its finding is classified and thus unavailable to DJI. As argued at length in the pending motion to compel, ECF 29, and due-process section above, the reliance on secret evidence here and elsewhere in the Report undermines DoD's decision. The significant errors of fact and reasoning that pervade the unclassified portion of the Report are sufficient—on their own and regardless of the nature of the classified materials at issue—to render the listing decision arbitrary and unlawful. These errors also heighten DJI's concern about DoD's reliance on, and analysis of, information that it does not want DJI to see (even though DJI's external counsel is in position to obtain reactivation of the necessary clearances).

contributor to the Chinese defense industrial base. Rather, it is a merchant that sells its products on the open market.

Moreover, even if the sale of products on the open market could constitute a contribution to the Chinese military, then, as DoD admits, the product at issue would have to be designed for military or at the least "dual" use. Opp. 24. Otherwise, again, any company in the world that sells products in any way useful to the Chinese military—from toilet paper to AAA batteries—would be a CMC. As DoD itself has found, DJI makes only recreational and commercial drones, not military or dual use drones, further demonstrating that DJI is not a contributor to the Chinese military. That finding is bolstered by DJI's clear policies prohibiting the combat use of its drones. AR 1341, 1345-46.

*Second*, even if DJI's drones were somehow found to be "dual use" products whose sale on the open market qualified as a contribution to the Chinese military, that contribution would at most be *de minimis* or incidental and therefore insufficient to render DJI a "contributor to the Chinese defense industrial base" as defined by Section 1260H.[4] It is a basic tenet of statutory construction that legislation should be understood to have more than *de minimis* effect, and should not be understood to address *de minimis* harms. Rather, "the venerable maxim *de minimis non curat lex* ('the law cares not for trifles') is part of the established background of legal principles against which all enactments are adopted, and which all enactments (absent contrary indication) are deemed to accept." *Wisc. Dep't of Revenue v. William Wrigley, Jr., Co.*, 505 U.S. 214, 231 (1992); *see Chambers v. D.C.*, 35 F.4th 870, 875, 883 (D.C. Cir. 2022) (en banc). The Court

---

[4] In its order dated April 15, 2025, ECF 40, the Court requested that the parties be prepared to address various iterations of this particular aspect of the relevant statute.

therefore should not read "contributor to the Chinese defense industrial base" to sweep in entities that make merely *de minimis* or incidental contributions to the Chinese defense industrial base.

This reading is reinforced by the purpose of the statutory scheme, which is designed to require the identification and listing of all "Chinese military company[ies]," not all "Chinese companies." If an attenuated, *de minimis* contribution to the Chinese military—through open market sales that eventually reach the military or its agents of products like toilet paper or batteries, for example—were sufficient to render a company a "contributor to the Chinese defense industrial base," then the word "military" would, in effect, be read out of the statute. Such a reading of 1260H also would lead to absurd results, requiring CMC designation of countless companies whose products, sold on the open market, might prove useful in some way to the Chinese military.

*Finally*, Section 1260H(g)(2)(b)(i)(II) must be read to require more than a *de minimis* or incidental contribution to the Chinese defense industrial base to avoid the problem of unfettered agency discretion. If even a *de minimis* contribution to the Chinese defense industrial base were sufficient to qualify a company as a CMC, then DoD would have virtually limitless, standardless discretion to select for CMC designation any or all of the thousands of Chinese and non-Chinese companies alike that contribute to the Chinese defense industrial base in *de minimis* ways. Congress surely did not intend to bestow such sweeping discretion on the DoD. *Genus Med. Techs. LLC v. United States Food & Drug Admin.*, 994 F.3d 631, 643 (D.C. Cir. 2021) ("[W]e are especially troubled by the FDA's inability to articulate a limiting principle with which to cabin its asserted discretion [to classify any device as a drug]. … We cannot reasonably infer such broad discretion without a clearer statement.").

DoD suggests that DJI is a CMC because its drones have been "sent to Russia and Ukraine after they're purchased in other countries." Opp. 24. Those facts, however, do not support a

conclusion that *DJI* itself contributes to the Chinese military.  Of course it is possible that DJI's drones—without any participation or endorsement by DJI—*could* be used by other parties for military purposes,[5] but, for its part, DJI does not intend or allow such uses of its products.  To the extent that unrelated third parties make use of DJI's products in a way that DJI not only does not endorse but actively tries to prevent, that is merely evidence of misuse by other people or entities, Mot. 40, not evidence of *DJI*'s own contribution to the Chinese defense industrial base.

### 2.    DJI Does Not Receive Assistance From The Government Of China Through Efforts Initiated Under The Chinese Military Planning Apparatus

DoD spends a significant portion of its briefing explaining that the NDRC—the body that recognizes NETCs—is a part of the Chinese military planning apparatus.  Opp. 26-27.  DJI disagrees with that assertion—NDRC has in fact held roundtable sessions with U.S. companies since 2021, Mot. 30 n.9—but need not belabor the point here because NDRC has given NETC recognition to many companies that are not CMCs in a practice clearly not "initiated under" an organ of the Chinese military planning apparatus.  NETC recognition is meant to acknowledge industry leaders that make everything from cars to dishwashers to sausages.  Indeed, DoD does not claim that NETC recognition has any relation to the Chinese military and even admits that recognition as a National Center is merely a "symbol of industry leadership and strength." AR 604.  In addition, the fact that many other non-CMC's (including many non-Chinese global brands) have received NETC recognition proves that the NETC is unrelated to the military.  Mot. 30; *supra* pp. 3-4.

---

[5]  Because DJI's products are publicly available on major online marketplaces, such as Amazon and eBay, and in major brick-and-mortar store chains such as BestBuy, Sam's Club, and Costco, DJI does not track its users—out of privacy concerns—and thus, as a practical matter, is not in a position to guarantee a bar on downstream military use that is undertaken by purchasers who procure their DJI products from entities other than DJI.

In an apparent effort to address this particular flaw in its listing rationale, DoD argues that the NETC program need not be related to the Chinese military because the NDRC is purportedly part of the Chinese Military and that alone is sufficient to satisfy Section 1260H(g). The statute says otherwise: DoD must list "[e]ntities knowingly receiving assistance from the Government … through science, technology, research, and industrial efforts … initiated … under … the Chinese military industrial planning apparatus." Section 1260H(g)(3). Thus the "efforts"—NETC recognition—through which DJI allegedly gets "assistance" must be "initiated … under" the Chinese Military. DoD does not argue that the NETC program is "initiated under" the military. It admits the opposite; the NETC recognition has nothing to do with the military. As a result, NETC recognition cannot be a basis for concluding that an entity is a "*military*-civil fusion contributor to the Chinese *defense* industrial base" on the ground that it receives assistance from the Chinese government through efforts initiated under "the Chinese *military* planning apparatus."

Another fatal flaw in this rationale for listing DJI is that DoD has not identified any "assistance" that DJI has ever received—much less that it is currently "receiving"—through any NETC recognition, as Section 1260H requires. Section 1260H(g)(3)(C). That is because DJI in fact is not receiving any assistance through its NETC recognition. The Report notes that NETC recipients are eligible for and *may* receive several benefits such as tax breaks and subsidies, AR 30, 604, but does not show that DJI is currently actually "receiving" any of those benefits—because it is not.

It also bears mention that DoD repeatedly misstates the statutory requirements when it says that the "assistance" an entity receives must be initiated under the Chinese military planning apparatus. *E.g.*, Opp. 24-25, 27. As explained, it is the efforts, not the assistance, that must be

connected to the military (neither of which is true here), further demonstrating that DoD has not undertaken the careful, reasoned decision-making process that the APA requires.

Further, DoD claims that DJI is receiving "massive financial assistance" from some ambiguous entity that "is a leading organization for the development of military-civil fusion in the domain of science and technology." Opp 25, 27. That claim is false, does not appear anywhere in the Report, and is unsupported by anything in the record.[6] The lone record cite that DoD provides for it, AR 604, does not say that DJI has received any financial assistance at all, much less massive financial assistance, from the NDRC or Ministry of Science and Technology, meaning that DoD has provided no factual basis for this assertion.

DoD also argues that the Court should not consider the fact that in *Xiaomi*, the Court took issue with DoD listing a company under Section 1260H's predecessor statute based on an award that many non-military companies had received. Opp. 28. DoD, however, does not explain how differences between Section 1260H and the statute at issue in *Xiaomi* render irrelevant *Xiaomi*'s determination that an award was not "substantial evidence" of a company's connection to the Chinese military because the "award" that the company received "was granted to private sector entrepreneurs in recognition of contributions to China's economic development." *Xiaomi*, 2021 WL 950144, at *8. While *Xiaomi* may not be controlling, its reasoning on this issue is persuasive, and it underscores the common sense conclusion that if various private sector entrepreneurs with no ties to the Chinese military receive an award for economic development, then receipt of that

---

[6] Like the NDRC, the Ministry of Science and Technology is not mentioned in any version of Section 1260H, showing Congress did not consider it to be a part of the development of military-civil fusion. In keeping with its overall strategy of defining everything as broadly as possible, DoD appears to take the implausible position that every Chinese government entity is connected to the Chinese military.

same award by another company cannot constitute evidence, much less "substantial evidence," of that company's connection to the Chinese military.

Finally, even if NETC recognition could somehow be a basis for listing a company as a CMC, DoD yet again cannot and does not explain why DJI should be treated differently from the many similarly situated companies that have received NETC recognition but that DoD never listed as CMCs. *See supra* pp. 3-4. DoD's only response is to point to the fact that DJI apparently has some relationship with "XMD" that is explained in the redacted portion of the record. DJI is unaware of any such relationship, and DoD has refused to provide information about these claimed ties so that DJI can address DoD's apparent misunderstanding. That argument also reinforces the fundamental unfairness of depriving DJI of access to—and an ability to challenge—the redacted materials and the conclusions they are meant to support. Moreover, it is unclear to DJI how its NETC recognition could be considered evidence of military affiliation when combined with an alleged relationship to XMD while DoD has not classified other companies who received the same NETC recognition as CMCs. This two-factor explanation is not articulated in the unredacted portions of the Report and appears to be a post-hoc, standardless rationale. The Court should therefore reject it.

### 3.    DJI Is Not Affiliated With The MIIT

The parties apparently agree that, both as a matter of plain meaning and as confirmed in the definitions set forth in the amended version of Section 1260H, to be "affiliated with" an entity is to have a "close" association with that entity. The parties therefore agree that associated entities may be insufficiently "close" to be considered "affiliated with" each other within the meaning of 1260H.

DJI's past, limited interaction with MIIT regarding a civilian safety standard was *insufficiently* close to constitute affiliation even at the time it occurred (2023)—and certainly

cannot support a finding of present affiliation. DoD alleges only that DJI engaged a university professor as an outside consultant in an independent-contractor capacity from 2020 to 2022 and that the professor also separately participated in an MIIT project on behalf of Jilin University that was completely unrelated to DJI; and that in 2023, DJI drafted a single, *civilian* safety standard, just like the many such standards that numerous non-CMCs draft for the MIIT on a regular basis. Those facts do not establish a "close" relationship between DJI and MIIT in any reasonable sense of the word, as established by the fact that so many companies that are not CMCs have drafted far more standards than DJI and therefore, in that context, have a much closer relationship with the MIIT. *See supra* pp. 3-4.

In response, DoD incorrectly argues that DJI *itself* acted in a leading role in a research project with the MIIT. Opp. 31. That claim is belied by the actual facts: a single independent contractor for DJI who was also a university professor—and was an independent contractor, not an important department head or even a member of DJI's management team, as DoD baselessly claims—worked in his spare time (*i.e.*, outside of his DJI working hours) on a project with the MIIT that ended in 2022. DoD offers no basis to conclude that this was a "close" relationship, nor any reason to believe that it continues to the present day such that it could support a 2025 CMC listing decision.

Further, the fact that DJI participated in drafting a safety standard also cannot be evidence of any close relationship. As DoD admits, DJI drafted the safety standard in 2023. Opp. 32. This is a common process by which companies draft safety guidelines for fields within their expertise and publish them for others to rely on—much like the process by which the American National Standards Institute drafts safety standards—and is not a joint venture project evidencing close association or any kind of subordinate relationship between MIIT and the many entities and

individuals who participate in that process. *See supra* pp. 3-4 (listing companies that have participated in drafting regulatory standards in the same manner as DJI).

DoD also does not explain how facts from 2022 and 2023 can establish a *present* close relationship. Even if DJI at one point had a close association with MIIT (it obviously did not), DoD provides no evidence at all that any such association continues today or that DJI is presently "affiliated with" MIIT, which is the statutory requirement. Section 1260H(g)(3)(B)(i).

Finally, on DJI's recurring point that DoD is treating it differently from other similarly situated companies, DoD argues that none of the other non-CMC standard drafters that DJI points to are "similarly situated" because DJI also had a contractor-worker university professor who, independent of his work for DJI, helped the MIIT on a project that ended in 2022. Opp. 32. That response similarly shows the weakness of DoD's position. Of course DJI is not situated in "exactly" the same way as other standard drafters, but it is "similarly" situated to the other drafters. DoD does not explain how DJI's previous association with a professor who at the same time worked on a separate and non-DJI-related MIIT project—much like Harvard Professor Cass Sunstein served a concurrent role at Bloomberg and DoD, Mot. 35—serves to distinguish DJI in any material way from the other standard-drafting companies. If anything, other drafters who wrote *hundreds* of standards for the MIIT should by DoD's reasoning have far closer relationships with the MIIT than DJI, which wrote just one standard.[7]

---

[7]   Indeed, many such standard drafters have various other close ties to MIIT that DJI does not. For instance, Nokia Bell, like many other companies, participated directly in MIIT projects and its management has met with MIIT officials. *Nuojiya beier shou jia wancheng gongxinbu 5G zhong pinduan shepin ceshi* [Nokia Bell is the first to complete the MIIT's 5G mid-band RF test], CHINA COMMC'NS. NETWORK (Jun. 21, 2018), https://tinyurl.com/yc8zrryw; *Jinzhuanglong buzhang lilin nuoyiya beier zhangtai* [Minister Jin Zhuanglong visited the Nokia Bell booth], CHINA COMMUNIC'NS NETWORK (Jun. 5, 2023), https://tinyurl.com/yy6t5xc3; *Gongxinbu zong gongchengshi zhaozhiguo huijian nuojiya jituan guanweihui chengyuan Federico* [Zhao Zhiguo,

### 4. DJI Does Not Reside In And Is Not Affiliated With A Military-Civil Fusion Enterprise Zone

DoD admits a number of errors in the Report's treatment of DJI's alleged residence in and affiliation with a military-civil fusion enterprise zone.  The Report's assertions regarding DJI's purported presence in a military-civil fusion zone consisted of two sentences:  "In 2019, DJI announced plans to build its Innovation Center and Global Technical Support Center in the Xi'an Economic and Technological Development Zone within five years. The new DJI headquarters, called the DJI Sky City Innovation Hub, has been open since September 2022."  AR 32.  The clear implication of those two sentences is that the new DJI headquarters is in the Xi'an Economic and Technological Development Zone.  Now, however, DoD admits that DJI's headquarters is in Shenzhen, as it always has been, more than 1,000 miles away from Xi'an.  Opp. 34.  That admission undermines the entire import of the Report's allegations regarding DJI's connection to the Xi'an Economic and Technological Development Zone or any geographic zone at all.  Because DJI's headquarters has never been anywhere in Xi'an, DoD is left with an alleged 2019 plan by DJI to build a center in the Xi'an Economic and Technological Development Zone.  That six-year old plan, with no evidence or claim that it was ever implemented, shows no present or even recent connection between DJI and the Xi'an Economic and Technological Development Zone.

Further, DoD now all but admits that the Report is incorrect in stating that the Xi'an Economic and Technological Development Zone is also known as the Xi'an High-Tech Industrial Development Zone.  Opp. 34.  While that admitted error is not strictly material because the Report makes no allegations that DJI has any presence in the Xi'an High Tech Zone, the error is yet another indicator of the Report's fundamental lack of the necessary analytical care and rigor.

---

Chief Engineer of MIIT, will meet with Federico], NOKIA BELL, (May 12, 2023), https://tinyurl.com/2p97cs4a.

The sum of those concessions is that the Report's section on the military-civil fusion zone is entirely unreliable and cannot support a conclusion that DJI resides in a military-civil fusion zone.  In response to this problem, DoD argues that the Xi'an High Tech Zone is also a military-civil fusion zone.  Opp. 34.  This assertion is irrelevant and incorrect.  It is irrelevant because the Report does not allege any connection between DJI and the Xi'an High Tech zone.  It is also incorrect because, as DJI set out in the complaint, the Xi'an High Tech zone is not a military-civil fusion zone.  Compl. ¶¶ 131–140.  The Xi'an High Tech Zone was established by the Xi'an municipal government in 1991 to promote the development of high-tech industries in the northwestern region of China.  *Xi'an Hi-Tech Industries Development Zone*, AMCHAM SHANGHAI, https://tinyurl.com/5bjx2uhh (last visited Apr. 17, 2025).  According to the American Chamber of Commerce in Shanghai, and other published reports,  the zone spans approximately 155 square kilometers and supports a wide range of commercial and non-profit projects, including malls, parks, residences, and elderly-care centers.  *Id.*; *Xi'an High-tech Zone signed projects at Silk Road expo*, CHINA DAILY (May 16, 2018), https://tinyurl.com/yc2yd3te.  Specifically, the zone is home to over 100 U.S. and international Fortune 500 companies, such as IBM (U.S.), Johnson & Johnson (U.S.), General Electric (U.S.), Applied Materials (U.S.), Micron (U.S.), Intel (U.S.), Sybase (U.S.), Vishay (U.S.), Infineon (Germany), Samsung (South Korea), NEC (Japan), and Fujitsu (Japan).[8]

---

[8]    *E.g.*, *Xi'an Hi-Tech Industries Development Zone*, AMCHAM SHANGHAI, https://tinyurl.com/5bjx2uhh (last visited Apr. 17, 2025); *Xian Gaoxin Jishu Chanye Kaifa Qu* [Xi'an High-tech Industrial Development Zone], SHANXISHENG DIFANGZHI BANGONGSHI [Shaanxi Province Local Office], https://tinyurl.com/4m6buvxw (last visited Oct. 17, 2024); *see also* Yingying Cao, *Applied Materials Supports Mega City's Growth*, China Daily, https://tinyurl.com/yb6j5nyy (last visited Apr. 1, 2025); Yuan Shenggao, *Xi'an high-tech zone fosters massive growth and employment*, CHINA DAILY (Jun. 4, 2023), https://tinyurl.com/39ff74sr.

Given its sheer size, the Xi'an High Tech Zone necessarily divides into subzones or clusters by industry, and DJI's subzone is not related to military-civil fusion in any respect.  Compl. Ex. C.  DJI is located in the National Service Outsourcing Demonstration Base in a software park, in Building G, Area 2, No. 34, Jinye 1st Road.  *See* BAIDU MAPS, *Jinye Yilu, 34 Hao Guojia Fuwu Waibao Shifan Jidi Erqu G Zuo* [Building G, Area 2, National Service Outsourcing Demonstration Base, No. 34, Jinye 1st Road], https://tinyurl.com/yc72ebzu (last visited Apr. 17, 2025).  The National Outsourcing Demonstration Base includes a number of Fortune 500 companies such as IBM (U.S.), Emerson (U.S.), SAP (Germany), NTT Data (Japan), and Fujitsu (Japan).  XIAN RUANJIANYUAN [Xi'an Software Park], *Lai Touzi* [Investment], *Yuanqu Jianjie* [Introduction to the Park],  https://tinyurl.com/2hnte2ck (last visited Apr. 17, 2025); *see also* Compl. Ex. D.  In addition, a number of other prominent U.S. and international companies—including, for example, HSBC,[9] Standard Chartered Bank,[10] Shell Oil,[11] TUV,[12] and Texas Instruments[13]—are DJI's neighbors, which further confirms that DJI is not located in any military-civil fusion zone.

Finally, DoD's allegation regarding Qujing are unavailing.  The Report does not assert any conduct by *DJI* regarding Qujing; it merely asserts that Qujing targeted DJI.  The public record

---

[9]  HUIFENG YINHANG [HSBC Bank], *Guanyu Huifeng Yinhang (Zhongguo) Youxian Gongsi Xian Xidajie Zhihang Qianzhi Ji Gengming Gonggao* [Announcement on the relocation and name change of Xi'an West Street Branch of HSBC Bank (China) Limited] (May 16, 2024), https://tinyurl.com/59bunpdf.

[10]  ZHADA YINHANG [Standard Chartered Bank], *Fenzhihang Chaxun* [Branch Inquiry], https://tinyurl.com/3nsw74s8 (last visited Apr. 17, 2025).

[11]  *Yanchang Qiaopai Shiyou Youxian Gongsi* [Yanchang Shell Petroleum Co., Ltd.], https://tinyurl.com/26atsbnm (last visited Apr. 1, 2025).

[12]  TÜV SÜD, *Xian Bangongshi* [Xi'an Office], https://tinyurl.com/8xzvx25e (last visited Apr. 17, 2025).

[13]  DEZHOU YIQI [Texas Instruments], *Zhongguoqu Lianxi Xinxi* [China contact information], https://tinyurl.com/4hr7aawy (last visited Apr. 17, 2025).

makes clear that DJI is not connected to Qujing.  *See* SZ DJI Technology Co., Ltd., Qichacha, https://tinyurl.com/5n8j4p9x (last visited Apr. 18, 2025) (attached as Ex. 11 for convenience).

Additionally, DoD's complaint that DJI does not cite record evidence on this issue is once more DoD's own fault for not providing DJI any opportunity to provide a complete record upon which DoD could have reached a reasonable determination.

## V.    VACATUR, NOT REMAND WITHOUT VACATUR, IS THE APPROPRIATE REMEDY

DoD urges the Court to remand without vacatur if it finds any legal deficiency, but the APA's plain text and well-established D.C. Circuit precedent confirm that the default remedy when agency action is unlawful is to vacate the action and remand to the agency.  *See* 5 U.S.C. § 706(2)(A) (instructing courts to "hold unlawful and set aside" agency actions found arbitrary and capricious or not in accordance with law); *United Steel v. Mine Safety & Health Admin*., 925 F.3d 1279, 1287 (D.C. Cir. 2019) ("The ordinary practice is to vacate unlawful agency action."). Remand without vacatur is reserved for narrow, exceptional circumstances—typically "where there is at least a serious possibility that the [agency] will be able to substantiate its decision given an opportunity to do so, and when vacating would be disruptive." *Haw. Longline Ass'n v. Nat'l Marine Fisheries Serv*., 288 F.Supp.2d 7, 12 (D.D.C. 2003) (quotations and citations omitted); *see also Allied–Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993) ("The decision to vacate depends on the seriousness of the ... deficiencies (and thus the extent of doubt whether the agency [decided] correctly) and the disruptive consequences of an interim change that may itself be changed." (quotations and citations omitted)).  As the D.C. Circuit has explained, "[t]here is a fine line between agency reasoning that is 'so crippled as to be unlawful' and action that is potentially lawful but insufficiently or inappropriately explained." *Radio–Television News Dirs. Ass'n v. FCC*, 184 F.3d 872, 872 (D.C. Cir. 1999).  "In the former

circumstance, the court's practice is to vacate the agency's [action], while in the latter the court frequently remands for further explanation ...." *Id.*

Neither factor supports withholding vacatur here. First, the flaws in DoD's action are serious and structural. The agency applied the wrong legal standard, failed to provide adequate process, did not meaningfully address DJI's evidence, and offered no reasoned basis for listing DJI as a CMC.  These are not minor explanatory gaps but fundamental defects that undermine both the legality and the fairness of the designation.  Because DoD's designation violates the APA and due process in multiple respects, simply remanding without setting aside the action would preserve an unlawful designation with immediate, ongoing consequences for DJI.

Moreover, there is no "serious possibility" that DoD will be able to substantiate its decision on remand—particularly because it has already had over two and a half years to hone its record, including having the benefit of DJI's comprehensive delisting petition submitted in July 2023. This is not a case where the agency acted in haste or lacked access to relevant information.  Instead, it is one where the agency had every opportunity to develop a lawful, evidence-based designation and simply failed to do so.

Second, vacatur would not cause the sort of disruption that warrants an exception to the default remedy.  As Defendants themselves acknowledge, they could promptly re-list DJI if they were able to cure the legal and procedural errors and provide an adequate factual basis under the correct statutory standard.  Indeed, removing DJI from the Section 1260H List during remand would merely restore the *status quo ante* while affording DoD an opportunity to address the Court's concerns.  By contrast, keeping DJI on the list—even though the designation is unlawful— prolongs the harm to DJI's reputation, business relationships, and prospective contracts.

DoD's speculation about the perils of removing DJI from the list cannot substitute for lawful procedure.  In fact, as discussed above, any legitimate supply-chain concerns were already addressed when DoD previously banned DJI's drones—meaning the CMC designation adds little, if anything, to national security.  Even in cases where national security is implicated, the Court must still ensure that agencies follow the law.  Allowing an unlawful designation to persist undermines the APA's core purpose of ensuring reasoned, lawful government action.

In short, both prongs of the vacatur analysis favor setting aside DoD's designation.  The flaws in DoD's action go to the heart of the agency's statutory and constitutional obligations, and vacatur would pose minimal disruption—especially since earlier bans already address any genuine supply-chain concerns. The Court should therefore vacate the designation.

## <u>CONCLUSION</u>

The Court should set aside DoD's listing of DJI as a CMC and compel DoD to delete DJI from the CMC list.

Dated:  April 18, 2025

QUINN EMANUEL URQUHART &
SULLIVAN, LLP

/s/   Samuel G. Williamson

Samuel G. Williamson (D.C. Bar No. 984748)
2601 South Bayshore Drive, Suite 1550
Miami, Florida 33133
samwilliamson@quinnemanuel.com
Tel.:  (305) 402-4880
Fax:  (305) 901-2975

Derek L. Shaffer (D.C. Bar No. 478775)
1300 I Street, Suite 900
Washington, DC 20005
derekshaffer@quinnemanuel.com
Tel.:  (202) 538-8000
Fax:  (202) 538-8100

Samuel P. Nitze (Registration No. 4859443)
Quinn Emanuel Urquhart & Sullivan, LLP
295 5th Avenue, 9th Floor
New York, New York 10016
Tel: (212) 849-7000

*Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 18, 2025, a true and correct copy of the foregoing was electronically filed and served via this Court's CM/ECF system upon any parties or counsel of record registered with the CM/ECF system.

/s/   Samuel G. Williamson
Samuel G. Williamson (Bar No. 984748)
samwilliamson@quinnemanuel.com